## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ALEX GRABCHESKI, | |
| Plaintiff, | |
| -against- | Civil Action No.: 10 Civ. 3902 |
| AMERICAN INTERNATIONAL GROUP, INC., | |
| Defendant. | |

### SECOND AMENDED COMPLAINT

Plaintiff United States of America ex rel. Alex Grabcheski states as follows for its second amended complaint.

### Preliminary Statement

1. This is a civil action under the False Claims Act, 31 U.S.C. §§ 3729 et seq. Qui tam relator Alex Grabcheski ("relator" or "Grabcheski"), acting on behalf of the United States, brings this action under 31 U.S.C. § 3730(b)(1) seeking recovery of treble damages for loss to the United States proximately resulting from knowing misrepresentations that were made by defendant American Insurance Group, Inc. ("AIG") in connection with the financial "bailout" of AIG by the United States.

2. As described in more detail below, AIG made misrepresentations relevant to the valuation of two of its subsidiaries in connection with the transfer to the Federal Reserve Bank of New York of preferred interests in those subsidiaries in return for a $25 billion reduction in the amount of the debt that AIG owed to the bank.

3.   As a proximate result of these knowing misrepresentations by AIG, the United States suffered damage in an amount to be determined at trial. Relator therefore seeks to recover on behalf of the United States treble damages of not less than that amount, as well as further relief as described below.

## Jurisdiction and Venue

4.   This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 & 1345 and under 31 U.S.C. § 3732(a). The action arises under 31 U.S.C. §§ 3729 & 3730, and relator brings suit on behalf of the United States under 31 U.S.C. § 3730(b)(1).

5.   The Court has personal jurisdiction over the defendant under 31 U.S.C. § 3732(a) because defendant AIG can be found in, and transacts business in, this district, and because service of process is authorized here under 31 U.S.C. § 3732(a).

6.   Venue is proper in this district under 31 U.S.C. § 3732(a) because defendant AIG can be found in, and transacts business in, this district. In addition, acts proscribed by the False Claims Act occurred in this district.

7.   Concurrently with the filing of his original complaint, and as required by 31 U.S.C. § 3730(b)(2), relator served the United States with a copy of the complaint and a written confidential and privileged statement of all known material evidence and information related to the complaint.

## Parties

8.   Relator is a citizen of the United States who resides in New Jersey. Until April 7, 2009, he was employed by AIG, most recently as a Worldwide Director of Human Resources and Operations for AIG's Group Management Division within the Global Life Companies.

9. Defendant AIG is an insurance corporation with its principal place of business in New York, N.Y.

## General Allegations

### I. Relator's employment by AIG

10. Relator joined AIG in 1996 as a temporary worker. Within a month, he was assigned to work for the vice president for human resources for the Global Life Companies.

11. Relator remained in that role, and assumed additional responsibilities, until 2007, when he was promoted to be Worldwide Director of Human Resources for the Group Management Division.

12. Relator's duties in this position included hiring and firing employees, moving executives to and from different locations, starting new offices, strategic planning, and growing the business in human capital.

13. As a result of his position as Worldwide Director of Human Resources, relator had an inside view of the senior management in the Global Life Companies, and AIG as a whole. He developed close contacts with a number of individuals throughout the company.

14. In March of 2009, the American Life Insurance Co., Inc.'s ("ALICO") management terminated relator from his position. The last day of his employment was April 7, 2009.

### II. The AIG bailout

15. From 2003 to approximately 2007, AIG earned billions of dollars selling credit-default swap derivatives (i.e., insurance policies) for the default risk on subprime mortgages sold in the United States.

3

16. On or about June 15, 2008, after disclosure of financial losses suffered by AIG and the resulting fall in AIG's stock price, AIG's CEO (Martin J. Sullivan) resigned. He was replaced by Robert B. Willumstad, who had been chairman of AIG's Board of Directors since 2006.

17. Subsequently, in September 2008, AIG suffered a spectacular liquidity crisis when its credit ratings were downgraded below "AA" levels after it became clear that it could not provide insurance coverage for the imploding subprime mortgage market.

18. The unit within AIG whose business activities had brought about this crisis about was the Financial Products Division. That division had entered into credit default swaps to insure $441 billion worth of securities originally rated AAA. Of those, $57.8 billion were structured-debt securities backed by subprime loans, all of which proved to be almost worthless. The Financial Products Division was later described (by the chairman of the Federal Reserve Bank) as a hedge fund attached to a large, stable insurance company.

19. Trying to avoid a total financial panic and collapse, on September 22, 2008, the Federal Reserve Bank created a two-year $85 billion credit- facility loan to enable AIG to meet increased collateral obligations consequent to the credit rating downgrade, in exchange for the issuance to the Federal Reserve Bank of stock warrants for 79.9% of AIG's equity.

20. In the face of these developments, the federal government forced Willumstad to step down from his position as AIG's CEO. On or about September 17, 2009, he was replaced by Edward M. Liddy.

21. Liddy immediately began to solicit additional government financial assistance to save his company from defaulting on its obligations, and from a possible involuntary liquidation and dissolution scenario.

4

22. In March 2009 the federal government had agreed to provide AIG additional bailout funds. That agreement was memorialized in a Securities Purchase Agreement dated as of April 17, 2009.

23. In that agreement, AIG agreed to issue in a private placement 300,000 shares of the Series F Fixed Rate Non-Cumulative Perpetual Preferred Stock and a warrant to purchase 3,000 shares of the its common stock, and the United States Treasury Department agreed to purchase those securities.

24. In exchange for these securities, the Treasury Department committed to provide AIG with funding of up to $29.835 billion.

### III. The misrepresentations regarding the valuation of AIA and ALICO

25. As described in greater detail below, at a time when AIG owed more than $60 billion to the Federal Reserve Bank of New York, AIG knowingly misrepresented facts relevant to the valuation of two of its subsidiaries in connection with agreements whereby interests in those subsidiaries would be transferred to the Bank in exchange for a $25 billion decrease in AIG's indebtedness.

### A. *The Federal Reserve Bank loan to AIG and the $25 billion reduction in the loan balance*

26. In response to the financial crisis beginning in 2008, the Federal Reserve Bank of New York ("FRBNY") provided AIG with a revolving credit facility of up to $60 billion for a five-year period.

27. In June 2009, AIG and FRBNY entered into agreements under which the outstanding balance due under that loan (which was then $60 billion) would be reduced by a total of $25 billion, in exchange for which FRBNY would receive preferred equity interests in newly-formed limited liability companies ("the LLCs") that would directly or indirectly hold 100% of the

common stock of two of AIG's wholly-owned subsidiaries: American International Assurance Limited ("AIA") and American Life Insurance Co., Inc. ("ALICO"). There was one agreement with respect to AIA and a separate agreement with respect to ALICO. (These two agreements are referred to collectively as "the Debt-Reduction Agreements" and are attached hereto as Exhibit 1.) Another AIG subsidiary—American International Reinsurance, Limited ("AIRCO")—was an additional party to the agreement involving AIA.

28. The Debt-Reduction Agreements provided in part as follows:

    a. With respect to the LLC to which the common stock of AIA was to be transferred, FRBNY would receive equity interests having a liquidation preference of $16 billion, and as consideration for that transfer, the outstanding balance due under the FRBNY loan would be reduced by the same amount.

    b. With respect to the LLC to which the common stock of ALICO was to be transferred, FRBNY would receive equity interests having a liquidation preference of $9 billion, and as consideration for that transfer, the outstanding balance due under the FRBNY loan would be reduced by the same amount.

29. Under each of the Debt-Reduction Agreements, the FRBNY's obligation to consummate the closing of the transaction was expressly conditioned on, among other things, the representations and warranties made by AIG and AIRCO being true and correct as of the date of the closing.

30. Those representations and warranties included the following:

    a. A representation and warranty that AIA, ALICO, and their respective subsidiaries have no liabilities or obligations "which are not properly reflected or reserved against in the Financial Statements to the extent required to be so reflected or

reserved against in accordance with the accounting standards or principles upon which they were prepared, except for (A) liabilities that have arisen since November 30, 2008 in the ordinary and usual course of business and consistent with past practice and (B) liabilities that, individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect."

b.  A representation and warranty that AIA, ALICO, and their respective subsidiaries "have all material permits, licenses, franchises, authorizations, orders and approvals of, and have made all material filings, applications and registrations with, Governmental Entities, that are required in order to permit them to own or lease their properties and assets and to carry on their business as presently conducted ('the Permits'), including all material licenses, certificates of authority, permits or other authorizations that are required to be obtained from any Governmental Entity in connection with the operation, ownership or transaction of insurance or reinsurance business."

c.  A representation and warranty that to AIG's knowledge, AIA, ALICO, and their respective subsidiaries have "complied in all respects and [are] not in default or violation of…any applicable Law, other than such noncompliance, defaults or violations that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect."

d.  A representation and warranty—

   i.  that AIA, ALICO, and their respective subsidiaries have "timely filed all federal income tax and all other material state, local and foreign income and franchise Tax returns ('Tax Returns') required to be filed through the

Signing Date, subject to permitted extensions, and has timely paid all Taxes shown as due on such returns";

ii. that all federal, state, local, and international tax returns filed by AIA, ALICO, and their respective subsidiaries "were true and complete in all material respects";

iii. that with exceptions not relevant here, "[t]he charges, accruals and reserves for Taxes with respect to [AIA, ALICO, and their respective subsidiaries] reflected on the books of such [entity]…are adequate to cover Tax liabilities accruing through the end of the last period for which each AIA Entity ordinarily record items on their respective books"; and

iv. that "all information set forth in the Financial Statements (including the notes thereto) relating to Tax matters is true and complete."

e. A representation and warranty that all "policy forms and rates in use by AIA, ALICO, or any of their subsidiary insurance companies, and all endorsements, applications and certificates pertaining thereto, as and where required by applicable Laws, have been either filed, approved, or filed and non-disapproved by all applicable Governmental Entities, subject to such exceptions that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect."

f. A representation and warranty that "[t]he reserves for payment of benefits, losses, claims and expenses under all Insurance Contracts of [AIA, ALICO, and their subsidiary insurance companies] as set forth in the most recent financial statements filed as of the Signing Date with the applicable regulatory authorities in the

primary jurisdictions of such entity and its material branches were determined in accordance with [the statutory accounting practices prescribed or permitted by the insurance commissioner (or other similar authority) in the domicile of such entity for the preparation of annual statements and other financial reports by insurance companies of the same type as such entity, which are applicable to the circumstances as of the date of filing of such statement or report.]"

g.  A representation and warranty—

   i.  that AIG had made available to the FRBNY "a true and complete copy of all appraisal valuation reports prepared by independent actuaries with respect to the business of each of [AIA, ALICO, and their subsidiary insurance companies] as at August 31, 2008, and all attachments, addenda, supplements and modifications thereto, including any roll-forward as of November 30, 2008 (the 'Actuarial Analyses')"; and

   ii.  that to AIG's knowledge, "any information and data furnished by [AIA, ALICO, and their subsidiary insurance companies] to independent actuaries in connection with the preparation of the Actuarial Analyses were accurate in all material respects[.]"

h.  A representation and warranty that "ALICO Historical Accounts" for 2006, 2007, and 2008, and "ALICO 2009 Accounts," and "Financial Statements," which are unaudited consolidated pro forma balance sheets, were "applied on a consistent basis and present fairly, in all material respects, the financial position and the results of operations of ALICO and its subsidiaries" and are "in accordance with GAAP."

31. AIG further agreed with FRBNY that those representations and warranties were a condition for closing the Agreements, were "true and correct," and had been satisfied prior to the closing of the Agreements by a "certificate signed on behalf of [AIG] by a senior executive certifying to the effect that the [representations and warranties] have been satisfied."

32. However, as explained in greater detail below, and as AIG (but not the FRBNY) knew at the time, each of the foregoing warranties and representations was materially false. As a result, the conditions for requiring the FRBNY to close on the debt-reduction transactions were not satisfied.

33. Because the FRBNY was not aware that the foregoing warranties and representations were false, it consummated the closing of the debt-reduction transactions.

34. Pursuant to the Debt-Reduction Agreements, (a) the transfers of the stock in AIA and ALICO to the LLCs occurred in November 2009, and (b) the transfers of the preferred equity interests to FRBNY occurred on or before December 1, 2009.

35. Upon the completion of those transfers, the outstanding balance due under the FRBNY loan was reduced by $25 billion.

36. Upon information and belief, the amounts of the liquidation preferences associated with the preferred equity interests that were transferred to FRBNY, and therefore of the corresponding reductions in the outstanding balance due under the FRBNY loan, were based on valuations that were prepared by (or based on information provide by) AIG, and the results of which were communicated to FRBNY.

37. AIG stated as follows in securities filings with the SEC:

    a.  that the preferred interests were measured at fair value as of December 1, 2009 (the date of issuance) which values were determined to be $24.4 billion;

b.  that the fair value of the preferred interests was determined using two valuation techniques, the results of which were evaluated and weighted, as appropriate, when considering the reasonableness of the indicated range of values;

c.  that the models included a discounted cash flow model that incorporated assumptions regarding the timing of estimated cash flows and an assessment of the appropriate discount rate, among others, and that the discount rates were determined using preferred stock return rates for companies comparable to AIA and ALICO, adjusted for characteristics specific to AIA and ALICO;

d.  that the timing of the estimated cash flows was determined based on management's assumptions, which AIG believed were representative of market-participant assumptions;  and

e.  that the valuation models also included an option pricing model that incorporated market-participant assumptions regarding the SPVs' enterprise value, expected term, volatility and the risk-free interest rate, among others.

38. The valuations were based on projections of future cash-flow, which were in turn based on historical cash flow.

39. In 2007, the revenue generated by GMD (defined in ¶ 55 below as the Multinational sales force within the U.S. for Group Management Division, where the relator worked) was approximately $229 million, of which approximately $10.3 million represented profit, of which 25% was allocable to AIA and 57% was allocable to ALICO.

40. In 2008, the revenue generated by GMD was approximately $263 million, of which approximately $14 million represented profit, of which 25% was allocable to AIA and 57% was allocable to ALICO.

41. Upon information and belief, the valuation's data on cash-flow for ALICO and AIA included revenue generated by GMD, including but not limited to GMD's 2007 and 2008 cash flow and/or management's estimation of GMD's future cash flow.

**B.   ALICO and AIA valuations of $25 billion based on AIG's false representations and warranties**

42. As described below, AIG's representations and warranties in the Debt-Reduction Agreements were materially false in multiple respects.

*1.   The undisclosed information about AIG's secret insurance business in the United States*

*a.   ALICO's status as a Delaware corporation and AIA's status in the U.S.*

43. At all relevant times, AIA was incorporated in Hong Kong.

44. At all relevant times, ALICO was incorporated in Delaware and had its principal place of business in New York.

45. Under both New York law and Delaware law, it was at all relevant times illegal to carry on an insurance business in the state without a license from the state's insurance regulatory agency.

46. At all relevant times, AIA and ALICO maintained that they did not do or transact any insurance business in New York or Delaware (or anywhere else in the United States). They maintained that all the insurance business that they did or transacted took place outside the United States.

47. Based on this position, (a) AIA and ALICO maintained that they were not subject to the regulatory requirements applicable to insurance companies that do or transact insurance business domestically, and (b) AIA and ALICO did not pay United States federal or state income

tax on income derived from what AIA and ALICO contended was their foreign insurance business.

48. Upon information and belief, ALICO sought and received special tax and regulatory protection by agreeing that it only wanted to open an administrative headquarters in Wilmington, Delaware and that it would conduct all of its operations (generating business, writing and delivering policies, underwriting, etc.) entirely overseas and not on U.S. soil. In other words, ALICO represented that it did not do anything in the way of operations in the U.S. other than having certain executives housed in its Wilmington and New York offices.

49. Because of ALICO's representations that it did not sell domestic insurance policies and/or did not sell insurance policies within the United States, insurance regulators in Delaware and New York did not during the relevant time period require ALICO to register and meet licensing requirements as an insurer.

50. AIA ostensibly had no presence in the United States.

51. At all relevant times, ALICO and AIA were not registered as insurers in any state in the U.S. and maintained publicly that they did not have to have to register as insurers in any state because they did not conduct insurance business anywhere in the U.S.

b.   *ALICO and AIA's secret insurance business*

52. As described below, AIA and ALICO's position that their insurance businesses were not subject to regulation or taxation in the United States was unfounded.

53. Despite AIA and ALICO's insistence that their respective insurance business was conducted entirely overseas, both AIA and ALICO at all relevant times conducted substantial domestic U.S. insurance business, such as underwriting, marketing, sales, and claims administration. They kept those activities a secret from state and federal regulators and taxing

authorities. As a result, ALICO and AIA were at all relevant times able to avoid their obligation to obey various legal requirements, including state registration and licensing requirements, state fees, insurance reserve requirements, and state and federal taxes on the income their U.S. operations generate.

54. At all relevant times, ALICO had several branch offices located throughout the U.S. that housed its undisclosed domestically-based sales force and other operational staff. The largest ALICO office in the U.S. was its office in Wilmington, Delaware, where ALICO actively engaged in part of its U.S.-based operations. ALICO's second-largest U.S. office was located in New York City, as was the office of its sales group.

55. ALICO's sales group located in New York City was internally called "Group Management Division, Multinational Sales Unit," ("GMD"), which sold group insurance products and services for AIG "life companies"—mostly for ALICO and AIA, and the rest for Unibanco, NanShan Insurance Co. LTD ("NanShan"), the Philippine American Life and General Insurance Co ("PHILAM Life")—companies which were located all over the world.

56. GMD's group products sold for those companies included life, disability, medical, pension, and "expat," "foreign ministry," and "TCN" insurance products.  GMD's services sold for those companies included multinational "pooling," "captive," and "credit."

57. A percentage of GMD's costs were paid by ALICO, AIA, Unibanco, NanShan, and PHILAM Life in proportion to the revenue GMD generated for those companies.

58. GMD was never a separate legal entity.

59. The New York office was a major sales hub for GMD.  GMD staff in New York held weekly meetings, and the sales force conducted regular national sales meetings in New York.

GMD employees throughout the U.S. would fly in at least once a year for these national sales meetings.

60. The New York sales force, consisting of eight to nine individuals, made regular marketing and sales calls and visits to New York customers in Manhattan and White Plains, New York, including Citibank and Deutsche Post (over $80 million in annual sales), GE, Marriott, Johnson & Johnson, Tyco, Coca Cola, DuPont, PepsiCo, Abbott, Cemex, DHL, IBM, and Merck.

61. In some instances, for example, the New York sales force would negotiate in New York with certain customers' home offices, agree on global prices for policies to take effect overseas, and then deliver each policy overseas in order to argue that the business really occurred overseas. But in reality, the business was originated in the New York office, details of the business were negotiated in the New York office, policies were written and contracts signed in the New York office, and/or underwriting of the policies occurred in the U.S.

62. GMD also conducted domestic insurance business, and marketed and executed sales, in offices in other cities in the U.S., such as Chicago, San Francisco, Denver, and Miami. As in New York, ALICO and AIA sold through its local sales team certain group health and benefit plans (e.g., employee insurance, credit, pension, health, life, and disability packages) that would cover overseas risk and, at times, even domestic risk.

63. ALICO performed domestic underwriting for those policies out of its Wilmington office.

64. At all relevant times, GMD was never licensed in any U.S. state to sell insurance, and no one in the GMD sales force was individually licensed to sell insurance in any U.S. state.

65. All of the aforementioned GMD insurance marketing and sales activity constituted unlicensed and illegal domestic insurance activity.

*c.  ALICO management's questioning of the secret insurance business*

66. At some point, ALICO management became concerned about whether it was "transacting insurance" in Delaware and New York.

67. In early and mid 2007, Gustavo Covacevich, who was President of GMD and an ALICO vice-president, and GMD sales personnel James Peiffer and James Long, were also concerned that GMD's domestic sales for ALICO would jeopardize ALICO's tax and regulatory exemptions.

68. In August of 2007 in an internal memo titled "International Group Management Migration to American General LLC"  prepared by GMD management, ALICO management was concerned about the fact that GMD employees in the U.S. that were performing services for ALICO were involved in "group underwriting for employee benefits and credit, group policy issuance, group claims adjudication, group product development, group accounting, group reinsurance administration, group and credit reserve valuations…calculations for group employee benefits and credit, group marketing and sales, pension customer service and claims administration, as well as group systems administration and support."

69.  In that same memo, ALICO management also stated its concern that "[t]hese services are performed on behalf of domestic life companies as well as ALICO" and that, "to the extent these activities are performed in Wilmington by ALICO (or by GMD on behalf of ALICO), they potentially may be deemed to constitute 'transacting insurance' in Delaware by ALICO[,]" and were, therefore, illegal.

70.  GMD did in fact perform these services on behalf of ALICO (despite any internal corporate switch of the "employing" entity on the books) and thus constituted transacting business in the U.S. and subjected the company to state regulations, licensing requirements, and fees.

71.  In or around 2008, certain senior executives of ALICO, such as Joyce Phillips (who was later fired), voiced concerns about ALICO doing anything in the U.S. except for having certain executives housed in its Wilmington office, as it had promised Delaware regulators was the case.

*d.    The deception of government regulators*

72.  Despite the management concerns described above, AIG and ALICO engaged in a number of practices to mislead regulators, all of which was done with AIG's knowledge and consent.

73.  ALICO falsely held out the occupants of the New York office as being the entity called "Group Management Division" and not ALICO.

74. Instead of seeking to obtain licenses to sell insurance or stopping the marketing and sale of insurance, in the latter part of 2007 GMD and ALICO management decided to conceal GMD sales personnel in another AIG company and to continue the unlicensed secret insurance work.

75. Specifically, in late 2007 and early 2008, ALICO transferred the GMD sales force from ALICO's payroll to the payroll of a domestic licensed insurer owned by AIG called American General Life Insurance Co., ("American General"), which was located in Texas even though none of the employees ever reported to any supervisors at American General, none were listed as employees at American General, and none did any work for American General.

76. After this transfer, GMD sales personnel sold TCN, expat, and foreign ministry policies purportedly generated from American General, i.e., on American General "paper," and continued selling ALICO and AIA group policies.

77. Shortly after this transfer, Christopher Swift, CEO of American General, sought to move GMD employees from American General back to ALICO because they were not doing any work for American General. Swift was told by GMD management it was not possible because ALICO was not licensed to do insurance work within the United States and moving the employees would therefore jeopardize ALICO's tax exemption. Swift stated he understood and agreed to keep GMD employees on the American General payroll.

78. Contemporaneous with this move, Covacevich resigned his official ALICO title of vice president. Legal documents were falsely titled under the "American General" name. Despite these purported changes, Covacevich's corporate responsibilities never changed, nor did the nature of his work.

79. After this move, all U.S. GMD employees continued to report to Covacevich and the sales force continued to sell ALICO and AIA group insurance products to U.S. companies within the United States, including New York City, Denver, San Francisco, Chicago, and Charlotte.

80. When, in 2008, AIG management decided to sell ALICO, it wanted to ensure that all of the employees supporting ALICO's operations in the U.S. would continue to do so without alerting regulators to GMD's unlicensed secret domestic insurance sales.

81. In October of 2008, ALICO and GMD management (including ALICO president Rod Martin and Covacevich) conceived of a plan to move GMD sales personnel from American General to a different licensed insurance company that could be sold along with ALICO.

82. In particular, the plan was to move GMD sales employees from American General to a subsidiary of an entity named Delaware American Life Insurance Company ("DELAM"). DELAM was a Delaware registered holding company and was itself a subsidiary of AIG; it had

no employees. After the GMD sales employees were moved to the DELAM subsidiary, ALICO would purchase DELAM.

83. Under this plan, the employees' responsibilities would remain the same: to support ALICO's operations in the U.S. As before, the identity of these employees' true employer (ALICO) would continue to be masked from state and federal regulators by embedding them in ALICO's subsidiary but having them continue their role supporting ALICO's operations in the U.S., including marketing, selling, and underwriting insurance policies.

84. The plan to transfer GMD sales personnel to a subsidiary of DELAM was carried out. In particular, the employees were transferred to a DELAM Global Benefits Network, LLC ("GBN").

e.   *ALICO's request for regulatory guidance and its disregard for the guidance that was obtained.*

85. Upon information and belief, on July 21, 2009, ALICO sent a letter to the New York State Insurance Department's Office of General Counsel ("NY Insurance GC") asking for regulatory guidance based on the fact that, on July 15, 2009, AIG was going to hold a public offering of ALICO stock on the New York Stock Exchange.

86. AIG represented to the NY Insurance GC that ALICO housed administrators in New York, but did not disclose GMD's robust marketing and selling of insurance policies.

87. The NY Insurance GC asked AIG to provide more definite facts, stating that the facts provided by AIG were too vague for her to provide a definitive opinion.

88. AIG did not provide any additional facts.

89. Based on the facts presented, on November 23, 2009, the NY Insurance GC issued an opinion stating that if ALICO's presence in New York was only administrative or ministerial

functions, that it was lawful activity, but that if ALICO was marketing or selling insurance, such activity was strictly prohibited.

90. On information and belief, AIG was concerned about ALICO's secret insurance business through GMD, or it would not have asked for the opinion.

91. Despite the NY Insurance GC's opinion stating that the marketing and selling of insurance by ALICO in New York was prohibited, GMD went ahead and continued marketing and selling insurance.

*f.*   *The falsity of the representations and warranties in the Debt-Reduction Agreements*

92.  Upon information and belief, as a result of the secret U.S. insurance business conducted by AIA and ALICO, the representations and warranties made by AIG in the Debt-Reduction Agreements were false in at least the following respects:

    a.   Contrary to the representations and warranties in the Debt-Reduction Agreements, not all liabilities and obligations of AIA and ALICO were reflected or reserved against in those entities' financial statements. As a result of their unlicensed domestic insurance business and their failure to pay federal and state income taxes on income derived from that business, both AIA and ALICO faced a substantial and material risk of criminal, civil, and administrative liability. That liability was neither reflected nor reserved against on those entities' financial statements.

    b.   Contrary to the representations and warranties in the Debt-Reduction Agreements, neither AIA nor ALICO had "all material permits, licenses, franchises, authorizations, orders and approvals of governmental entities that were required in order to permit them to carry on their businesses as then conducted[.]" Moreover, and contrary to the representations and warranties in the Debt-Reduction Agreements,

they had not "made all material filings, applications, and registrations with governmental entities that were required in order to permit them to carry on their businesses as then conducted[.]"

c.  Contrary to the representations and warranties in the Debt-Reduction Agreements, AIA and ALICO had not complied with all applicable laws, but were instead in default and/or violation of applicable state insurance laws, such that the non-compliance, defaults, and violations (both individually and in the aggregate) would reasonably be expected to have a material adverse effect as defined in the Debt-Reduction Agreements.

d.  Contrary to the representations and warranties in the Debt-Reduction Agreements, AIA and ALICO, and their respective subsidiaries—

　i.  the tax returns that had been filed by AIA and ALICO were not "true and complete in all material respects" because they did not report the income attributable to the undisclosed domestic insurance operations;

　ii.  the "charges, accruals and reserves for Taxes with respect to [AIA, ALICO, and their respective subsidiaries] reflected on the books of such [entity]" were not "adequate to cover tax liabilities accruing through the end of the last period for which each AIA Entity ordinarily records items on their respective books" in that they did not account for the tax liability resulting from the income attributable to the undisclosed domestic insurance operations, or for the interest and penalties with respect to the failure to report or pay tax on that income; and

iii.  The information set forth in AIA and ALICO's financial statements relating to tax matters was not true and complete, in that the financial statements failed to disclose any information regarding the tax liability resulting from the undisclosed domestic insurance operations;

e.  Contrary to the representations and warranties in the Debt-Reduction Agreements, all "policy forms and rates in use by [AIA, ALICO, and their subsidiary insurance companies], and all endorsements, applications and certificates pertaining thereto, as and where required by applicable Laws," had neither been filed with, nor approved by, nor filed with and non-disapproved by, any applicable U.S. governmental entities.

f.  Contrary to the representations and warranties in the Debt-Reduction Agreements, "[t]he reserves for payment of benefits, losses, claims and expenses under all Insurance Contracts of [ AIA, ALICO, and their subsidiary insurance companies] as set forth in the most recent financial statements filed as of the Signing Date with the applicable regulatory authorities in the primary jurisdictions of such entity and its material branches" were not determined in accordance with statutory accounting practices required or permitted by the insurance regulatory authority in the jurisdiction where the company was domiciled.

g.  Contrary to the representations and warranties in the Debt-Reduction Agreements, the information and data furnished by AIA, ALICO, and their subsidiary insur-ance companies to independent actuaries in connection with the preparation of the Actuarial Analyses provided to the FRBNY were not accurate "in all material respects," in that the actuaries were not informed that the insurance business

22

carried on by AIA and by ALICO was, in substantial part, illegal because it constituted unlicensed domestic insurance business. The actuaries were therefore unable to take account of the resulting risks to AIA and ALICO's ability to continue carrying on that business.

h.   Contrary to the representations and warranties in the Debt-Reduction Agreements, the information and data furnished by AIA, ALICO, and their subsidiary insurance companies concerning "ALICO Historical Accounts" and "AIA Historical Accounts" for 2006, 2007, and 2008, and "ALICO 2009 Accounts," and "Financial Statements" were not "applied on a consistent basis" and/or did not "present fairly, in all material respects, the financial position and the results of operations of [AIA and ALICO] and its subsidiaries[,]" and/or were not "in accordance with GAAP," based on the fact that AIG did not disclose the fact such documentation included its illegal domestic insurance business, which would have materially affected the FRBNY's assessment of AIA and ALICO's "financial position" and its resulting valuations based on the fact that AIA and ALICO's illegal domestic insurance business would have had to immediately cease its operations.

93.   Upon information and belief, AIG knew when it executed the Debt-Reduction Agreements that its representations and warranties were false in at least the foregoing respects.

94. Upon information and belief, as a result of the concealment of AIA and ALICO's domestic insurance business and the falsity in AIG's representations and warranties, the valuations of AIA and ALICO that AIG provided to the FRBNY were substantially and materially overstated, in at least the following respects:

a. The valuations did not take account of the potential criminal, civil, administrative, and tax liability that AIA and ALICO faced as a result of their undisclosed domestic insurance operations.

b. The valuations used historical operating data as a basis for projecting future revenue, but did not take account of the fact that AIA and ALICO had been operating in violation of law and that as a result their ability to conduct business at comparable levels in the future could be jeopardized.

95. On information and belief, the valuations inappropriately included the value of AIA and ALICO's undisclosed domestic insurance business.  That value should not have been included in the overall valuation of $24.4 billion, because it was based on activity that was illegal.

96. On information and belief, had AIG not improperly inflated these valuations, ALICO and AIA's valuations would have been at least $100 million less because GMD's past and estimated cash flows would have been omitted from the valuation analysis and the potential liabilities associated with the illegal business would have been included.

97. Because the representations and warranties by AIG were false, the conditions precedent to the FRBNY's obligation to consummate the closing under the Debt-Reduction Agreements were not satisfied.

98.  The FRBNY was not aware that the representations and warranties by AIG in the Debt-Reduction Agreements were false.

99.  Thus, as a proximate result of AIG's knowingly false representations and warranties, AIG was able to obtain a substantially larger reduction in the amount of its debt to the FRBNY than it could otherwise have obtained.

24

## C.  Government Enforcement Action

100. The New York Department of Financial Services has since 2012 been investigating AIG regarding the secret insurance business that was illegally conducted in New York by ALICO. It is contemplating pursuing civil claims against AIG, among others, with regard to that activity.

101. The New York County District Attorney's Office is conducting a criminal probe into AIG and other entities with regard to the illegal secret business that was conducted in New York through GMD.

102. The investigations described in ¶¶100-101, above, were initiated based on disclosures by the relator.

## D.  No Public Disclosure of Allegations

103. Prior to the filing of the original complaint or the First or Second Amended Complaints, there has never been a public disclosure of the falsity of AIG's representations and warranties of the Debt-Reduction Agreement.

104. Assuming there was such a public disclosure, the relator was the original source of the allegations in this complaint.

**Count I**
**False Claims Act**
**(AIG's Misrepresentations Regarding AIA)**

105. As is more fully described in ¶¶ 1–104, above, which are incorporated here by reference, AIG knowingly and intentionally made materially false statements to the FRBNY, intending that FRBNY would rely on those statements. FRBNY did in fact reasonably rely on those false statements, and as a result AIG was able to avoid a lawful debt to the federal government.

106. The conduct by AIG that is described in ¶¶ 1–104 above, violates 31 U.S.C. § 3729(a)(7).

WHEREFORE, Relator Alex Grabcheski, on behalf of the United States of America, demands judgment against AIG as follows:

   a.  Damages in the amount of three times the loss sustained by the United States of America on account of AIG's violations of the False Claims Act.

   b.  A civil penalty pursuant to 31 U.S.C. § 3729 of not less than $5,000 and not more than $10,000.

   c.  Prejudgment interest.

   d.  Costs, including reasonable attorney's fees.

Relator Alex Grabcheski further prays, on his own behalf, that he be awarded a portion of the proceeds of this action, as provided by 31 U.S.C. § 3730(d), together with his costs, including reasonable attorney's fees.

Relator Alex Grabcheski, on behalf of the United States of American and on his own behalf, further prays that the Court grant such other and further relief as it deems to be warranted.

### Count II
### False Claims Act
### (AIG's Misrepresentations Regarding ALICO)

107. As is more fully described in ¶¶ 1–104, above, which are incorporated here by reference, AIG knowingly and intentionally made materially false statements to the FRBNY, intending that FRBNY would rely on those statements. FRBNY did in fact reasonably rely on those false statements, and as a result AIG was able to avoid a lawful debt to the federal government.

108. The conduct by AIG that is described in ¶¶ 1–104, above, violates 31 U.S.C. § 3729(a)(7).

WHEREFORE, Relator Alex Grabcheski, on behalf of the United States of America, demands judgment against AIG as follows:

   a.  Damages in the amount of three times the loss sustained by the United States of America on account of AIG's violations of the False Claims Act.

   b.  A civil penalty pursuant to 31 U.S.C. § 3729 of not less than $5,000 and not more than $10,000.

   c.  Prejudgment interest.

   d.  Costs, including reasonable attorney's fees.

Relator Alex Grabcheski further prays, on his own behalf, that he be awarded a portion of the proceeds of this action, as provided by 31 U.S.C. § 3730(d), together with his costs, including reasonable attorney's fees.

Relator Alex Grabcheski, on behalf of the United States of American and on his own behalf, further prays that the Court grant such other and further relief as it deems to be warranted.

Dated:  May 12, 2014
        New York, New York

Respectfully submitted,

_____
Regina Alter
Butzel Long, P.C.
230 Park Avenue, Suite 850
New York, N.Y. 10169
Phone: (212) 818-1110
Fax: (212) 818-0494
alter@butzel.com

27

Thomas Patton
Max Maccoby*
Butzel Long, P.C.
1747 Pennsylvania Ave., N.W., 3rd Floor
Washington, D.C. 20006
Phone: (202) 454-2800
Fax: (202) 454-2805
pattont@butzel.com
maccoby@butzel.com
*Petition for admission *pro hac vice* to be filed.

*Counsel for Plaintiff/Relator*

## Jury Demand

Plaintiff/Relator Alex Grabcheski, on behalf of the United States of America and on his own behalf, demands trial by jury of all issues so triable as of right.

Regina Alter