**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ALEX GRABCHESKI,<br><br>               Plaintiff,<br><br>    v.<br><br>AMERICAN INTERNATIONAL GROUP, INC.,<br><br>               Defendant. | Case No.:  10-cv-3902 (GBD) |

---

## MEMORANDUM IN SUPPORT OF
## <u>DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT</u>

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Michael B. Carlinsky
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
michaelcarlinsky@quinnemaunel.com

William A. Burck
Lori Alvino McGill
777 6th Street, 11th Floor
Washington, D.C. 20001
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
williamburck@quinnemanuel.com
lorialvinomcgill@quinnemanuel.com

*Attorneys for Defendant American*
*International Group, Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................2

    **A.**    The Parties ........................................................................................2

    **B.**    The Debt Repurchase Agreements.............................................................4

    **C.**    The Alleged "Secret" and "Illegal" Insurance Scheme ...........................6

    **D.**    The Dispositions of ALICO and AIA ....................................................8

ARGUMENT ....................................................................................................8

I.    THE SECOND AMENDED COMPLAINT FAILS ADEQUATELY TO PLEAD
    A CLAIM UNDER THE FALSE CLAIMS ACT ................................................9

    **A.**    The Complaint Fails To Plead A False Statement With Particularity .................10

    **B.**    The Complaint Fails To Plead That AIG Acted Knowingly ................................14

II.    IN ANY EVENT, THE PUBLIC DISCLOSURE BAR IN 31 U.S.C.
    § 3730(e)(4)(A) INDEPENDENTLY COMPELS DISMISSAL ....................................17

    **A.**    The Key Elements Of The Fraud Alleged In The Complaint Were Publicly
    Disclosed Before Relator Filed This Suit ...............................................19

        1.    "Secret" Marketing Activities Were Publicly Disclosed In The
        News Media ..............................................................................20

        2.    The Alleged "Underwriting" Activities Were Publicly Disclosed In
        Administrative Reports ...............................................................21

    **B.**    The "Key" Allegations In The Complaint Are Substantially Similar To
    Information Already In The Public Domain...............................................22

    **C.**    Relator Was Not An "Original Source"....................................................23

III.    DISMISSAL WITH PREJUDICE IS APPROPRIATE ....................................................24

CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...................................................................................9, 12, 16

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...........................................................................................9, 11

*Gold v. Morrison-Knudsen Co.,*
    68 F.3d 1475 (2d Cir. 1995) ....................................................................................9

*Graham Cnty. Soil & Water Conserv. Dist. v. U.S. ex rel. Wilson,*
    559 U.S. 280 (2010) .................................................................................................22

*Hayes v. Dep't of Educ. of N.Y.,*
    __ F. Supp. 3d __, 2014 WL 2048196 (S.D.N.Y. May 16, 2014) .......................10

*L-7 Designs, Inc. v. Old Navy, LLC,*
    647 F.3d 419 (2d Cir. 2011) ....................................................................................9

*Mikes v. Straus,*
    274 F.3d 687 (2d. Cir. 2001) ..................................................................................11

*Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.,*
    966 F. Supp. 2d 282 (S.D.N.Y. 2013) ...................................................9, 10, 11, 21

*Shields v. Citytrust Bancorp, Inc.,*
    25 F.3d 1124 (2d Cir. 1994) ..................................................................................11

*Thulin v. Shopko Stores Operating Co.,*
    2013 WL 5946503 (W.D. Wis. Nov. 5, 2013) .................................................13, 14

*U.S. ex rel. Anti-Discrimination Ctr. Metro. N.Y., Inc. v. Westchester Cnty.,*
    668 F. Supp. 2d 548 (S.D.N.Y. 2009) ..................................................................17

*U.S. ex rel. Blundell v. Dialysis Clinic,*
    2011 WL 167246 (N.D.N.Y. Jan. 19, 2011) ....................................................18, 19

*U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.,*
    637 F.3d 1047 (9th Cir. 2011) ...............................................................................10

*U.S. ex rel. Colucci v. Beth Israel Med. Ctr.,*
    785 F. Supp. 2d 303 (S.D.N.Y. 2011), *aff'd,* 531 F. App'x 118 (2d Cir. 2013)................12, 13

*U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.,*
    2014 WL 4375638 (E.D. Pa. Sept. 4, 2014) ........................................................18

*U.S. ex rel. DeCarlo v. Kiewit/AFC Enterprises, Inc.,*
    937 F. Supp. 1039 (S.D.N.Y. 1996).......................................................................17

*U.S. ex rel. Doe v. John Doe Corp.*,
   960 F.2d 318 (2d Cir. 1992)...................................................................................18, 22

*U.S. ex rel. Doe v. Taconic Hills Cent. Sch. Dist.*,
   8 F. Supp. 3d 339 (S.D.N.Y. 2014) ...........................................................................9, 11

*U.S. ex rel. Ellsworth v. United Bus. Brokers of Utah, LLC*,
   2011 WL 1871225 (D. Utah May 16, 2011)....................................................................12

*U.S. ex rel. Findley v. FPC-Boron Empls.' Club*,
   105 F.3d 675 (D.C. Cir. 1987)........................................................................................23

*U.S. ex rel. Fowler v. Caremark RX, LLC*,
   496 F.3d 730 (7th Cir. 2007), *overruled on other grounds by Glaser v. Wound Care*
   *Consultants, Inc.*, 477 F.3d 502 (7th Cir. 2007) ............................................................15

*U.S. ex rel. Fox Rx, Inc. v. Dr. Reddy's Inc.*,
   2014 WL 6750786 (S.D.N.Y. Dec. 1, 2014) .................................................................9, 10

*U.S. ex rel. Green v. Serv. Contract Educ. & Training Trust Fund*,
   843 F. Supp. 2d 20 (D.D.C. 2012)..................................................................................21

*U.S. ex rel. Hixson v. Health Management Sys. Inc.*,
   613 F.3d 1186 (8th Cir. 2010) ........................................................................................13

*U.S. ex rel. Kester v. Novartis Pharm. Corp.*,
   __ F. Supp. 3d __, 2014 WL 4370597 (S.D.N.Y. Sept. 3, 2014) ...........................................23

*U.S. ex rel. Kirk v. Schindler Elevator Corp.*,
   601 F.3d 94 (2d Cir. 2010), *rev'd on other grounds*, 131 S. Ct. 1885 (2011) ........................18

*U.S. ex rel. Kirk v. Schindler Elevator Corp.*,
   437 F. App'x 13 (2d Cir. 2011) ...................................................................................19, 23

*U.S. ex rel. Kneepkins v. Gambro Healthcare, Inc.*,
   115 F. Supp. 2d 35 (D. Mass. 2000) ...............................................................................16

*U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
   985 F.2d 1148 (2d Cir. 1993)...........................................................................................19

*U.S. ex rel. Lamers v. City of Green Bay*,
   168 F.3d 1013 (7th Cir. 1999) ........................................................................................13

*U.S. ex rel. May v. Purdue Pharma L.P.*,
   737 F.3d 908 (4th Cir. 2013) ........................................................................................18

*U.S. ex rel. Monaghan v. N.Y.C. Dep't of Housing, Pres. & Dev.*,
   2012 WL 4017338 (S.D.N.Y. Sept. 10, 2012), *aff'd* 531 F. App'x 127 (2d Cir. 2013).....19, 24

*U.S. ex rel. Pervez v. Beth Israel Medical Center*,
   736 F. Supp. 2d 804 (S.D.N.Y. 2010).............................................................................16

*U.S. ex. rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.*,
   690 F.3d 951 (8th Cir. 2012) .........................................................................................13

*U.S. ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.*,
  739 F. Supp. 2d 396 (S.D.N.Y. 2010) .................................................18, 24

*U.S. ex rel. Smith v. N.Y. Presb. Hosp.*,
  2007 WL 2142312 (S.D.N.Y. July 18, 2007) ......................................10, 25

*U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*,
  14 F.3d 645 (D.C. Cir. 1990) ......................................................................23

*U.S. ex rel. Streck v. Allergan, Inc.*,
  894 F. Supp. 2d 584 (E.D. Pa. 2012) .........................................................13

*U.S. ex rel. Taylor v. Gabelli*,
  345 F. Supp. 2d 313 (S.D.N.Y. 2004) .........................................................12

*U.S. ex rel. Thomas v. Siemens AG*,
  708 F. Supp. 2d 505 (E.D. Pa. Apr. 23, 2010) ...........................................16

*U.S. ex rel. Veltz v. Allegany Rehab. Assocs., Inc.*,
  2011 WL 1042194 (W.D.N.Y. 2011) ...........................................................24

*U.S. ex rel. Williams v. Bell Helicopter Textron Inc.*,
  417 F.3d 450 (5th Cir. 2005) .......................................................................17

*U.S. ex rel. Williams v. Renal Care Grp., Inc.*,
  696 F.3d 518 (6th Cir. 2012) .......................................................................13

*U.S. v. Bollinger Shipyards, Inc.*,
  979 F. Supp. 2d 721 (E.D. La. 2013) ..........................................................17

*United States v. Mallas*,
  762 F.2d 361 (4th Cir. 1985) .......................................................................13

*United States v. Pirro*,
  212 F.3d 86 (2d Cir. 2000) ...........................................................................13

*Wood el rel. U.S. v. Applied Research Assocs., Inc.*,
  328 F. App'x 744 (2d Cir. 2009) ...............................................................9, 10

## Statutes and Rules

31 U.S.C. § 3729 ..............................................................................2, 8, 9, 14

31 U.S.C. § 3730 ...................................................................................... passim

Federal Rule of Civil Procedure 9 ............................................................ passim

Federal Rule of Civil Procedure 12 ...................................................................9

Defendant American International Group, Inc. ("AIG") respectfully submits this memorandum of law in support of its motion to dismiss with prejudice the Second Amended Complaint ("Complaint") of Relator Alex Grabcheski ("Relator").

## PRELIMINARY STATEMENT

This is a *qui tam* suit under the False Claims Act ("FCA"), to which the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies.  Rule 9(b) requires that a complaint plead with particularity the alleged false statement.   But the Second Amended Complaint here contains only vague generalities and bare legal conclusions, falling far short of what is required under that standard.   Indeed, the Complaint fails even to allege a plausible claim for relief.  The Complaint simply declares that former AIG subsidiaries American Life Insurance Company ("ALICO") and American Insurance Assurance Limited ("AIA") were conducting an "illegal," "secret" insurance business in the United States, but fails to identify with any specificity the allegedly unlawful conduct, or what laws were allegedly violated.  Based on this unsupported premise of illegal activity, the Complaint alleges that statements to the effect that ALICO and AIA were in full compliance with the law, made by AIG in debt reduction agreements ("DRAs") with the Federal Reserve Bank of New York ("FRBNY"), were "false statements."

Even assuming that the Complaint had adequately pled that ALICO and AIA were conducting illegal insurance activities in the United States, it contains no allegations to support its threadbare allegation that AIG *knew* that its former subsidiaries were conducting an illegal insurance business, and *knowingly* made false representations and warranties to the contrary in the DRAs.  Despite repeated promises to explain AIG's knowledge of falsity and intent "in greater detail below," the Complaint contains nothing more than general allegations based on "information and belief."   The Federal Rules of Civil Procedure demand far more than such naked, conclusory allegations of fraud.   Given such paltry support for the Complaint's allegations, it is little surprise that the Department of Justice declined to intervene in this action.

In any event, Relator's suit is precluded by the FCA's public disclosure bar. *See* 31 U.S.C. § 3730(e)(4)(A) (2006). The Complaint seeks to support its claims of illegality by relying on allegations that insurance marketing activities by or on behalf of ALICO and AIA occurred in New York, and that ALICO conducted underwriting activities in Wilmington, Delaware. But these allegations were publicly disclosed in the news media and in administrative reports before the June 2009 execution of the DRAs and Relator's May 2010 commencement of this action. Any supplemental information that Relator may claim to have provided in the Complaint is substantially similar to these public disclosures, and such information is—by Relator's own admission—based on purported second-hand knowledge he claims to have uncovered during his employment, which ended months before the alleged false statements were made. Relator's claims are therefore barred.

The Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS

Relator filed this action against AIG on May 12, 2010, *see* Dkt. No. 1, under the *qui tam* provisions of the FCA, 31 U.S.C. § 3729, *et seq.* Four years later, on May 9, 2014, Relator filed the Second Amended Complaint. *See* Dkt. No. 16. The United States has already given formal notice that it has declined to intervene in this suit. *See* Dkt. No. 15 (Notice of Election to Decline Intervention filed by the United States of America).

### A.   The Parties

At the time of the DRAs, Defendant AIG was one of the world's largest insurance organizations, serving customers in more than 130 countries. AIG companies served commercial, institutional, and individual customers through one of the most extensive worldwide property-casualty networks of any insurer. In addition, AIG companies were leading providers of life insurance and retirement services in the United States. Until 2010, ALICO and AIA were wholly owned subsidiaries of AIG that wrote foreign life insurance (*i.e.*, exclusively covering foreign risks) in more than 50 countries—but not the United States.

2

ALICO is incorporated under the laws of the State of Delaware, and during the relevant time period its principal office was located in Wilmington, Delaware.  ALICO was a wholly-owned subsidiary of AIG until it was sold to MetLife on November 1, 2010.  ALICO did not have a license to conduct insurance operations in New York, but, contrary to Relator's allegation in the Complaint, ALICO did have a Delaware insurance license.  *Compare* Compl. ¶ 51 ("At all relevant times, ALICO and AIA were not registered as insurers in any state in the U.S. . . .") *with, e.g.*, Del. Ins. Dep't Report On Exam. of ALICO at 5 (Dec. 31, 2004) (ALICO's "Certificate of Authority from the Delaware Insurance Department authorizes [ALICO] to transact the following types of insurance . . . .") *and* Del. Ins. Dep't Report on Examination of the Am. Life Ins. Co. at 13–14 (Dec. 31, 2007) ("The following is a schedule of countries in which the Company was licensed to write business as of year-end 2007: . . . United States of America (Delaware) [no business written in United States]").[1]

AIA was AIG's primary life insurance provider in Asia for a period of time. Incorporated in Hong Kong, AIA had operations in Hong Kong, mainland China, Singapore, Malaysia, Thailand, Korea, Australia, New Zealand, Vietnam, Indonesia, and India.  AIA conducted an initial public offering on the Hong Kong stock exchange on October 29, 2010.[2] AIG sold its remaining stake in AIA in a public offering on December 17, 2012.[3]

Relator alleges he was hired by AIG in 1996 and worked in human resources until he was fired in March 2009, *see* Compl. ¶¶ 10–14, months before the June 2009 execution of the DRAs at issue.  From 2007 until he was fired, Relator was the Worldwide Director of Human

---

[1]   Relevant excerpts of the December 31, 2004 and the December 31, 2007 Examination Reports are attached to the Declaration of Michael B. Carlinsky as Exhibits A and C, respectively.

[2]   *See* Press Release, Am. Int'l Grp., Inc., AIG Raises Nearly $37 Billion In Two Transactions To Repay Government (Nov. 1, 2010), *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=76115&p=irol-newsArticle&ID=1489536.

[3]   *See* Press Release, Am. Int'l Grp., Inc., AIG Announces Pricing of Sale of Ordinary Shares of AIA Group Limited (Dec. 17, 2012), *available at* http://www.sec.gov/Archives/edgar/data/5272/000119312512504944/d455127dex991.htm.

Resources for the Group Management Division.[4]  *Id.* ¶ 11.  In that role, his duties included "hiring and firing employees, moving executives to and from different locations, starting new offices, strategic planning, and growing the business in human capital."  *Id.* ¶ 12.  Relator does not allege he had any responsibility for marketing, negotiating, underwriting, or selling insurance to anyone, at any time, or that he was involved in any respect in the negotiation or execution of the DRAs.  Relator claims he "had an inside view of the senior management in the Global Life Companies, and AIG as a whole [and] developed close contacts with a number of individuals throughout the company," *id.* ¶ 13, but does not identify a single one of his "close contacts" (let alone any AIG employee who he claims made any false statements).  According to the Complaint, ALICO management, not AIG management, fired Relator in March 2009.  *Id.* ¶ 14.

### B.      The Debt Repurchase Agreements

As alleged, during the financial crisis in late 2008 and early 2009, the U.S. government provided financial assistance to AIG.  Compl. ¶¶ 19–24.  One form of that assistance was a five-year, $60 billion revolving credit facility provided by the FRBNY, which was fully drawn in June 2009.  *See id.* ¶ 26.  At that time, AIG and the FRBNY agreed to reduce AIG's debt by $25 billion in exchange for ownership interests in ALICO and AIA.  *Id.* ¶ 27.  The deal involved parallel transactions (one for ALICO and one for AIA) whereby AIG transferred its ownership of ALICO and AIA to newly created limited liability companies in which both AIG and the FRBNY held interests.  *Id.* ¶ 28.  The FRBNY obtained equity in each LLC, with the right to receive the first $16 billion and $9 billion respectively upon liquidation of the AIA-related LLC and the ALICO-related LLC.  *Id.*  In exchange, the FRBNY reduced AIG's obligation under the $60 billion credit facility by $25 billion.  *Id.* ¶ 35.

---

[4]      As explained below in Section C, the Group Management Division non-exclusively marketed ALICO's and AIA's (among others') life insurance products throughout the world.  *See generally* Compl. ¶¶ 54–57.

The agreement was announced as part of a larger restructuring of AIG's obligations to the Government on March 2, 2009.[5]  Later that month, Relator was fired.  Compl. ¶ 14.  Months later, on June 25, 2009, AIG and the FRBNY finalized and executed the DRAs.[6]  That same day, the DRAs were filed with the SEC and made publicly available.[7]  Finally, on December 1, 2009, the transactions were completed when AIG and the Federal Reserve finalized the LLC agreements.[8]  *See* Compl. ¶ 34.

In the eight months between the announcement of the restructuring and the closing of the transaction, the FRBNY conducted an extensive review of ALICO's and AIA's operations, financial results, audits, and other books and records.  For example, as documented in the DRAs, the FRBNY had access to, among other things, AIG's, ALICO's, and AIA's confidential business information.  *See* ALICO DRA at ¶ 3.7(a); AIA DRA at ¶ 3.7(a).  In addition to the sophisticated in-house and outside counsel representing both AIG and the FRBNY in the negotiation, due diligence, and execution of the DRAs, the Federal Reserve had a unique view into AIG and its business units and subsidiaries.

The DRAs contained representations and warranties made by AIG to the FRBNY.  *See* Compl. ¶ 30.  Among these were representations that, to AIG's knowledge, ALICO and AIA had all material licenses and were in compliance with all material laws, had fairly represented financial results, and had timely filed certain tax returns.  *See* Compl. ¶ 30.  The Complaint

---

5   *See* Press Release, Am. Int'l Grp., Inc., U.S. Government Provides Support for Continued Restructuring of AIG (Mar. 2, 2009), *available at* http://www.sec.gov/Archives/edgar/data/5272/000095012309003740/ e74794exv99w2.htm.

6   The Complaint claims to, but does not in fact, attach the DRAs as Exhibit 1.  *See* Compl. ¶ 27.  Copies of the DRAs are attached to the Carlinsky Declaration as Exhibits D (the "ALICO DRA") and E (the "AIA DRA").  The documents are also available at http://www.ny.frb.org/aboutthefed/aig/pdf/alico_preferred_interest_purchase_ agreement.pdf (ALICO DRA) and http://www.ny.frb.org/aboutthefed/aig/pdf/aia_interests_purchase_agreement.pdf (AIA DRA).

7   *See* Am. Int'l Grp., Current Report (Form 8-K) (June 25, 2009), *available at* http://www.sec.gov/Archives/ edgar/data/5272/000095012309017102/y77933e8vk.htm.

8   *See* Second Amended and Restated LLC Agreement of ALICO Holdings LLC (Dec. 1, 2009), *available at* http://www.ny.frb.org/aboutthefed/aig/pdf/alico_holdings_agreement.pdf;  Fourth Amended and Restated LLC Agreement of AIA Aurora LLC (Dec. 1, 2009), *available at* http://www.ny.frb.org/aboutthefed/aig/pdf/aia_aurora_agreement.pdf.  The LLC agreements are attached to the Carlinsky Declaration as Exhibits F (ALICO Holdings LLC agreement) and G (AIA Aurora LLC agreement).

alleges that these representations were false because of the alleged "secret" insurance scheme described below.

### C.  The Alleged "Secret" And "Illegal" Insurance Scheme

Because Relator's allegations with respect to the alleged insurance activities consist entirely of conclusory assertions lacking any particularity whatsoever, it is difficult to ascertain what Relator claims occurred and where.  The following reflects AIG's best efforts to fairly summarize the allegations in the Complaint.

While owned by AIG, ALICO and AIA—through their branches and subsidiaries in more than 50 countries—underwrote, issued, and delivered a range of life and health insurance products, including traditional life, variable life, annuities, pensions, personal accident insurance, and group insurance for large and small organizations.  ALICO's and AIA's life insurance products were marketed non-exclusively by the Group Management Division ("GMD"), which described itself as marketing products and services of group life insurance companies, including ALICO and AIA, throughout the world.  *See generally* Compl. ¶¶ 54–57.  Much of the marketing of ALICO's insurance products occurred in New York, and most senior GMD employees were based in New York and Delaware.  *Id.* ¶¶ 59–60.

Marketing by GMD personnel typically included presentations to and discussions with multinational clients by phone, email, and in person, in an effort to assess their needs for foreign insurance products in foreign operations and to discuss ALICO's and AIA's capabilities regarding those foreign products and operations.  *See id.*  GMD personnel would contact U.S.-based multinational corporations that had foreign operations in countries where ALICO and AIA could provide group employee benefit packages or pension products.  *Id.* ¶¶ 59–60, 62.

The Complaint does not allege that ALICO, AIA, or GMD marketed, solicited, or sold insurance products to U.S. residents or covering U.S. insureds.  Nor does it allege that ALICO, AIA, or GMD maintained any premiums for insurance in the State of New York*, see generally id.* ¶¶ 52–64, or underwrote insurance in New York, *see id.* ¶¶ 61, 63 (alleging that the

underwriting of AIA's and ALICO's insurance policies sold by GMD in New York "occurred in the U.S.," but later specifying that "ALICO performed domestic underwriting for [ALICO's] policies out of its Wilmington office").

Based on its vague descriptions of insurance activities allegedly conducted by or on behalf of ALICO and AIA without the required licenses, the Complaint concludes that ALICO and AIA engaged in "secret" and illegal domestic insurance business in the United States, thereby rendering false AIG's representations and warranties in the DRAs that AIA and ALICO were in compliance with all relevant laws. *See, e.g.*, Compl. ¶¶ 53, 92. The Complaint further contends that AIG knew these representations and warranties were false when made, but does not specify who at AIG knew of the falsity or how AIG came to know of the falsity. Instead, the Complaint ignores corporate distinctions altogether, lumping AIG, AIA, ALICO, and GMD together as if they are one corporate entity with a shared state of mind.[9]

With respect to damages, the Complaint asserts (i) "on information and belief, as a result of the concealment of AIA and ALICO's domestic insurance business and the falsity in AIG's representations and warranties, the valuations of AIA and ALICO that AIG provided to FRBNY were substantially and materially overstated," Compl. ¶ 94, and (ii) "[o]n information and belief, had AIG not improperly inflated these valuations, ALICO and AIA's valuations would have been at least $100 million less because GMD's past and estimated cash flows would have been

---

[9]   By way of example only, the Complaint alleges that on "July 21, 2009," one month after the DRAs were executed, "ALICO sent a letter to the New York State Department's Office of General Counsel . . . asking for regulatory guidance based on the fact that, on July 15, 2009, AIG was going to hold a public offering of ALICO stock on the New York Stock Exchange." Compl. ¶ 85. Despite stating that ALICO had sent the letter (in fact, ALICO's outside counsel sent the letter, *see* Carlinsky Decl., Ex. H), in the very next paragraph Relator alleges that "AIG represented [in the letter] to the NY Insurance GC that ALICO housed administrators in New York, but did not disclose GMD's robust marketing and selling of insurance policies." *Id.* ¶ 86 (emphasis added). Without explaining the change from ALICO to AIG, the Complaint concludes that "[o]n information and belief, AIG was concerned about ALICO's secret insurance business through GMD, or it would not have asked for the opinion," *id.* ¶ 90, evidently suggesting that these events (which occurred after the execution of the DRAs) somehow demonstrate that AIG knew the representations and warranties made in the DRAs were false.

The Complaint also alleges efforts by GMD's and ALICO's management to conceal GMD's operations by "embedding" it in different "AIG compan[ies]" throughout 2007 and 2008. *See* Compl. ¶¶ 72–84. As for AIG's involvement, the Complaint simply alleges that it was "done with AIG's knowledge and consent." *Id.* ¶ 72.

omitted from the valuation analysis and the potential liabilities associated with the illegal business would have been included," *id.* ¶ 96.

### D.    The Dispositions Of ALICO And AIA

By November 1, 2010, AIG had completed an initial public offering for AIA and the sale of ALICO to MetLife.  *See supra* n.2.  The AIA IPO raised $20.5 billion of gross proceeds, and the ALICO sale raised approximately $16.2 billion of total proceeds, approximately $7.2 billion of which was cash.  *See id.*  Together, the transactions generated $36.7 billion in aggregate proceeds, $27.7 billion in cash, which AIG planned to use "to repay the credit facility extended to AIG by the [FRBNY] and to make payments on other interests owned by the government." *Id.*  A little more than two months later, on January 14, 2011, AIG fully repaid the FRBNY.[10] The FRBNY announced that "the New York Fed's revolving credit facility has been fully repaid, including interest and fees . . . and the New York Fed has been *paid in full for its preferred interests in the AIA and ALICO special purpose vehicles*."[11]  Accordingly, the FRBNY did not lose a single dollar on the transactions, and the Complaint does not allege otherwise.

### <u>ARGUMENT</u>

Relator attempts to plead two counts of "reverse false claim" under § 3729(a)(1)(G)[12] of the FCA based on the representations and warranties contained in each of the DRAs.  The Complaint should be dismissed both because it fails to state a claim under the heightened pleading standard of Rule 9(b) and for lack of subject matter jurisdiction.

---

[10]    *See* Am. Int'l Grp., Inc., Current Report (Form 8-K) (Jan. 14, 2011), *available at* http://www.sec.gov/ Archives/edgar/data/5272/000095012311003061/y88987e8vk.htm.

[11]    Press Release, Fed. Reserve Bank of N.Y., *New York Fed Ends AIG Assistance with Full Repayment* (January 14, 2011), *available at* http://www.ny.frb.org/newsevents/news/aboutthefed/2011/oa110114.html (emphasis added).

[12]  The Complaint alleges violations of 31 U.S.C. § 3729(a)(7), *see* Compl. ¶¶ 106, 108, but in 2009, this section was amended and reclassified as § 3729(a)(1)(G).  Section 3729(a)(1)(G) provides that "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" violates the FCA. 31 U.S.C. § 3729(a)(1)(G).

## I.  THE SECOND AMENDED COMPLAINT FAILS ADEQUATELY TO PLEAD A CLAIM UNDER THE FALSE CLAIMS ACT

The Complaint alleges that AIG violated the so-called "reverse false claim" provision, 31 U.S.C. § 3729(a)(1)(G), by making false statements in the DRAs to avoid a lawful debt owed to the federal government.  Compl. ¶¶ 106, 108.  To plead a reverse false claim, Relator must allege that AIG made a (1) material false statement or record, (2) knowing it to be false, (3) for the purpose of concealing, avoiding, or decreasing an obligation to pay money to the government.  *See U.S. ex rel. Doe v. Taconic Hills Cent. Sch. Dist.*, 8 F. Supp. 3d 339, 346 (S.D.N.Y. 2014).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6),[13] Relator must plead enough facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancements." *Id.* (internal quotation marks and citation omitted).  A court may disregard "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.*

In addition, FCA claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  *See, e.g., Gold v. Morrison–Knudsen Co.,* 68 F.3d 1475, 1476–77 (2d Cir. 1995) ("[C]laims brought under the FCA fall within the express scope of Rule 9(b).");  *Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 295 (S.D.N.Y. 2013) (same).  Thus, to satisfy Rule 9(b), the Complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Wood el rel. U.S. v.*

---

[13]   In deciding a Rule 12(b)(6) motion to dismiss, in addition to the pleadings, the court may consider "any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *U.S. ex rel. Fox Rx, Inc. v. Dr. Reddy's Inc.*, 2014 WL 6750786, at *5 (S.D.N.Y. Dec. 1, 2014) (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)).

*Applied Research Assocs., Inc.*, 328 F. App'x 744, 747 (2d Cir. 2009) ("A relator's contention, that discovery will unearth information tending to prove his contention of fraud, is precisely what Rule 9(b) attempts to discourage.") (internal quotation marks and citation omitted). "In other words, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *Ping Chen,* 966 F. Supp. 2d at 301 (internal quotation marks omitted). Complaints that do not meet this exacting standard must be dismissed. *See, e.g.*, *U.S. ex rel. Smith v. N.Y. Presb. Hosp.*, 2007 WL 2142312, at *6 (S.D.N.Y. July 18, 2007) (dismissing claims where complaint only provided a "rough sketch of [relator's] theory of FCA fraud").

These threshold requirements of the Federal Rules are cumulative:  to survive dismissal, an FCA complaint must plead fraud with particularity and state a plausible, not merely a possible, claim for relief. *See, e.g.*, *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011); *U.S. ex rel. Fox Rx, Inc. v. Dr. Reddy's Inc.*, 2014 WL 6750786, at *9–*10 (S.D.N.Y. Dec. 1, 2014) (dismissing FCA claims based on "bare allegations" where relator failed to point to any "statutory or regulatory provision that would prohibit" the alleged fraudulent statement).  "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Wood*, 328 F. App'x at 746–47 (quoting *Iqbal*).[14]

## A.    The Complaint Fails To Plead A False Statement With Particularity

The central premise of the Complaint is that ALICO and AIA were not in compliance with the law, at the relevant time, because they were allegedly engaged in "unlicensed and illegal domestic insurance activity."   Compl. ¶ 65; *see also id.* ¶¶ 55, 62–63 (referring to New York, Delaware, Illinois, California, Colorado, and Florida).   Yet, the Complaint remarkably fails to specify *any* provision of law that was allegedly violated—from among the dozens of insurance licensing laws to which the Complaint might theoretically be referring—or what licenses these entities did not have.  Absent any allegations specifying which law or laws ALICO and AIA

---

[14]   *See also Hayes v. Dep't of Educ. of N.Y.*, __ F. Supp. 3d __, 2014 WL 2048196, at *2 (S.D.N.Y. May 16, 2014) (a complaint is facially plausible only where the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" (citing *Spataro v. Glenwood Supply*, 479 F. App'x 403, 404 (2d Cir. 2012)).

allegedly violated, the Complaint fails even to allege a theory that is "plausible on its face," *Twombly*, 550 U.S. at 570.   This defect alone requires dismissal.  *See, e.g.*, *Taconic Hills Cent. School Dist.*, 8 F. Supp. 3d at 349 (dismissing claim based on false certification of compliance with the law where complaint "fail[ed] to cite to any applicable regulation or statute"); *see also Mikes v. Straus*, 274 F.3d 687, 697–99 (2d. Cir. 2001) (claims based on alleged "legal falsehood" require relator to demonstrate that the defendant has "certifie[d] compliance with a statute or regulation as a condition to government payment," yet knowingly failed to comply with such statute or regulation).   Given Relator's inability even to identify a law that ALICO, AIA, or GMD violated—or a license they were missing—it is little surprise that the Department of Justice has declined to intervene in this case.  *See* Dkt. No. 15.   Further, because the Complaint fails to reveal which laws AIG allegedly knew its subsidiaries were violating at the time the representations and warranties were made, AIG is left to hypothesize as to the underlying violation of law that is at the heart of Relator's case.   That alone demonstrates the insufficiency of the allegations.   "Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud."   *Ping Chen*, 966 F. Supp. 2d at 301.   The rule is designed to provide a defendant with fair notice of a plaintiff's claims, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to discourage the filing of complaints as a pretext for what amounts to a fishing expedition.   *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994).

The Complaint appears to be centered on activities alleged to have occurred in New York and Delaware, *see, e.g.*, Compl. ¶¶ 47–48, 55, 59–62, 66.[15]  But Relator has not pleaded any facts or legal theory explaining how ALICO or AIA allegedly violated these states' insurance laws.[16]

---

[15]    That is so at least with respect to ALICO.   The allegations regarding AIA are so threadbare that it is impossible to discern what conduct Relator believes AIA engaged in, where the alleged conduct occurred, or how the alleged conduct violated any State's insurance laws.

[16]    As AIG set forth in its declaratory judgment action against the New York State Department of Financial Services, none of ALICO's or GMD's activities constitute "doing an insurance business" under New York law.   *See* Am. Compl., *Am. Int'l Grp. v. Lawsky,* 14-cv-2355 (AJN) (S.D.N.Y.), Dkt. No. 29.

And the Complaint does not even attempt to explain how an entity like ALICO that has a Delaware insurance license—as well as foreign insurance licenses in the various jurisdictions where it issues policies—violates Delaware insurance law through any of the activities alluded to in the Complaint.[17]   This failure, too, requires dismissal.  *See, e.g.*, *U.S. ex rel. Ellsworth v. United Bus. Brokers of Utah, LLC*, 2011 WL 1871225, at *4 (D. Utah May 16, 2011) (where complaint alleged fraud based on violation of SBA guidelines, failure to "provide information regarding the SBA guidelines that were not met" justified dismissal).

This is not just a technical pleading failure.  The complaint is so deficient in this respect that it deprives AIG of the ability meaningfully to assert the well-established defense of compliance with an objectively reasonable interpretation of applicable law.  Courts routinely dismiss FCA complaints premised on allegedly false certifications of compliance with applicable law, where the complaint does not demonstrate that the defendant's construction of the law is unreasonable.  *See, e.g.*, *U.S. ex rel. Colucci v. Beth Israel Med. Ctr.*, 785 F. Supp. 2d 303, 316 (S.D.N.Y. 2011) ("Where a relator alleges that a claimant's interpretation of an ambiguous regulation renders its claims false under the FCA, falsity is evaluated by examining whether the interpretation is *correct* in light of applicable law; but whether a claimant acted knowingly in submitting a false claim turns on the *reasonableness* of the claimant's interpretation." (emphases in original, internal quotation marks removed)), *aff'd*, 531 F. App'x 118 (2d Cir. 2013); *U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 329 (S.D.N.Y. 2004) (errors based simply on "differences in interpretation growing out of disputed legal questions" are not false under the FCA (quoting *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999)); *see also U.S. ex. rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.,* 690 F.3d 951, 957 (8th Cir. 2012) (plaintiff must show that there is "no reasonable interpretation of the law that would make

---

[17]   Indeed, a complaint for violation of the insurance laws (assuming it actually named any laws) premised on such paltry factual allegations could hardly withstand scrutiny under traditional pleading standards, let alone the heightened standards of Rule 9(b), because it would permit the court "to infer the mere possibility of misconduct" and thus "has alleged—but not shown—that the pleader is entitled to relief."   *Iqbal*, 556 U.S. at 679 (internal quotation marks omitted).

the allegedly false statement true." (citing *U.S. ex rel. Hixson v. Health Mgmt. Sys. Inc.*, 613 F.3d 1186, 1991 (8th Cir. 2010)).[18]

As Judge Chin explained in dismissing a claim for false certification of compliance with law:

> Even assuming the claims submitted by [defendant] were "false," given the lack of clarity in the law, it cannot be said that defendants "knew" the claims were false. [Relator]'s inability to identify any regulation violated by defendants demonstrates that defendants' interpretation of the Medicare regulations was not unreasonable, and thus not knowingly false or fraudulent.

*Colucci*, 785 F. Supp. 2d at 316. This is so because a defendant cannot be found liable for "knowingly" making a false statement with respect to compliance with the law where the law is objectively unclear. *Cf. United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) ("'Criminal prosecution for the violation of an unclear duty itself violates the clear constitutional duty of the government to warn citizens whether particular conduct is legal or illegal,'" *regardless* of the defendant's subjective state of mind." (quoting *United States v. Mallas*, 762 F.2d 361, 363 (4th Cir. 1985)).

Thus, AIG is entitled to argue that even if New York's or Delaware's or some other state's insurance law could be read to suggest that any of the alleged conduct constituted unlicensed insurance activity, AIG's and its former subsidiaries' interpretations of the law were not unreasonable. But in this case, the Complaint is so deficient that AIG cannot defend itself on this ground, because the Relator has not identified which laws AIG's former subsidiaries allegedly violated, or in what manner.

---

[18]   *See also U.S. ex rel. Streck v. Allergan, Inc.*, 894 F. Supp. 2d 584, 600 (E.D. Pa. 2012) (dismissing FCA claim where relator failed to show that defendants' construction of relevant statute was "not a reasonable interpretation . . . let alone to plausibly infer that [defendants] engaged in the unjustifiably high risk of violating the statute" (quotation marks removed); *Thulin v. Shopko Stores Operating Co.*, 2013 WL 5946503, at *7 (W.D. Wis. Nov. 5, 2013) ("Indeed, numerous district courts have dismissed similar FCA claims at least in part because a debate surrounding the plaintiff's theory of falsity precludes any finding of knowledge."); *cf. U.S. ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 532 (6th Cir. 2012) ("The defendants are correct, irrespective of whether they in fact violated the regulations. The False Claims Act is not a vehicle to police technical compliance with complex federal regulations.").

### B.       The Complaint Fails To Plead That AIG Acted Knowingly

Even if the Complaint did allege what laws were violated and how, it fails to allege how *AIG*, the defendant in this action, made knowing misrepresentations to the FRBNY.  "Knowing" under the False Claims Act is established by showing (i) actual knowledge, (ii) deliberate ignorance, or (iii) reckless disregard for the truth or falsity of the information.  31 U.S.C. § 3729(b)(1).  But the Complaint fails to allege any facts that, taken as true, give rise to a plausible inference that AIG knowingly made a false statement.  Despite more than five years since consummation of the DRAs and more than four-and-a-half since Relator commenced this action, Relator offers nothing other than a bare legal conclusion that AIG "knowingly misrepresented facts relevant to the valuation of two of its subsidiaries in connection with" the DRAs.  Compl. ¶ 25.  The passage of time (and the Department of Justice's declining to intervene) lead to only one conclusion: there is no evidence AIG knew of any of the alleged unlicensed insurance activities.

The Complaint promises again and again to explain how exactly AIG knew its representations were false.  *See, e.g.*, Compl. ¶ 2 ("As described in more detail below, AIG made misrepresentations . . .");  ¶ 25 ("As described in greater detail below, . . . AIG knowingly misrepresented facts . . . .");  ¶ 32 ("However, as described in greater detail below, and as AIG (but not the FRBNY) knew at the time, each of the foregoing warranties and representations was materially false.").  But the promised explanation amounts simply to allegations about what *ALICO*'s management knew and did, *see, e.g., id.* ¶¶ 66–84, and as to AIG, the Complaint offers nothing other than a bare recitation of this element of the claim, "on information and belief," *see id.* ¶ 93 ("Upon information and belief, AIG knew when it executed the Debt-Reduction Agreements that its representations and warranties were false in at least the foregoing respects.").

A complaint that does not even specify what theory of "knowledge" it seeks to advance and is premised merely on unsupported allegations and clever attempts to conflate distinct corporate entities cannot survive a motion to dismiss.  *See, e.g., Thulin v. Shopko Stores Operating Co.*, 2013 WL 5946503, at *8 (W.D. Wis. Nov. 5, 2013) (dismissing FCA claim

14

where "plaintiff [failed] to allege facts to support *how* [corporate defendant] knows of such an obligation, nor *who* in the organization [had] actual knowledge"); *U.S. ex rel. Fowler v. Caremark RX, LLC*, 496 F.3d 730, 743 (7th Cir. 2007) ("There is no evidence in the . . . complaint that Caremark had actual knowledge of this issue or otherwise ignored or disregarded this situation."), *overruled on other grounds by Glaser v. Wound Care Consultants*, *Inc.*, 477 F.3d 502 (7th Cir. 2007).

The allegations in the Complaint regarding the purported concealment of ALICO's and AIA's "unlicensed" insurance business, and the deception of regulators about the same, even if true, would not establish that *AIG* engaged in any wrongdoing.  Paragraphs 43 to 91 discuss alleged conduct of ALICO, AIA, and GMD, but mention AIG only in passing, providing no factual allegations that could give rise to a plausible inference that AIG engaged in any misconduct.  For example, paragraphs 52 to 65 discuss "ALICO's and AIA's secret insurance business," but do not mention any conduct by any AIG officer, director, or employee.  Similarly, in paragraphs 66 to 91, the Complaint discusses the alleged concealment and deception of regulators by GMD and ALICO management, not AIG.  *See, e.g.*, Compl. ¶ 66 ("At some point, *ALICO management* became concerned about whether it was 'transacting insurance' in Delaware and New York.") (emphases added); ¶ 75 ("[I]n late 2007 and early 2008, *ALICO* transferred the GMD sales force from *ALICO's* payroll to the payroll of a domestic licensed insurer owned by AIG called *American General Life Insurance Co*. . . .") (emphasis added); ¶ 81 ("In October of 2008, *ALICO and GMD management* . . . conceived of a plan to move GMD sales personnel . . . .") (emphasis added); ¶ 85 ("Upon information and belief, on July 21, 2009, *ALICO* sent a letter to the [NY Insurance GC] asking for regulatory guidance . . . .") (emphasis added).  The few times that Relator actually mentions AIG are nothing more than Relator's sly attempts to conflate AIG with its subsidiaries.  *See, e.g.*, ¶¶ 85–91 (alleging that ALICO sent a letter to the New York Insurance Department but inexplicably claiming that the letter was part of

correspondence between the Insurance Department and *AIG*, not ALICO); *see also* Carlinsky Decl., Ex. H (letter sent by ALICO's outside counsel, not AIG).[19]

The Complaint's failure to allege with *any* factual support, let alone with the particularity required by Rule 9(b), that AIG knew that ALICO's and AIA's conduct violated licensing statutes and that representations in the DRAs were not true is fatal to its FCA claims.  *See Iqbal*, 556 U.S. at 680–81 (rejecting as conclusory and not entitled to presumption of truth allegation that defendants "knew of," were the "principal architect of," and were "instrumental" in carrying out discriminatory policy); *U.S. ex rel. Pervez v. Beth Israel Medical Center*, 736 F. Supp. 2d 804, 814–15 (S.D.N.Y. 2010) (dismissing complaint for failure to plead facts that made plausible relator's allegations that defendant knew statements were false); *U.S. ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d  505, 515–16 (E.D. Pa. 2010) (dismissing FCA complaint against parent corporation where amended complaint "contain[ed] no facts about Siemens Corporation's actual involvement in the alleged fraud" aside from a conclusory assertion that Siemens "promoted cross-selling among and was responsible for regulatory compliance of Siemens companies"; assertion that Siemens "over[saw] and faciliat[ed] the fraud" was insufficient); *U.S. ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 40 (D. Mass. 2000) (dismissing FCA complaint against parent corporation where relator's assertion of knowledge was based merely on the fact that parent corporation owned the subsidiary).  The Complaint contains no facts whatsoever to support the bare allegation that AIG knew of ALICO's and AIA's alleged domestic activity, let alone that AIG knew that such activity required a license those entities did not possess, and that AIG's representations in the DRAs were thus false.

Even where the Complaint nakedly alleges that AIG (and not one of its subsidiaries) knew that the representations in the DRAs were false, the allegations are doubly insufficient because they merely identify AIG, not the individuals responsible for the purported false claims. *See U.S. ex rel. DeCarlo v. Kiewit/AFC Enterprises, Inc.*, 937 F. Supp. 1039, 1050 (S.D.N.Y.

---

[19]   *See supra* n.9

1996) (dismissing under Rule 9(b) because "the complaint fails to refer to specific employees who may have been involved in submitting false claims. . . . Here, the complaint refers only to "Kiewit" [*i.e.*, the corporate defendant] without identifying the individuals involved in the alleged fraud to any extent."); *U.S. ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 454 (5th Cir. 2005) ("Significantly, [relator's] complaint is directed at the company, not the three named employees that allegedly filed false reports.  Beyond its conclusory assertions, [relator's] complaint fails to plead any particular facts showing that [the corporation] was aware of the actions of its employees, that it had intentionally filed these false claims with the government, that it had purposefully withheld information about these charges, or that it intentionally failed to repay the government for the overcharges.").

Finally, as described above, the FRBNY had virtually unfettered access to AIG's, ALICO's, and AIA's internal confidential information and thus was able to conduct an extensive review of ALICO's and AIA's activities prior to entering into the DRAs.  *See supra* Statement of Facts, Section B.  That indisputable fact undermines any conclusion that AIG knowingly made a false statement in order to reduce its indebtedness to the Government.  *See U.S. ex rel. Anti-Discrim. Ctr. Metro. N.Y., Inc. v. Westchester Cnty.*, 668 F. Supp. 2d 548, 568 (S.D.N.Y. 2009); *see also U.S. v. Bollinger Shipyards, Inc.*, 979 F. Supp. 2d 721, 733–34 (E.D. La. 2013) (dismissing claims where allegations "lead to the inference" that the government was aware of the alleged falsity because "[t]here can be no FCA liability in such circumstances").

In sum, the Complaint fails to allege—with particularity, or even plausibility—facts that, if true, could support an inference that AIG knowingly made a false statement to the Government.

## II.    IN ANY EVENT, THE PUBLIC DISCLOSURE BAR IN 31 U.S.C. § 3730(e)(4)(A) INDEPENDENTLY COMPELS DISMISSAL

Relator's *qui tam* action should be dismissed in its entirety for the additional and independent reason that the Complaint is based on publicly disclosed facts readily available in the "news media" and "administrative . . . report[s]."  The FCA's public disclosure bar provides

that "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, *administrative*, or Government Accounting Office *report*, hearing, audit or investigation, or from the *news media*, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information."   31 U.S.C. § 3730(e)(4)(A) (2006) (emphasis added).[20]   To avoid dismissal, a relator has the burden to demonstrate, by a preponderance of the evidence, that:   (1) the "information on which the allegation of fraud rests[] was [not] a public disclosure through one of the sources enumerated in the statute"; and (2) the relator's allegations are not based on, or substantially the same or similar to, a prior public disclosure."   *See U.S. ex rel. Blundell v. Dialysis Clinic*, 2011 WL 167246, at *5 (N.D.N.Y. Jan. 19, 2011) (describing test and noting that a relator's claim is "based upon" a public disclosure where the allegations in the complaint are "substantially similar" to the publicly disclosed information (citing *U.S. ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 324 (2d Cir. 1992)); *WB/Stellar IP Owner*, *U.S. ex rel. Rosner v. WB/Stellar IP Owner, LLC*, 739 F. Supp. 2d 396, 401 (S.D.N.Y. 2010) (relator must prove subject matter jurisdiction by a preponderance of evidence).   Where the relator is unable to make this showing, dismissal is compelled unless the relator can demonstrate that he was the "original source" of the information.   *See, e.g.*, *Dialysis Clinic*, 2011 WL 167246, at *5; 31 U.S.C. § 3730(e)(4)(A) (requiring dismissal where the claim is based on information previously publicly disclosed and for which the relator is not the original source).

---

[20]   Although the Patient Protection and Affordable Care Act ("PPACA") amended the public disclosure bar, *see* Patient Protection & Affordable Care Act, Pub. L. 111-148, § 10104(j)(2), 124 Stat. 119, 901–02, the change does not apply in this case, because the alleged conduct at issue in the Complaint occurred in or before June 2009, *see, e.g.*, Compl. ¶ 27, well before the March 23, 2010 Amendment.  *See, e.g.*, *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 103 n.4 (2d Cir. 2010) ("Because this amendment [to the public-disclosure bar] was not made retroactive, we do not address the new statutory language here."), *rev'd on other grounds*, 131 S. Ct. 1885 (2011); *see also U.S. ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 918 (4th Cir. 2013) ("[B]ecause the 2010 amendments have retroactive effect and the legislation is silent as to retroactivity, the 2010 version of the public-disclosure bar cannot be applied in this case, notwithstanding the fact that the complaint was filed after the effective date of the amendments."); *U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 2014 WL 4375638, at *7 (E.D. Pa. Sept. 4, 2014) ("[T]he 2010 amendments should not apply to claims based on conduct before March 23, 2010.").

**A.     The Key Elements Of The Fraud Alleged In The Complaint Were Publicly Disclosed Before Relator Filed This Suit**

Courts in this Circuit have routinely dismissed FCA actions where, as here, the "essential elements of the alleged fraud" were publicly disclosed prior to the commencement of the action. *See U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 437 F. App'x 13, 17 (2d Cir. 2011); *see also U.S. ex rel. Monaghan v. N.Y. City Dep't of Housing, Pres. & Dev.*, 2012 WL 4017338, at *5 (S.D.N.Y. Sept. 10, 2012) (concluding that public disclosure bar applied where "the essential elements of the alleged fraud" were publicly disclosed); *Blundell*, 2011 WL 167246, at *6 (same), *aff'd*, 531 F. App'x 127 (2d Cir. 2013); *see also U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1158 (2d Cir. 1993) ("§ 3730(e)(4) was designed to preclude *qui tam* disputes based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator.") (quotation marks removed).

Relator's core allegations are that at or before the time the DRAs were executed in June 2009, ALICO and AIA engaged in "secret" insurance business by engaging in underwriting activities in Wilmington, Delaware, *see, e.g.*, Compl. ¶ 63 ("ALICO performed domestic underwriting for those policies out of its Wilmington Office"); ¶¶ 68–69 (same), and/or by engaging—through GMD—in sales and marketing efforts of insurance products exclusively covering foreign insureds (that is, risks located outside the United States) in New York City, Wilmington, Delaware, and other cities in the United States, *see, e.g.*, *id.* ¶¶ 55, 57, 68–69. This "secret unlicensed insurance work" was allegedly "undisclosed" and "kept . . . secret from state and federal regulators and taxing authorities," *id.* ¶¶ 53–54, and Relator alleges that he brought these alleged misrepresentations to light for the first time, *id.* ¶¶ 103–04. But far from an exposé of ALICO's "secret" insurance business, the Complaint merely alleges activities that were openly and publicly disclosed and in the public domain at the time Relator initiated this action.

### 1. "Secret" Marketing Activities Were Publicly Disclosed In The News Media

GMD's marketing activities on behalf of ALICO and AIA were well documented in the news media long before the execution of the DRAs in June 2009 and Relator's subsequent commencement of this action in May 2010.  By way of example, in March 2008—more than one year before the DRAs were negotiated and executed—AIG issued the following press release:

> AIG Group Management Division (GMD) is a division of the life insurance subsidiaries of AIG.  *Headquartered in New York*, GMD operates in more than 100 countries through a regional and local management structure.  GMD's employee benefits, credit insurance, and global pension products and services are offered through the various life insurance subsidiaries of AIG, including *American International Assurance (AIA)*, *American Life Insurance Company (ALICO)*, Nan Shan (Taiwan), Philamlife as well as other strategic partners around the world.[21]

Approximately eight years before that press release, in May 2000, AIG issued a similar press release, explaining as follows:

> American Life Insurance Company (ALICO), incorporated in Delaware, is one of the largest international life insurance companies in the world, with more than $216.5 billion of life insurance in force as of December 31, 1999. ALICO holds Standard and Poor's highest financial strength rating, AAA, and an AAA insurance financial strength rating from Moody's. ALICO and its branches, affiliates and subsidiaries market a broad range of life and other insurance products through a network of some 24,000 agents and brokers in approximately 50 countries worldwide. American International Companies' Group Management Division provides employee benefit programs to multinational and indigenous companies worldwide.[22]

AIG was just as candid about GMD's activities in other publicly available documents, including its 2005 Annual Report, in which it stated that "[t]he Group Management Division (GMD) is the primary distribution arm for AIG's international employee benefits, credit, and

---

[21]   Press Release, Am. Int'l Grp., Inc., *AIG Group Management Launches Group Life Product That Expands Employee Benefit Capabilities in the European Union* (Mar. 25, 2008), *available at* http://media.corporate-ir.net/media_files/irol/76/76115/releases/032508b.pdf (emphases added).  A copy of the press release is attached to the Carlinsky Declaration as Exhibit I.

[22]   Press Release, Am. Int'l Grp., Inc., *AIG's American Life Insurance Company to Offer Second Opinions to Insureds Via the Worldcare Global Health E-Health Network™* (May 9, 2000), *available at* http://ir.aigcorporate.com/phoenix.zhtml?c=76115&p=irol-newsArticle&ID=231022 &highlight=.  A copy of the press release is attached to the Carlinsky Declaration as Exhibit J.

pension products and services.  GMD continued its strong performance in 2005 by maintaining its leadership position as either the number one or two provider of group benefits in Hong Kong, Malaysia, Singapore, Taiwan and Thailand as measured by market share, and the number one issuer of new group life policies in Japan."[23]

Each of these public disclosures qualifies as "news media" as that term is used in 31 U.S.C. § 3730(e)(4)(A), and establish that the supposed "secret" marketing activities were no secret at all.  *See, e.g.*, *Ping Chen*, 966 F. Supp. 2d at 290–91, 297 ("news media" includes online media publications and publicly accessible websites); *U.S. ex rel. Green v. Serv. Contract Educ. & Training Trust Fund*, 843 F. Supp. 2d 20, 32–33 (D.D.C. 2012) (noting that courts to "have considered [the meaning of 'news media'] have construed the term to include readily accessible websites," and concluding that a "promotional [web]page . . . readily accessible to the public" constituted "news media").  The accusation that ALICO and AIA tried to "conceal" such activities is nonsensical applying common sense alone (Relator accuses ALICO and AIA of using GMD to *publicly* market themselves to multi-national customers), and is belied by the above-described public disclosures.

### 2. The Alleged "Underwriting" Activities Were Publicly Disclosed In Administrative Reports

Although the Complaint contains an unadorned allegation that "underwriting" secretly and illegally "occurred in the U.S.," Compl. ¶ 61, the only specific location that Relator identifies is Wilmington, Delaware, and that allegation is solely in reference to ALICO.  *See id.* ¶ 63 ("ALICO performed domestic underwriting for those policies out of its Wilmington office.").  Relator ignores that ALICO *was* a licensed insurance business in Delaware, *see supra*, Statement of Facts, Section A (discussion of Delaware Insurance Department Market Conduct Reports), and overlooks that underwriting was disclosed to the Delaware Insurance Department

---

[23]   Am. Int'l Grp., Annual Report 36 (Mar. 16, 2006), *available at* http://www.aig.com/Chartis/internet/US/en/2005annualreport_tcm3171-440890.pdf.   Relevant excerpts from AIG's 2005 Annual Report is attached to the Carlinsky Declaration as Exhibit K.

and documented in the Delaware Insurance Department's "administrative . . . report[s]." *See,*
*e.g.*, Del. Ins. Dep't Market Conduct Exam. of ALICO at 11 (Sept. 18, 2005) ("The Company
[ALICO] maintains an Underwriting and Selection Procedure.  The Company's procedures are
based upon a Company developed underwriting manual and supplemented with underwriting
selections decisions with employee access to reinsurance manuals. . . . [T]he Home Office [in
Wilmington, Delaware] underwriters perform audits on at least four (4) local operations per
year.");[24] *id.* at 12 ("Adherence to the life insurance underwriting procedures is documented in
the audits described in [text quoted] above.  In the case of audits, file documentation, adherence
to procedures, adequacy of decision and any adverse findings are noted in the audit report.").[25]

These reports issued by the Delaware Department of Insurance (a state agency)
unequivocally qualify as "administrative . . . report[s]" under the version of §3730(e)(A)(4)
applicable here.  *See, e.g., Graham Cnty. Soil & Water Conserv. Dist. v. U.S. ex rel. Wilson*,
559 U.S. 280, 302 (2010) (holding that "the term 'administrative' . . . is not limited to federal
sources").  And these public disclosures defeat Relator's claim that underwriting in Wilmington,
Delaware was somehow concealed.   To the contrary, such underwriting was disclosed to
regulators documented in the public domain.

**B.     The "Key" Allegations In The Complaint Are Substantially Similar To
Information Already In The Public Domain**

As set forth above, all of Relator's key allegations, including the essential elements of the
alleged fraud, are substantially similar to information readily available in the public domain.  *See*
*U.S. ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 322 ("[A]llegations of fraud are publicly
disclosed when they are placed in the 'public domain.'" (citation omitted)).   A relator's

---

[24]   Relevant excerpts of the September 18, 2005 Market Conduct Examination Report of ALICO are attached to
the Carlinsky Decl. as Exhibit B.

[25]   The public disclosure of underwriting in Wilmington, Delaware continued both before and after the sale of
ALICO to MetLife in 2010.  *See, e.g.*, Jonathan Starkey, *MetLife's Delaware Layoffs Scrutinized*, News J. (Apr. 14,
2011),      *available      at*      www.delawareinsurance.gov/departments/news/articles_editorials/041411-Press-
MetlifeLayoffs.shtml ("'The bottom line on this is the commissioner is taking all appropriate means necessary to
ascertain whether MetLife has the proper level of personnel in place to carry out management and underwriting
operations of ALICO,' Deputy Insurance Commissioner Gene Reed said in an interview.").

allegations are "substantially similar" where the public disclosures "exposed all the essential elements of the alleged fraud." *Schindler Elevator Corp.*, 437 F. App'x at 17.  Thus, where the "public disclosure included 'the allegation of fraud' itself or the 'critical aspects of the fraudulent transaction,' from which an inference of fraud can be raised," the relator's claim is barred.  *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, ___ F. Supp. 3d ___, 2014 WL 4370597, at *9 (S.D.N.Y. Sept. 3, 2014).

Here, the core allegations of Relator's claims—that ALICO and AIA (through GMD) engaged in marketing activities in New York, that ALICO engaged in underwriting activities in Delaware, and that AIG represented in the DRAs that ALICO and AIA were in compliance with the law—were publicly disclosed both by and at the time the DRAs were negotiated and executed (and publicly released) in June 2009, and by the time that Relator commenced this action in May 2010.  Thus, assuming that Relator's interpretation of unspecified insurance laws were correct, the public disclosures when viewed together were more than "sufficient to raise the inference of fraud."  *See U.S. ex rel. Findley v. FPC-Boron Empls.' Club*, 105 F.3d 675, 687 (D.C. Cir. 1987); *see also U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994) ("[T]he information conveyed [in the public disclosures] could have formed the basis for a governmental decision or prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing."  (internal quotation marks omitted)).  For this reason, Relator's claims are barred.[26]

## C.   Relator Was Not An "Original Source"

Relator cannot escape the consequence of these documented public disclosures by claiming to be an "original source."  Prior to the 2010 amendments to the FCA, § 3730(e)(4)(A) defined an "original source" as "an individual who has direct and independent knowledge of the

---

[26]   That Relator's Complaint may have "provided more information about the [alleged secret insurance] scheme does not mean that [the public disclosures] about [ALICO and AIA] did not expose all the essential elements of the alleged fraud.  Section 3730(e)(4)(A) only requires substantial similarity between the allegations in the *qui tam* complaint and the allegations in the public disclosures—*not complete identity* between the two sets of allegations." *Novartis Pharm. Corp.*, 2014 WL 4370597, at *3 (internal quotation marks and citation omitted) (emphasis added).

information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." The Second Circuit has interpreted the "direct and independent knowledge" requirement to bar suits where, as here, "a third party," not the Relator, "is the source of the core information upon which the *qui tam* complaint is based." *Rosner*, 739 F. Supp. 2d at 403 (relator was not "original source" where he learned of alleged misconduct by "interviewing" other people).

Relator worked in Human Resources and does not even purport to claim direct responsibility over any of the matters relevant to his complaint, including the alleged "secret" insurance activities or the relevant (and entirely unspecified) statutes and/or regulations. Such secondhand knowledge does not qualify as an "original source" under the FCA. *See e.g.*, *U.S. ex rel. Veltz v. Allegany Rehab. Assocs., Inc.*, 2011 WL 1042194, at *6 (W.D.N.Y. Mar. 18, 2011) (relator did not have direct and independent knowledge of alleged misconduct because he "learned of possible deficiencies through a co-worker"). Further, Relator obviously has no direct knowledge of the core allegations in this case—that AIG knowingly deceived the government by making false statements in the DRAs—because Relator played no role negotiating the transaction and, in any event, his employment with GMD ended in April 2009, Compl. ¶ 8, months ahead of the negotiation and signing of the DRAs. These facts likewise disqualify Relator from being an original source, because a relator does not have "direct and independent" knowledge where a third party is the source of the core information. *Rosner*, 739 F. Supp. 2d at 408 (neither background information that enables relator to understand the significance of public information, nor collateral research, suffices to turn relator into an original source) (citations omitted); *Monaghan*, 2012 WL 4017338, at *6 (S.D.N.Y. 2012) (same) (citing *Rosner*), *aff'd* 531 F. App'x 127 (2d Cir. 2013).

## III. DISMISSAL WITH PREJUDICE IS APPROPRIATE

Whether or not this suit is precluded by the public disclosure bar, dismissal with prejudice is appropriate. Relator commenced this action more than four-and-a-half years ago.

After availing himself of multiple opportunities to amend (to which AIG consented), the Complaint consists of mere threadbare conclusions and other glaring defects. Not only has the FRBNY never asserted claims based on the DRAs, the Department of Justice declined to intervene in this litigation. Having already amended his complaint twice and failed to plead allegations even approaching the "who, what, where, how, and when" standard required for FCA claims, Relator has demonstrated that further amendment would be futile and that this action should be dismissed with prejudice. *See, e.g.*, *N.Y. Presb. Hosp.*, 2007 WL 2142312, at *7 (dismissing FCA action with prejudice where relator already had several opportunities to amend the complaint over a six year time period because "it appears that any amendment would be futile").

## CONCLUSION

For the foregoing reasons, Relator's Second Amended Complaint should be dismissed with prejudice.

Dated:      New York, New York           QUINN EMANUEL URQUHART
            December 22, 2014            & SULLIVAN, LLP

                                         /s/ *Michael B. Carlinsky*
                                         Michael B. Carlinsky
                                         51 Madison Avenue, 22nd Floor
                                         New York, New York 10010
                                         Telephone: (212) 849-7000
                                         Facsimile: (212) 849-7100
                                         michaelcarlinsky@quinnemaunel.com

                                         William A. Burck
                                         Lori Alvino McGill
                                         777 6th Street, 11th Floor
                                         Washington, D.C. 20001
                                         Telephone: (202) 538-8000
                                         Facsimile: (202) 538-8100
                                         williamburck@quinnemanuel.com
                                         lorialvinomcgill@quinnemanuel.com

                                         *Attorneys for Defendant American*
                                         *International Group, Inc.*