UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA, ex rel.    :
ALEX GRABCHESKI,    :
    :
           Plaintiff,    :
    :
    -against-    :        10 Civ. 3902 (GBD)
    :
AMERICAN INTERNATIONAL GROUP,    :
INC.,    :
    :
    :
           Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## PLAINTIFF/RELATOR'S COMBINED MEMORANDUM
### (1) IN SUPPORT OF HIS MOTION FOR LEAVE
#### TO FILE THIRD AMENDED COMPLAINT
#### AND
### (2) IN OPPOSITION TO DEFENDANT'S MOTION
#### TO DISMISS THE SECOND AMENDED COMPLAINT

BUTZEL LONG, a professional corporation
Thomas Patton
Max Maccoby (admitted pro hac vice)
James Gehrke (admitted pro hac vice)
Neal Goldfarb (admitted pro hac vice)
1747 Pennsylvania Ave., NW, Suite 300
Washington, DC 20006
Telephone: (202) 454-2800
Facsimile:  (202) 454-2805
pattont@butzel.com
maccoby@butzel.com
gehrke@butzel.com
goldfarb@butzel.com

Robert Sidorsky
230 Park Avenue, Suite 850
New York, NY 10169
Telephone: (212) 818-1100
Facsimile:  (212) 818-0494
sidorsky@butzel.com

*Attorneys for Plaintiff/Relator Alex Grabcheski*

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................ iii

Introduction ........................................................................................................................ 1

Statement of Facts ............................................................................................................. 2

   A.  The Claim Against AIG. ......................................................................................... 2

   B.  AIG's Motion to Dismiss. ....................................................................................... 4

   C.  The Procedural Background to the Second Amended Complaint. ........................... 5

   D.  The Proposed Third Amended Complaint. .............................................................. 6

Argument ........................................................................................................................... 7

  I.   Relator Should Be Given Leave to File the Third Amended Complaint and
      the Motion to Dismiss Should Therefore Be Denied as Moot. ............................... 7

     A.  The Reasons Advanced by AIG for Barring Further Amendment Are
         Unfounded .......................................................................................................... 8

        1.  Granting leave to amend will not be futile ............................................... 8

        2.  There has been no "repeated failure to cure deficiencies by
            amendments previously allowed." ......................................................... 10

     B.  There Is No Other Reason to Deny Leave to Amend. ................................... 10

  II.  The Third Amended Complaint Cures the Alleged Deficiencies That Are
      Cited By AIG. ....................................................................................................... 12

     A.  The Third Amended Complaint Specifies the Provisions of Law That
         ALICO and AIA Violated, and Therefore Adequately Pleads That AIG
         Made False Statements. .................................................................................... 12

     B.  The Third Amended Complaint Provides More Than Enough Detail to
         Support the Allegation That AIG Acted Knowingly. ...................................... 13

  III. There Has Been No Public Disclosure Sufficient to Bar the Claim. ................... 18

     A.  The Public-Disclosure Bar Applies Only If All the Key Elements of
         the Claim Were Publicly Disclosed Before the Suit Was Filed. ................... 18

     B.  The Disclosures AIG Relies on Did Not Reveal the Key Elements of
         the Claim. ....................................................................................................... 19

        1.  The disclosures did not reveal that the FRBNY gave AIG $25
            billion in debt reduction in reliance on false representations by AIG
            about ALICO and AIA. ........................................................................ 19

        2.  The disclosures did not reveal that ALICO and AIA engaged in
            unlicensed insurance activities in New York. ...................................... 19

3.   The disclosures did not reveal that ALICO was engaged in
     underwriting in Delaware. ..................................................................................22

C.   Because the Key Elements of the Claim Were Not Publicly Disclosed,
     AIG's "Original Source" Argument Is Beside the Point............................................24

Conclusion ...........................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................8

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)....................................................8

*Betts v. Shearman*, 751 F.3d 78 (2d Cir. 2014) ...........................................................17

*In re Crysen/Montenay Energy Co.*, 226 F.3d 160 (2d Cir. 2000) ...................................7

*Dluhos v. Floating & Abandoned Vessel, Known as N.Y.,* 162 F.3d 63 (2d Cir. 1998) ............................................................................................................................7

*Dreieck Finanz AG v. Sun*, No. 89 CIV. 4347 (MBM), 1990 WL 11537 (S.D.N.Y. Feb. 9, 1990) ...........................................................................................................13

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435 (4th Cir. 2011) ...................17

*Foman v. Davis,* 371 U.S. 178 (1962).........................................................................8, 10

*Freeman v. Timberlake*, No. 06 CV 1112 GBD, 2007 WL 184817 (S.D.N.Y. Jan. 25, 2007) ..........................................................................................................7

*Goston v. Potter*, No. 9:08-CV-478 (FJS/ATB), 2010 WL 4774238 (N.D.N.Y. Sept. 21, 2010) .....................................................................................................12

*Grace v. Rosenstock*, 228 F.3d 40 (2d Cir. 2000)..........................................................11

*Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326 (2d Cir.1997).................................17

*Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118 (2d Cir. 2006)..............................7

*Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93 (2d Cir. 2014)....................8, 12

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986) ...............................................................11

*Lucente v. IBM*, 310 F.3d 243 (2d Cir. 2002).................................................................7

*Madison Fund, Inc. v. Denison Mines Ltd.*, 90 F.R.D. 89 (S.D.N.Y. 1981)....................12

*Olsen v. Pratt & Whitney Aircraft, Div. of United Techs. Corp.*, 136 F.3d 273 (2d Cir. 1998) .............................................................................................................11

*Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282 (S.D.N.Y. 2013)...............................................................................................................18

*Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230 (2d Cir. 1995)........................11

*Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647 (2d Cir. 1987) ......................................11

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir.1994) ........................................7

*State Farm Ins. Cos. v. Kop-Coat, Inc.*, 183 F. App'x 36 (2d Cir. 2006).................................11

*United States ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir.2006)........................................8

*United States ex rel. Berge v. Board of Trustees*, 104 F.3d 1453 (4th Cir.1997) ...........................8

*United States ex rel. Chilcott v. KBR, Inc.*, No. 09-CV-4018, 2013 WL 5781660 (C.D. Ill. Oct. 25, 2013) ........................................16

*United States ex rel. DeCarlo v. Kiewit/AFC Enters.*, 937 F. Supp. 1039 (S.D.N.Y.1996) ........................................8

*United States ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 21 (D.D.C. 2008) ........................................8

*United States ex rel. Feldman v. van Gorp*, No. 03 CIV 8135 (WHP), 2010 WL 2911606 (S.D.N.Y. July 8, 2010) ........................................8

*United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94 (2d Cir. 2010), *rev'd on other grounds*, 131 S. Ct. 1885 (2011) ........................................18

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645 (D.C.Cir.1994) ........................................18

**Statutes and Rules**

31 U.S.C.:

    § 3107(e)(4)(A) (2006) ........................................18
    § 3729(a)(1)(G).....................................................4
    § 3729(b) ..............................................................13
    § 3730(e)(4)(A). ....................................................8

Fed. R. Civ. P.:

    Rule 9(b) ........................................................8, 11, 13
    Rule 15(a)(2) ........................................................8

N.Y. Ins. Law

    § 1101(b)(1) ........................................................12
    § 2102(a)(1)(A)....................................................12
    § 2117(a) ..............................................................12

18 Del. Code

§ 1104.................................................................................................................13

§ 1313.................................................................................................................13

§ 1321.................................................................................................................13

§ 2712.................................................................................................................13

§ 5801.................................................................................................................13

§ 5809.................................................................................................................13

**Other Authorities**

Consent Order, *In re American International Group, Inc.* (N.Y. Dep't of Fin.
Servs.), *available at* http://www.dfs.ny.gov/about/press2014/pr141031-
consent.pdf (last visited March 23, 2015)........................................................7

American International Group, Inc., *AIG.com: Education Center: Underwriting:
What is underwriting?,* http://www.aig.com/underwriting_3789_536492.html
(last visited March 23, 2015)..........................................................................23

Edmund L. Andrews et al., *Fed's $85 Billion Loan Rescues Insurer*, New York
Times, Sept. 17, 2008, at A1, available at http://www.nytimes.com/2008/09/17
/business/17insure.html?pagewanted=all (last visited March 23, 2015)...............19

State of Delaware, Department of Insurance, *Market Conduct Examination of
American Life Insurance Company as of September 18, 2005, available at*
http://delawareinsurance.gov/departments/berg/ExamReports/ALICO2005MC
WEB.pdf (last visited March 23, 2015)...................................................22, 23, 24

New York Department of Financial Services, *NYDFS announces AIG to pay $35
million penalty for insurance law violations related to its former subsidiaries
ALICO and DELAM,* (Oct. 31, 2014)*, available at* http://www.dfs.ny.gov/
about/press2014/pr1410311.htm (last visited March 23, 2015).............................7

## INTRODUCTION

AIG argues that the Second Amended Complaint fails to state a claim on which relief may be granted, but rather than deciding that issue, the Court should grant plaintiff/relator Alex Grabcheski leave to file his Third Amended Complaint; doing so will render AIG's motion moot because the Second Amended Complaint will be superseded for all purposes. There is a strong presumption in favor of permitting pleadings to be amended, and no circumstances are present that can overcome that presumption. Most importantly, allowing the complaint to be further amended will not be futile.

The proposed Third Amended Complaint cures the alleged deficiencies in the Second Amended Complaint. AIG argues that the Second Amended Complaint is inadequate because it does not identify the provision of state insurance law that AIG's subsidiaries ALICO and AIA violated; the proposed Third Amended Complaint cites and quotes the relevant provisions. AIG also argues that the Second Amended Complaint does not adequately allege that AIG knew that its representations were false; the Third Amended Complaint provides extensive detail showing that AIG made the false representations knowingly. (The proposed Third Amended Complaint, along with its exhibits, is submitted as Exhibits 1–3 of this memorandum.)

In addition, the Court is not deprived of jurisdiction by the False Claims Act's public-disclosure bar. None of the key elements of the claim were disclosed before this action was filed. AIG does not even contend that there was a disclosure of the most important aspect of the claim: the fact that AIG obtained $25 billion in debt-reduction by means of misrepresentations about ALICO and AIA. Nor was there any disclosure of the fact that ALICO and AIA illegally engaged in unlicensed insurance activity in New York or that ALICO improperly engaged in insurance underwriting in Delaware while representing to the Delaware regulators that all of its insurance activities took place overseas. Although AIG cites various materials to support its argument regarding the latter two points, those materials do not contain the disclosures that AIG contends they do.

Thus, AIG is wrong in contending that granting leave to amend would be futile. It is also wrong in its argument that leave to amend should be denied because the complaint has already been amended twice. The claim asserted in the Second Amended Complaint was not asserted until the

filing of the First Amended Complaint, so it has been amended only once. And more important, the modifications made in the Second Amended Complaint were not made in response to any challenge to the First Amended Complaint's sufficiency. There had been no such challenge, and *a fortiori* there had been no holding by the Court that the First Amended Complaint was deficient.

Finally, AIG has pointed to no other reason for denying leave to amend, and no such reason exists. There has been no undue delay, Plaintiff is not acting in bad faith or based on dilatory motive, and granting leave to amend would not subject AIG to undue prejudice. Leave to amend should be granted, and AIG's motion to dismiss should be denied as moot.

## STATEMENT OF FACTS

### A. The Claim Against AIG.

This is a qui tam action under the False Claims Act, in which Relator contends that defendant American International Group, Inc. ("AIG") defrauded the federal government in connection with the restructuring of the debt that AIG owed the government due to the bailout of AIG in 2008.

In the summer of 2009, AIG entered into two agreements with the Federal Reserve Bank of New York ("FRBNY"), together which provided that AIG would give FRBNY an interest in two of its wholly-owned subsidiaries—American Life Insurance Co. ("ALICO") and American International Assurance Limited ("AIA")—in exchange for a reduction in the amount of the debt that AIG owed the FRBNY.[1] One agreement had to do with ALICO and the other with AIA, and together they provided for a reduction of AIG's indebtedness by $25 billion. (We refer here to the agreements as "the Debt-Reduction Agreements.")

The agreements included representations and warranties regarding ALICO and AIA's operations, including warranties (1) that their liabilities were accurately reflected in their financial statements, (2) that they had all necessary licenses, (3) that they were in compliance with all relevant laws, and (4) that they had filed accurate tax returns and paid all taxes that were owed.[2] These

---

1. Second Am. Compl. ¶¶ 27–28.

2. Second Am. Compl. ¶ 29.

2

representations and warranties were made not only as of the date of the agreements, but also as of the date of the closing of the transactions that the agreements contemplated.[3] Moreover, the FRBNY's obligations under the agreements were conditioned on the representations and warranties being true at time of the closing.[4]

The Second Amended Complaint alleges that the representations and warranties in the Debt-Reduction Agreements were knowingly false.[5] Their falsity arose in part from the fact that ALICO and AIA were engaged in an insurance business in New York despite not being licensed there.[6] Among the results of that was the fact that (contrary to what AIG warranted, ALICO and AIA were not in compliance with all relevant laws, and their financial statements were not accurate because they account for the potential liabilities resulting from the unlicensed insurance activities.[7]

Moreover, the Second Amended Complaint alleges that as a result of AIG's misrepresentations, the interests in ALICO and AIA that the government acquired were worth at least $100 million less than what the government had "paid" for them in debt reduction.[8] The amount of debt reduction was based on the valuations of the two subsidiaries, and the valuations were in turn inflated because they were based on the assumption that the facts regarding ALICO and AIA's business and operations were as AIG had warranted.[9] For example, the valuations did not take account of the potential liabilities arising from that ALICO and AIA's illegal activities, or of the fact that ALICO and AIA could not count on being able to continue them.[10] And because the amount of indebtedness that was forgiven was tied directly to the valuation amounts, AIG received a larger reduction of its

---

3.   *Id.* ¶¶ 29, 31.

4.   *Id.*

5.   *Id.* ¶¶ 92, 93.

6.   *Id.* ¶¶ 52–65.

7.   *Id.* ¶¶ 92.

8.   *Id.* ¶¶ 94–99.

9.   *Id.* ¶¶ 94–95.

10.  *Id.* ¶ 94, 95.

debt than it would have if it had told the truth.[11] AIG has not disputed the sufficiency of these allegations.

Based on the facts summarized above (and set out in more detail in the Second Amended Complaint) Relator seeks to have AIG held liable under 31 U.S.C. § 3729(a)(1)(G) for what is known as a "reverse" false claim: "improperly avoid[ing] or decreas[ing] an obligation to pay…money…to the Government" (as opposed to obtaining money) by "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay…money…to the Government[.]" *Id*. AIG has not challenged the allegation that (assuming its representations were knowingly false), it violated this provision.

**B. AIG's Motion to Dismiss.**

AIG contends that the Second Amended Complaint should be dismissed for failure to state a claim. According to AIG, the Second Amended Complaint fails to adequately plead that AIG's representations and warranties were false. AIG's sole basis for that argument is that Plaintiff did not specifically identify the laws that ALICO and AIA violated by engaging in unlicensed insurance business. AIG also contends that the Second Amended Complaint does not adequately allege that (assuming the warranties were false) AIG acted knowingly. While we disagree with AIG on these points, rather than argue the issue we have decided to seek leave to further amend the complaint in order to fill the supposed gaps in the Second Amended Complaint.

AIG also argues that the False Claims Act's "public-disclosure bar" deprives the Court of jurisdiction over the case. It asserts that the key elements of the claim were publicly disclosed before this action was commenced. In fact, the disclosures AIG relies on were made before the occurrence of the transaction from which the claim arises. AIG therefore contends, in effect, that its fraud was publicly disclosed before it happened.

Finally, AIG argues not only that the Second Amended Complaint should be dismissed, but that even if the public-disclosure bar does not apply, the Second Amended Complaint should be dis-

---

11. *Id*. ¶¶ 36, 96–99.

missed without leave to amend. That argument is based on the contention that because Grabcheski has already amended the complaint twice, any further amendment would be futile.[12] As we will show, that argument is mistaken: our proposed Third Amended Complaint significantly fleshes out the allegations on which the claim is based, and in doing so it cures the alleged deficiencies in the Second Amended Complaint.

Moreover, while it is true that the complaint has already been amended twice, AIG's bare statement to that effect presents a misleading view of the amendments and the context in which they occurred. So before we describe the new allegations that are included in the proposed Third Amended Complaint, we briefly set out the relevant procedural history.

### C. The Procedural Background to the Second Amended Complaint.

This action was commenced in May 2010, by the filing of a complaint under seal. The allegations of fraud in that original complaint were different than those that are the subject of the Second Amended Complaint; the latter allegations were added in the First Amended Complaint, which was filed as a matter of right on July 29, 2011, while the complaint was still under seal because the government had not yet decided whether to intervene in the action.[13]

Before the First Amended Complaint was served on AIG, Relator sought leave to file a Second Amended Complaint.[14] Leave to amend was granted on May 9, 2014,[15] and the Second Amended Complaint was subsequently served on AIG.

The primary reason for the second amendment to the complaint was to delete the allegations of fraud that had been the basis for the original complaint, which had turned out (based on

---

12. AIG Memorandum in Support of Motion to Dismiss the Second Amended Complaint ("AIG Memo.") 24–25.

13. Dkt. No. 6.

14. Dkt. No. 12. The motion for leave was filed after the government had given notice of its decision not to intervene and the Court had ordered that the complaint be unsealed. However, it appears that the order was not received by the Sealed Records division of the Clerk's office, so the Clerk's office was still treating the case as being under seal when the motion for leave to amend was filed.

15. Dkt. No. 13.

information obtained by the United States Attorney's Office after the complaint was filed) not to be viable. In addition to dropping those allegations, the Second Amended Complaint provided further factual details regarding the allegations that remained.

That represents the only amendment so far of the allegations that we are currently pursuing. And that amendment was not made in response to any argument that the First Amendment Complaint was in any way deficient. The First Amended Complaint had not been served on AIG, and nothing had been said to challenge the First Amended Complaint's sufficiency.

### D. The Proposed Third Amended Complaint.

The proposed Third Amended Complaint is almost twice as long as the Second Amended Complaint, and the additional material—more than 20 pages' worth—consists entirely of factual details of the sort that AIG contends are missing from the Second Amended Complaint. For example—

- The Third Amended Complaint identifies of the provisions of New York law that ALICO and AIA violated, and provides additional factual detail supporting the allegation that their conduct violated New York law. (Third Am. Compl. ¶¶ 52–58.)

- The Third Amended Complaint clarifies that ALICO's violation of Delaware law consisted, not of lacking a Delaware insurance license, but of improperly taking advantage of regulatory exemptions that were available only to insurers that did not transact insurance business anywhere in the United States. (Third Am. Compl. ¶ 46.)

- The Third Amended Complaint identifies the provisions of Delaware law that provided for the regulatory exemptions. (Third Am. Compl. ¶ 46.)

- The Third Amended Complaint identifies provisions of California, Colorado, Illinois, and North Carolina law that ALICO and AIA violated by engaging in unlicensed insurance activity in those states. (Third Am. Compl. ¶¶ 61–65.)

- The Third Amended Complaint alleges facts showing that AIA (and not just ALICO) engaged in unlicensed insurance activity in the United States. (Third Am. Compl. ¶¶ 67–87.)

- The Third Amended Complaint alleges additional facts showing that AIG (and not just ALICO) knew the facts that made AIG's representations and warranties false (Third Am. Compl. ¶¶ 150–62; *see also id.* 104–26.) Specific senior officers of AIG who had such knowledge are identified, and what they knew is summarized. (*Id.* 153–55.)

- The Third Amended Complaint alleges facts supporting the conclusion that AIG was involved in ALICO's concealment of its unlicensed activities from the New York insurance regulators and that it knew the substance of the advisory opinion that the regulators gave, which should have made it clear to AIG that ALICO and AIA's unlicensed activities in New York were illegal. (Third Am. Compl. ¶¶ 127–48, 155.)

- The Third Amended Complaint describes the findings by the New York Department of Financial Services that AIG and ALICO had violated New York law in connection with ALICO's unlicensed transaction of insurance business in New York. It also describes the consent orders arising from those findings, under which AIG paid a civil penalty of $35 million and MetLife (which had acquired ALICO from AIG) paid a penalty of $50 million, part of which was paid on behalf of ALICO.[16] (Third Am. Compl. ¶¶ 176–86.[17])

## ARGUMENT

**I.   Relator Should Be Given Leave to File the Third Amended Complaint and the Motion to Dismiss Should Therefore Be Denied as Moot.**

Although we disagree with AIG's argument that the Second Amended Complaint fails to state a claim, the Court need not reach that issue, because it will become moot if the Court grants leave to file the Third Amended Complaint (as it should). As the Second Circuit has repeatedly said, "an amended pleading ordinarily supersedes the original and renders it of no legal effect."[18] Thus, if a pleading is amended while a motion to dismiss it is pending, the amendment makes the motion moot.[19]

---

16. The penalty paid by MetLife on behalf of ALICO presumably arose both from ALICO's activities while it was a subsidiary of AIG and from its activities after it was acquired by Met Life. We do not know what portion of the $50 million is attributable to ALICO's activities as an AIG subsidiary.

17. *See also* Consent Order, *In re American International Group, Inc.* (N.Y. Dep't of Fin. Servs.), *available at* http://www.dfs.ny.gov/about/press2014/pr141031-consent.pdf (last visited March 23, 2015) (Declaration of Max Maccoby ["Maccoby Decl."] Ex. 1); New York Department of Financial Services, *NYDFS announces AIG to pay $35 million penalty for insurance law violations related to its former subsidiaries ALICO and DELAM,* (Oct. 31, 2014)*, available at* http://www.dfs.ny.gov/about/press2014/pr1410311.htm (last visited March 23, 2015).

18. *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir. 2000). *See Lucente v. IBM*, 310 F.3d 243, 260 (2d Cir. 2002); *Dluhos v. Floating & Abandoned Vessel, Known as N.Y.,* 162 F.3d 63, 68 (2d Cir. 1998); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994).

19. *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 120 (2d Cir. 2006) ("plaintiffs then filed their amended complaint, mooting the NYP defendants' original motion to dismiss"); *Freeman v. Timberlake*, No. 06 CV 1112 GBD, 2007 WL 184817, at *2 (S.D.N.Y. Jan. 25, 2007) (granting leave to file second amended complaint and therefore denying motion to dismiss the first amended complaint as moot) (Daniels, J.).

Under Fed. R. Civ. P. 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires." And as the Supreme Court has said, "this mandate is to be heeded":[20]

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."[21]

As we explain in detail below, none of the circumstances that might justify denying leave to amend are present here. Moreover, granting leave to amend is especially appropriate given that AIG's primary argument is that the Second Amended Complaint fails to plead fraud with specificity. When a motion to dismiss is granted on that ground, leave to amend is routinely granted.[22] And the case for allowing amendment is even stronger where, as here, the plaintiff seeks to amend after the defendant has moved to dismiss but the motion has not yet been acted on.

## A.   The Reasons Advanced by AIG for Barring Further Amendment Are Unfounded.

Anticipating that we might seek leave to amend, AIG makes a perfunctory argument that the Second Amended Complaint should be denied with prejudice. AIG contends that the complaint has already been amended twice and that any further amendment would be futile. But this attempt to bar an additional amendment is unfounded and should be rejected.

### 1.   Granting leave to amend will not be futile.

Contrary to what AIG contends, amending the complaint again would not be futile. As we show in Section II, below, the proposed Third Amended Complaint cures any lack of specificity in the current version. And as is shown in Section III, this Court's jurisdiction is not defeated by the "public-disclosure bar" of 31 U.S.C. § 3730(e)(4)(A).

---

20. *Foman v. Davis,* 371 U.S. 178, 182 (1962).

21. *Id. See also, e.g.*, *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 109 (2d Cir. 2014).

22. *E.g.*, *Olsen v. Pratt & Whitney Aircraft, Div. of United Techs. Corp.*, 136 F.3d 273, 276 (2d Cir. 1998) ("Plaintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint.").

Furthermore, and contrary to what AIG contends, the government's decision not to intervene in this action is irrelevant to the question whether amendment would be futile. That decision gives no indication about the government's view of the merits. "Because the government 'may have a host of reasons for not pursuing a claim,' courts 'do not assume that in each instance in which the government declines intervention in an FCA case, it does so because it considers the evidence of wrongdoing insufficient or the qui tam relator's allegations [of] fraud to be without merit.'"[23] Indeed, to make such an assumption "would seem antithetical to the purpose of the *qui tam* provision—to encourage private parties to litigate on behalf of the government."[24]

If the Court nevertheless takes account of the federal government's decision not to intervene, it should also consider (a) the findings by the New York State Department of Financial Services that AIG and ALICO violated New York law in connection with ALICO's unlicensed transaction of insurance business in New York, (b) the consent orders that the Department obtained from AIG and ALICO, under which AIG paid a civil penalty of $35 million and a penalty of $50 million was paid in part on ALICO's behalf, and (c) the deferred prosecution agreement ALICO, MetLife, and another MetLife subsidiary entered into the Manhattan district-attorney's office, under which a further penalty of $10 million was paid in part on ALICO's behalf.[25] While those facts do not establish that AIG is liable in this case, they are certainly relevant to whether Relator's allegation of fraud satisfies the *Twombly–Iqbal* plausibility requirement.[26] They also confirm that ALICO and AIA's unlicensed insurance activities in New York gave rise to very substantial potential liabilities, as was alleged in the Second Amended Complaint and as is alleged again in the proposed Third Amended Complaint.

---

23. *United States ex rel. Feldman v. van Gorp*, No. 03 CIV. 8135 (WHP), 2010 WL 2911606, at *2 (S.D.N.Y. July 8, 2010) (quoting *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006)). *See also, e.g.*, *United States ex rel. DeCarlo v. Kiewit/AFC Enters.*, 937 F. Supp. 1039, 1047 (S.D.N.Y.1996) ("[N]on-intervention does not necessarily signal governmental disinterest in an action.").

24. *United States ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 21 (D.D.C. 2008). *See also United States ex rel. Berge v. Board of Trustees*, 104 F.3d 1453, 1458 (4th Cir.1997) ("the plain language of the Act clearly anticipates that even after the Attorney General has 'diligently' investigated a violation [of the FCA], the Government will not necessarily pursue all meritorious claims").

25. Third Am. Compl. ¶¶ 176–85; Maccoby Decl. ¶¶ 4–5 & Ex.1–3.

26. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

### 2. There has been no "repeated failure to cure deficiencies by amendments previously allowed."

In noting that Grabcheski has already amended the complaint twice, AIG apparently seeks to portray this case as one involving "repeated failure to cure deficiencies by amendments previously allowed[.]"[27] But such a portrayal would be inappropriate, because it depends on a mischaracter-ization of the procedural history to date.

The claim Relator is currently pursuing was not included in the original complaint, but was added in the First Amended Complaint. And although the claim was subsequently amended (by the Second Amended Complaint), that amendment was not prompted by a challenge to the claim's sufficiency. AIG had not even been served at that point, and there had been no contention (much less a holding) that the claim was deficient. The primary purpose of the second amendment was to drop the claim that had been asserted in the original complaint, which we had decided not to pursue. And given that the complaint was being amended anyway, we used the opportunity to add some additional allegations in support of the claim that was not being dropped.

Thus, before AIG moved to dismiss the Second Amended Complaint, there had been *no* "failure[s] to cure deficiencies by amendments previously allowed[.]"

## B. There Is No Other Reason to Deny Leave to Amend.

AIG's argument that the Second Amended Complaint should be dismissed without leave to amend is based solely on the points that are discussed above. It does not contend that Plaintiff delayed unduly in seeking to amend, he is acting in bad faith or due to a dilatory motive, or that allowing the amendment would cause it undue prejudice. And if any such argument had been made, it would have been baseless.

*First*, there has been no undue delay. As noted above, granting leave to amend is the norm when a complaint is dismissed for failure to plead fraud with specificity. It follows that the plaintiff's failure to have amended sooner does not in and of itself amount to undue delay. *A fortiori*, there can

---

27. *Foman*, 371 U.S. at 182.

be no issue of undue delay where, as here, leave to amend is sought before the motion to dismiss has been fully briefed, much less ruled on.

Furthermore, the rule in this Circuit is that delay alone—without some additional factor such as bad faith or undue prejudice—does not justify denying leave to amend.[28] As is shown below, no such additional factors exist here. And in any case, AIG is in no position to complain about any delay on Relator's part, after having sought and obtained several extensions of the deadline for responding to the Second Amended Complaint.

*Second,* the Relator is acting in good faith. There is nothing remotely inappropriate about amending a complaint in order to address alleged deficiencies raised by the defendant. Indeed, where the complaint is challenged on the ground that it fails to allege fraud with specificity (as AIG contends here), granting leave to amend is the norm.[29] And AIG does not contend that it would amount to bad faith for Grabcheski to seek leave to amend.

*Third*, it follows from what we have already said that Relator is not acting based on a dilatory motive. He is acting in good faith, and any suggestion that he is trying to cause delay would make no sense given that granting leave to amend would not result in any delay. Our motion for leave to amend will presumably be ruled on at the same time as AIG's motion to dismiss. Therefore, the course of future proceedings if leave is granted will be the same as if the motion to dismiss was denied without leave to amend having been sought.

*Finally,* granting leave to amend will not cause any undue prejudice. The proposed amendment does not assert any new claims, but rather provides additional details about the claim that has already been asserted. Discovery has not yet begun, so AIG will have ample time to take discovery

---

28. *See, e.g.*, *State Farm Ins. Cos. v. Kop-Coat, Inc.*, 183 F. App'x 36, 37-38 (2d Cir. 2006); *Grace v. Rosenstock*, 228 F.3d 40, 53-54 (2d Cir. 2000); *Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 234-35 (2d Cir. 1995); *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987).

29. *Olsen*, 136 F.3d at 276 ("Plaintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint."); *Luce v. Edelstein*, 802 F.2d 49, 56–57 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend.") (internal quotation marks and citation omitted).

regarding the newly-alleged facts.[30] And as we have pointed out, granting leave to amend will not delay future proceedings.

## II.  The Third Amended Complaint Cures the Alleged Deficiencies That Are Cited By AIG.

AIG argues that the Second Amended Complaint should be dismissed because it fails in two respects to plead fraud with particularity. First, it supposedly fails to adequately plead a false statement, because it does not identify the provisions of New York and Delaware law that ALICO and AIA violated. Second, it supposedly fails to adequately plead that AIG acted knowingly. But even assuming, *arguendo*, that the Second Amended Complaint is inadequate in those respects, the Third Amended Complaint indisputably cures any such deficiency.[31]

### A.  The Third Amended Complaint Specifies the Provisions of Law That ALICO and AIA Violated, and Therefore Adequately Pleads That AIG Made False Statements.

The Third Amended Complaint cures the first alleged deficiency AIG cites, by specifically identifying the provisions of law that ALICO and AIA violated.

*First*, the Third Amended Complaint cites and quotes the provisions of New York law that were violated by the unlicensed insurance business that ALICO and AIA carried on in New York: N.Y. Ins. Law §§ 1101(b)(1), 2102(a)(1)(A), and 2117(a).[32] It also devotes almost four pages to spelling out the activities by and on behalf of ALICO and AIA that violated those provisions.[33]

---

30.  *Cf. Kroshnyi*, 771 F.3d at 109 (plaintiff was not prejudiced by defendant's assertion of statute-of-frauds defense more than a year after filing their answer and four months after the close of discovery, because plaintiff still "had an adequate opportunity to argue against its application to this case").

31.  In deciding whether to allow the Third Amended Complaint to be filed, the Court need not undertake a "comprehensive legal analysis" of the pleading's sufficiency, but may instead defer such an analysis until a subsequent motion to dismiss, should one be filed. *See, e.g.*, *Goston v. Potter*, No. 9:08-CV-478 (FJS/ATB), 2010 WL 4774238 at *5 (N.D.N.Y. Sept. 21, 2010); *Madison Fund, Inc. v. Denison Mines Ltd.*, 90 F.R.D. 89, 91 (S.D.N.Y. 1981).

32.  Third Am. Compl. ¶¶ 52–55; *see also id.* ¶¶ 56–58 (describing advisory opinions issued by the New York State Department of Insurance).

33.  *Id.* ¶¶ 67–87.

*Second*, the Third Amended Complaint clarifies and provides further details regarding the allegation that ALICO did not comply with Delaware law. Whereas the Second Amended Complaint mistakenly said that ALICO was not licensed in Delaware, the Third Amended Complaint alleges and clarifies that because of ALICO's underwriting activity in Delaware, and its unlicensed insurance activity in other states, it was not eligible for various regulatory exemptions that it had been afforded based on its assertion that it did no insurance business in the United States.[34] And the statutory provisions providing for those exemptions are specifically identified: 18 Del. Code §§ 1104, 1313, 1321, 2712, 5801, and 5809.[35]

The Third Amended Complaint also goes beyond the Second Amended Complaint by alleging that in addition to violating New York and Delaware law, ALICO and AIA engaged in unlicensed insurance activity in California, Colorado, Illinois, and North Carolina—and as to each state, the relevant statutes are cited and quoted.

### B. The Third Amended Complaint Provides More Than Enough Detail to Support the Allegation That AIG Acted Knowingly.

As AIG recognizes, the term "knowingly" is defined in the False Claims Act to include not only actual knowledge but also "deliberate ignorance" or "reckless disregard" of the representation's truth or falsity.[36] Moreover, AIG's knowledge (as so defined) need not be alleged with particularity: Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[37] While the complaint must still "provide at least a minimal factual basis" for the allegation that the defendant acted knowingly,[38] that requirement is easily satisfied here. The Third

---

34. *Id.* 46–51, 88–91.

35. *Id.* ¶ 46.

36. 31 U.S.C. § 3729(b). Therefore, as used with regard to AIG, ALICO, AIA, or any of their officers, employees, or agents in the Third Amended Complaint and in this memorandum, (a) the word "knew" means "had actual knowledge of…, acted in deliberate ignorance of the truth or falsity of…, or acted in reckless disregard of the truth or falsity of…[,]" and (b) the related words "knowing," "knowingly, " and "knowledge" have a meaning consistent with that definition of "know." *See* Third Am. Compl. ¶ 150 n.7.

37. Fed. R. Civ. P. 9(b). *See, e.g.*, *Dreieck Finanz AG v. Sun*, No. 89 CIV. 4347 (MBM), 1990 WL 11537, at *3 (S.D.N.Y. Feb. 9, 1990) (knowledge need not be pled with particularity).

38. *Dreieck Finanz AG*, 1990 WL 11537, at *3.

Amended Complaint provides more than eight pages of facts supporting the conclusion that AIG acted knowingly.[39]

1.   The Third Amended Complaint begins by specifying *what* AIG knew and *when* it knew it.[40] It alleges that senior officers of AIG knew the following facts "at the time the Debt Reduction Agreements were negotiated and executed, and for a period of several years before that":[41]

- ALICO and AIA were (through the actions on their behalf of the Group Management Division ("GMD")) engaged in the unlicensed insurance activities that the Third Amended Complaint describes;

- such activities were not allowed under the applicable state's law unless both the insurer (ALICO or AIA, as the case may be) and the individuals carrying on the activities were licensed in that state;

- neither ALICO nor AIA nor the GMD personnel carrying on the activities in New York and the other states had such licenses;

- ALICO was not entitled to the regulatory exemptions under Delaware law that it claimed entitlement to (and that it was afforded) on account of the fact that it supposedly transacted insurance only outside the United States;

- ALICO was not in compliance during the relevant time period with at least some of the regulatory requirements that it had wrongfully claimed to be exempt from;

- ALICO and AIA were required to report revenue from the insurance sales in the United States as income on federal and state tax returns, and to pay tax as applicable on that income; and

- ALICO and AIA had neither reported that revenue nor paid applicable federal or state taxes on it.

The Third Amended Complaint also specifies *who* knew these facts. It identifies (by name and title) ten senior AIG officers who knew the facts. And to be clear, these were officers of AIG, at the very top of AIG's management hierarchy, whose knowledge is indisputably attributable to AIG.[42]

---

39.  Third Am. Compl. ¶¶ 104–26. 150–62.

40.  *Id.* 151–52,

41.  *Id.* ¶ 151; *see also id.* ¶ 152.

42.  Third Am. Compl. ¶ 153; *see also id.* ¶¶ 154–56.

So AIG cannot contend (as it does about the Second Amended Complaint[43]) that we are conflating AIG's knowledge with that of its subsidiaries.

Moreover, the Third Amended Complaint identifies four of the senior AIG officers as having "[known] about the Debt Reduction Agreements, and about the representations and warranties that AIG made in those agreements, when those agreements were executed by AIG[.]"[44] In fact, one of those officers was the person who signed the agreements on AIG's behalf.[45]

In addition, the Third Amended Complaint alleges facts showing that AIG knew about the advisory opinion issued by the New York insurance regulators in 2009 (in response to a request from ALICO), which made it clear that a New York license was required for conducting insurance activities in New York that did not involve contact with the public, that were not "primarily ministerial in nature," and that involved solicitation or sale of insurance, even where the insurance covered risks and insureds that are located outside New York.[46] And although the advisory opinion was issued after the Debt-Reduction Agreements were executed, it predated the closing under those agreements.[47] That is important, because AIG warranted that its representations would be (and were) true as of the closing date as well as the execution date.[48] The allegations about the advisory opinion therefore support the conclusion that AIG knew that ALICO and AIA had been engaging in an insurance business in New York for which they needed—but did not have—a license.

AIG has referred to the possibility that New York law was ambiguous as to whether ALICO and AIA needed licenses for their activities in New York.[49] However, it has not actually made an

---

43. AIG Memo. 15.

44. Third Am. Compl. ¶ 154.

45. *Id.*; *see also id.* ¶ 31. Although Relator no longer worked at AIG by the time the Debt-Reduction Agreements were executed, he is aware of these officers' knowledge as a result of his observations and interactions before he was fired. *See* Third Am. Compl. ¶¶ 151.

46. Third Am. Compl. ¶¶ 127–48.

47. The letter was dated November 23 and the closing was on December 1. (Third Am. Compl. ¶ 37, 144.)

48. *Id.* at ¶¶ 29, 30, 33.

49. AIG Memo 12–13.

ambiguity argument. Therefore, while the New York was, in our view, unambiguous—especially in light of the publicly available advisory opinions by the Department of Insurance—we need not discuss that issue here.

But even if the law were ambiguous, that would not affect the conclusion that AIG's misrepresentations were made knowingly. The Third Amended Complaint's allegations support the conclusion that AIG subjectively understood ALICO and AIA's activities in New York to constitute the transaction of insurance business for which a license was required.[50] When that understanding is considered together with AIG's awareness that ALICO and AIA did not have the required licenses, it becomes clear that AIG made representations that it did not believe to be true. Those representations were therefore knowingly false regardless of whether the applicable law was ambiguous.[51]

**2.**    In addition to arguing that the Second Amended Complaint does not provide enough factual detail, AIG asserts that the allegation that AIG acted knowingly, is "undermine[d]" by the supposed fact that "the FRBNY had virtually unfettered access to AIG's, ALICO's, and AIA's internal confidential information and was able to conduct an extensive review of ALICO's and AIA's activities prior to entering into the [Debt-Reduction Agreements]."[52] But that contention relies on unsupported assertions by AIG's counsel, not on anything in the Second Amended Complaint or in any document that the Second Amended Complaint incorporates by reference or otherwise refers to.

To support its claim about the FRBNY's alleged access to AIG's information, AIG cites section B of its Statement of Facts,[53] of which the only relevant part is this three-sentence paragraph:

> In the eight months between the announcement of the restructuring and the closing of the transaction, the FRBNY conducted an extensive review of ALICO's and AIA's operations, financial results, audits, and other books and records. For example, as documented in the DRAs [Debt-Reduction Agreements], the FRBNY

---

50.  Third Am. Compl. ¶¶ 104–43, 155–61.

51.  *Cf. United States ex rel. Chilcott v. KBR, Inc.*, No. 09-CV-4018, 2013 WL 5781660, at *6 (C.D. Ill. Oct. 25, 2013) (a deliberate or knowing misrepresentation can give rise to False Claims Act liability even if it was based on a reasonable interpretation of the contract).

52.  AIG Memo. 17.

53.  *Id.*

had access to, among other things, AIG's, ALICO's, and AIA's confidential business information. See ALICO DRA at ¶ 3.7(a); AIA DRA at ¶ 3.7(a). In addition to the sophisticated in-house and outside counsel representing both AIG and the FRBNY in the negotiation, due diligence, and execution of the DRAs, the Federal Reserve had a unique view into AIG and its business units and subsidiaries.[54]

The first and last sentence of the paragraph are self-serving assertions by AIG's counsel, unsupported by any citation to the complaint (or to anything else). They are outside the scope of the Second Amended Complaint, and may not properly be considered in ruling on a motion to dismiss for failure to state a claim.[55] These are questions of fact for a jury.

That leaves the second sentence, which asserts that "the FRBNY had access to, among other things, AIG's, ALICO's, and AIA's confidential business information." As support for that assertion, AIG cites ¶ 3.7(a) of the Debt-Reduction Agreements. But that provision (which is the same in each agreement) does not support the proposition that AIG cites it for. Although § 3.7(a) indicates that FRBNY was given access to information *of some sort*, it says nothing to describe that information. All it says is that the information (whatever it might be) must be treated as confidential:

> The information concerning Seller, the Company or ALICO or their respective subsidiaries furnished or made available to Buyer or its representatives by Seller, the Company or ALICO or their respective representatives pursuant to this Agreement shall be held confidential pursuant to the terms of the nondisclosure agreement, dated as of September 25, 2008, between Seller and Buyer (the "Non-disclosure Agreement").[56]

This provision gives no reason to think that the government had access to information relevant to whether ALICO or AIA had engaged in unlicensed insurance activity in New York. And even if the provision could otherwise support such an inference, the inference would be inappropriate because the complaint must be read in the light most favorable to the plaintiff.[57]

---

54. *Id.* at 5.

55. *See, e.g.*, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 449 (4th Cir. 2011) ("statements by counsel that raise new facts constitute matters beyond the pleadings and cannot be considered on a Rule 12(b)(6) motion").

56. Carlinsky Decl. Ex. D at 24 (Dkt. No. 31-4 at ECF pg. 31) & Ex. E at24 (Dkt. No. 31-5 at ECF pg. 31).

57. *E.g.*, *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014); *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir.1997).

### III.  There Has Been No Public Disclosure Sufficient to Bar the Claim.

Under the version of the False Claims Act applicable here,[58] the courts lack jurisdiction over qui tam actions "based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless…the person bringing the action is an original source of the information."[59] AIG's contention that Relator's claims are barred by this provision is unfounded. As shown below, the "allegations or transactions" from which this case arises were not publicly disclosed before the complaint was filed.

### A.  The Public-Disclosure Bar Applies Only If All the Key Elements of the Claim Were Publicly Disclosed Before the Suit Was Filed.

The public-disclosure bar applies only if there was a prior public disclosure (via one of the specified sources) of "the material elements of the 'allegations or transactions' on which the claim is based."[60] As the D.C. Circuit has explained in a case that the Second Circuit has quoted with approval, "Congress sought to prohibit qui tam actions only when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain."[61]

Thus, if one assume that "Z represents the allegation of fraud and X and Y represent its essential elements [,]" the fraud is deemed to have been publicly disclosed only if "the combination of X and Y [are] revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed."[62] In other words, "the question is whether the information conveyed [in the disclosures] could have formed the basis for a governmental decision on prosecution, or could at

---

58. Plaintiff agrees with AIG that the 2010 amendment is inapplicable.

59. 31 U.S.C. § 3107(e)(4)(A) (2006).

60. *United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 103 (2d Cir. 2010), *rev'd on other grounds*, 131 S. Ct. 1885 (2011).

61. *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C.Cir.1994), *quoted in United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d at 103. *See also, e.g., Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 297–98 (S.D.N.Y. 2013).

62. *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d at 654, *quoted in United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d at 103.

least have alerted law-enforcement authorities to the likelihood of wrongdoing."[63] The disclosures that AIG relies on do not remotely meet this standard.

### B. The Disclosures AIG Relies on Did Not Reveal the Key Elements of the Claim.

#### 1. The disclosures did not reveal that the FRBNY gave AIG $25 billion in debt reduction in reliance on false representations by AIG about ALICO and AIA.

The single most important element of the claim here—the element that makes this a False Claims Act case rather than a case about some other kind of fraud—is the fact that AIG made knowingly false representations about ALICO and AIA *to the federal government* and thereby obtained $25 million in debt reduction.

AIG does not contend that this fact was publicly disclosed before this action was commenced. Of course, the Debt-Reduction Agreements themselves were presumably in the public domain, but that does not amount to a public disclosure of the fact that the agreements contained misrepresentations by AIG, much less *knowing* misrepresentations. Certainly the specific disclosures that AIG relies on did not reveal that fact. Indeed, they could not possibly have revealed that fact, because they were all made before the Debt-Restructuring Agreements were executed, and indeed before the bailout that gave rise to the indebtedness in the first place: the most recent disclosure occurred in March 2008—roughly six months before the bailout in September of that year.[64]

#### 2. The disclosures did not reveal that ALICO and AIA engaged in unlicensed insurance activities in New York.

AIG cites three media reports (in 2000, 2005, and 2008) as supposedly revealing the essential elements of the its fraud:[65]

---

63. *Id.* (internal quotation marks and citation omitted).

64. *Compare* AIG Memo. 20, 22 (referring to disclosures in 2000, 2005, and 2008) *with* Edmund L. Andrews et al., *Fed's $85 Billion Loan Rescues Insurer*, New York Times, Sept. 17, 2008, at A1, available at http://www.nytimes.com/2008/09/17/business/17insure.html?pagewanted=all (last visited March 23, 2015).

65. AIG Memo. 20–21.

**The 2008 press release** (emphasis added by AIG)

AIG Group Management Division (GMD) is a division of the life insurance subsidiaries of AIG. *Headquartered in New York*, GMD operates in more than 100 countries through a regional and local management structure. GMD's employee benefits, credit insurance, and global pension products and services are offered through the various life insurance subsidiaries of AIG, including *American International Assurance (AIA)*, *American Life Insurance Company (ALICO)*, Nan Shan (Taiwan), Philamlife as well as other strategic partners around the world.[66]

**The 2000 press release**

American Life Insurance Company (ALICO), incorporated in Delaware, is one of the largest international life insurance companies in the world, with more than $216.5 billion of life insurance in force as of December 31, 1999. ALICO holds Standard and Poor's highest financial strength rating, AAA, and an AAA insurance financial strength rating from Moody's. ALICO and its branches, affiliates and subsidiaries market a broad range of life and other insurance products through a network of some 24,000 agents and brokers in approximately 50 countries worldwide. American International Companies' Group Management Division provides employee benefit programs to multinational and indigenous companies worldwide.[67]

**AIG's 2005 annual report**

The Group Management Division (GMD) is the primary distribution arm for AIG's international employee benefits, credit, and pension products and services. GMD continued its strong performance in 2005 by maintaining its leadership position as either the number one or two provider of group benefits in Hong Kong, Malaysia, Singapore, Taiwan and Thailand as measured by market share, and the number one issuer of new group life policies in Japan.[68]

None of these statements disclosed the crucial elements of Relator's claim.

The claim here is based on the allegation that AIG falsely warranted in the Debt Restructuring Agreements that (among other things) ALICO and AIA had all licenses that were required for them to carry on their business and that they were in compliance with all applicable laws.[69] With respect to the insurance activities in New York, Plaintiff alleges that AIG's warranties were false because (1) ALICO and AIA were (by virtue of GMD's activities on their behalf) engaged in so-

---

66.  Carlinsky Decl. Ex. I (Dkt. No. 31-9) (quoted in AIG Memo. at 20).

67.  Carlinsky Decl. Ex. J (Dkt. No. 31-10) (quoted in AIG Memo. at 20).

68.  Carlinsky Decl. Ex. K (Dkt. No. 31-10) (quoted in AIG Memo. at 20–21).

69.  Third Am. Compl. ¶ 149.

liciting insurance business in New York, (2) that activity required them to be licensed to do an insurance business in New York, but (3) they did not have such a license. None of those elements were disclosed in the media reports that AIG relies on.

   *a. The solicitation of insurance business in New York was not disclosed.* None of the reports AIG relies on disclosed that ALICO and AIA were soliciting insurance business in New York. Although the 2008 press release stated that GMD was "headquartered" in New York, it did not state that GMD solicited insurance business in New York on behalf of ALICO or AIA. On the contrary, it said that GMD "operates in more than 100 countries *through a regional and local management structure*"[70]—a statement that leads one to infer that solicitation occurred overseas, under the umbrella of the "regional and local management structure." The press release therefore gave no reason to think that, AIA, or GMD was soliciting insurance business in New York. (Indeed, in a 2009 letter to the New York regulators, ALICO denied that it solicited insurance in New York or otherwise conducted insurance business in New York.[71])

   Similarly, the press release in 2000 did not disclose any of the relevant facts. To begin with, it said nothing to suggest that ALICO, AIA, or GMD had any presence in New York. Moreover, it stated, "ALICO and its branches, affiliates and subsidiaries market a broad range of life and other insurance products *through a network of some 24,000 agents and brokers in approximately 50 countries worldwide*."[72] Like the 2008 press release, this one gave no clue that ALICO, AIA, or GMD carried on an insurance business in New York.

   Finally, AIG's 2005 annual report did not mention ALICO or AIA at all, and referred to GMD's overseas activities without saying anything to suggest that it had any presence in the United States, much less that it was conducting insurance business in New York. [73]

---

70.  Carlinsky Decl. Ex. I (Dkt. No. 31-9) (quoted in AIG Memo. at 20) (emphasis added).

71.  Carlinsky Decl. Ex. H (Dkt. No. 31-8) (quoted in AIG Memo. at 20).

72.  Carlinsky Decl. Ex. J  (Dkt. No. 31-10) (quoted in AIG Memo at 20) (emphasis added).

73.  Carlinsky Decl. Ex. K (Dkt. No. 31-11) (quoted in AIG Memo. at 20) (emphasis added).

*b. The need for New York insurance licenses was not disclosed.* The disclosures AIG relies on are also inadequate to trigger the public-disclosure bar because none of them states or even implies that ALICO, AIA, or GMD was carrying on activity in New York for which a New York insurance license was required. Nor do any of the disclosures state or imply that the GMD personnel in New York who acted on ALICO and AIA's behalf were required to have New York producer's licenses.

*c. The fact that the activities in New York were unlicensed was not disclosed.* Just as there was no disclosure that New York licenses were required, there was no disclosure that such licenses were lacking. None of the disclosures states or implies that ALICO, AIA, or GMD were not licensed to carry on an insurance business in New York. Nor do any of the disclosures state that the personnel in New York did not have New York producers' licenses.

### 3. The disclosures did not reveal that ALICO was engaged in underwriting in Delaware.

AIG contends that the fact that ALICO engaged in underwriting in Delaware was disclosed in a report issued in 2005 by the Delaware Commissioner of Insurance ("the Delaware Examination Report"). [74] But in reality, the report provides no such disclosure.

AIG relies on the following language from the report (alterations by AIG in its memorandum):

> The Company [ALICO] maintains an Underwriting and Selection Procedure. The Company's procedures are based upon a Company developed underwriting manual and supplemented with underwriting selection decisions with employee access to reinsurance manuals…. [T]he Home Office [in Wilmington, Delaware] underwriters perform audits on at least four (4) local operations per year.
>
> …
>
> Adherence to the life insurance underwriting procedures is documented in the audits described in [text quoted] above. In the case of audits, file documentation, adherence

---

74. AIG Memo. 21–22 (citing State of Delaware, Department of Insurance, *Market Conduct Examination of American Life Insurance Company as of September 18, 2005*, *available at* http://delawareinsurance .gov/departments/berg /ExamReports/ALICO2005MCWEB.pdf). The portions of the report cited by AIG are attached to the Carlinsky Declaration as Exhibit B.

to procedures, adequacy of decision and any adverse findings are noted in the audit report.[75]

Contrary to what AIG contends, nothing in these two paragraphs states or implies that ALICO engaged in underwriting in Delaware. Rather, they say that ALICO established underwriting *procedures* (without stating where that took place) and that the "Home Office" performed audits. Neither of those activities constitutes underwriting, which AIG itself has described as "the process of determining which risk class is most appropriate for the proposed insured based on several possible factors including age, gender, current physical condition and medical history, financial background, personal habits, avocation and relevant hobbies (such as aviation)."[76] The language AIG quotes does not suggest that ALICO performed that process in Delaware.

Any doubt on that score is dispelled by portions of the report that AIG does not mention. *First*, the report says that although ALICO "has a composite insurance license and is authorized to write Life and Health and Property and Casualty insurance in Delaware[,]" it "does not conduct any business within the United States or the territories governed by the United States."[77] That statement refutes AIG's argument that the report disclosed ALICO's underwriting in Delaware.

*Second*, the report says, "The focus of this examination centers on how the Company's Compliance Department *develops, informs, and monitors specific procedures from their home office*."[78] That statement confirms that the language quoted by AIG deals with developing and monitoring underwriting procedures, not carrying out those procedures to perform underwriting. Similarly, the report distinguishes between (on the one hand) "a planning function where direction, policy, objectives and goals are formulated" and (on the other hand) "an execution or implementation of the planning function elements" and "a measurement function that considers the results of the planning

---

75.  AIG Memo. 21–22 (quoting *Delaware Examination Report* 11, 12).

76.  American International Group, Inc., *AIG.com: Education Center: Underwriting: What is underwriting?*, http://www.aig.com/underwriting_3789_536492.html (last visited March 23, 2015).

77.  *Delaware Examination Report* 4 (Maccoby Decl. Ex. 4).

78.  *Id.* (emphasis added).

and execution[.]"[79] The language AIG quotes deals with the planning and measurement functions, not the execution or implementation function.

*Third*, AIG's first quote leaves out two-thirds of the paragraph, and the part that was left out includes language indicating that the actual underwriting process was carried out at ALICO's local offices in foreign countries, not in its "home office" in Delaware:

> The Company's underwriting manual may still require local operations jurisdictional adjustments to meet local compliance requirements….
>
> According to the Company, audits are performed on the underwriting units within the local operations at various levels. Currently periodic audits are performed on some of the local operations. The Company has stated that in the future it is expected that all local operations will perform case audits. At the regional level, the regional underwriter is responsible for auditing the operations within his or her region on an annual basis.[80]

The only thing in the report that even arguably supports AIG's position is the reference to "the Home Office underwriters" (who are said to "perform audits on at least four (4) local operations per year"). But the mere fact that the home office employed members of the underwriting profession does not mean that those employees were engaged in the underwriting process—just as lawyers employed by a corporation do not necessarily practice law. The home-office functions described in the report (developing underwriting procedures, and auditing local and regional underwriting operations) obviously require the involvement of professional underwriters. Thus, the report's one-time use of the phrase "Home Office underwriters" does not amount to a public disclosure that ALICO performed underwriting in Delaware.

### C. Because the Key Elements of the Claim Were Not Publicly Disclosed, AIG's "Original Source" Argument Is Beside the Point.

The question whether Plaintiff was the "original source" of the allegations in the complaint arises only if those allegations were publicly disclosed before the complaint was filed. There was no such public disclosure here. The original-source issue is therefore irrelevant.

---

79. *Id.* at 6.

80. *Id.* at 11.

## CONCLUSION

For the reasons stated above, the Court should (1) grant leave for Plaintiff/Relator to file the Third Amended Complaint, (2) deny AIG's motion to dismiss as being moot, and (3) hold that the public-disclosure bar does not deprive the Court of jurisdiction.

Respectfully submitted,

Dated:     Washington, D.C.                     BUTZEL LONG, a professional corporation
           March 25, 2015

                                               By: /s/ *Max Maccoby*
                                                   Max Maccoby (admitted *pro hac vice*)
                                               Thomas Patton
                                               James Gehrke (admitted *pro hac vice*)
                                               Neal Goldfarb (admitted *pro hac vice*)1747
                                               Pennsylvania Ave., NW, Suite 300
                                               Washington, DC 20006
                                               Telephone: (202) 454-2800
                                               Facsimile:  (202) 454-2805
                                               goldfarb@butzel.com
                                               pattont@butzel.com
                                               maccoby@butzel.com
                                               gehrke@butzel.com

                                               Robert Sidorsky
                                               230 Park Avenue, Suite 850
                                               New York, NY 10169
                                               Telephone: (212) 818-1100
                                               Facsimile:  (212) 818-0494
                                               sidorsky@butzel.com

                                               *Attorneys for Plaintiff/Relator Alex Grabcheski*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of March, 2015, the foregoing memorandum was served on the following via the Court's ECF system:

Michael B. Carlinsky, Esq.
Quinn Emanuel Urquhart & Sullivan
51 Madison Avenue, 22nd Floor
New York, New York 10010
michaelcarlinsky@quinnemaunel.com

William A. Burck, Esq.
Lori Alvino McGill, Esq.
Quinn Emanuel Urquhart & Sullivan
777 6th Street, 11th Floor
Washington, D.C. 20001
williamburck@quinnemanuel.com
lorialvinomcgill@quinnemanuel.com

and on the following by email (pursuant to written consent to electronic service):

Pierre Armand, Esq.
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
86 Chambers Street
New York, N.Y. 10007
Pierre.Armand@usdoj.gov

/s/ Max Maccoby
Max Maccoby (admitted pro hac vice)
1747 Pennsylvania Ave., NW, Suite 300
Washington, DC 20006
Telephone: (202) 454-2800
Facsimile:  (202) 454-2805
*Attorneys for Plaintiff/Relator Alex Grabcheski*