F7M9USAA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA, EX
    REL. ALEX GRABCHESKI,
4
                    Plaintiff,
5
                v.                          10 CV 3902 (GBD)
6
    AMERICAN INTERNATIONAL GROUP,
7   INC.,

8                   Defendant.

9   ------------------------------x
                                        New York, N.Y.
10                                      July 22, 2015
                                        11:00 a.m.
11
    Before:
12
                        HON. GEORGE B. DANIELS
13
                                            District Judge
14
                            APPEARANCES
15
    BUTZEL LONG, P.C.
16        Attorneys for Plaintiff
    BY:  NEAL GOLDFARB
17        MAX F. MACCOBY
          JAMES F. GEHRKE
18
    QUINN EMANUEL URQUHART & SULLIVAN, LLP
19        Attorneys for Defendant
    BY:  WILLIAM A. BURCK
20        DAN KOFFMAN
          LORI ALVINO MCGILL
21

22

23

24

25

F7M9USAA

1              (In open court; case called)

2              THE COURT:  Good morning.  Why don't I hear from you

3      first, Mr. Burck, on your motion.

4              MR. BURCK:  Thank you, your Honor.

5              I wanted to start with a procedural question that's a

6      little bit unclear to us at the moment because of essentially

7      how the relator has responded to our motion to dismiss.

8              THE COURT:  I would address the third amended

9      complaint.

10             If that's your question.

11             MR. BURCK:  For the record, your Honor, I think that

12     they've conceded that the second amended complaint should be

13     dismissed and if that's the case we'd like that on the record

14     so we can then address this essentially as our opposition to

15     the motion to file the third amended complaint.

16             THE COURT:  However they want to respond to it but I

17     consider the third amended complaint to have superseded the

18     second amended complaint.  So if I do not allow the amendment

19     I'm going to dismiss the case unless somehow the third amended

20     complaint is different.  Somehow the claim is that the second

21     amended complaint is sufficient in a way that the third amended

22     complaint isn't.

23             MR. BURCK:  Thank you, your Honor.

24             THE COURT:  Did you want to respond?

25             MR. GOLDFARB:  Your Honor, I think that's right.  I

F7M9USAA

1    don't have anything additional to say about the second amended

2    complaint that wouldn't apply to the third.  So I think if we

3    lose on the third we're certainly not going to win on the

4    second.

5           MR. BURCK:  Thank you, your Honor.  What I'll do then

6    your Honor, I will address our opposition to the third amended

7    complaint.

8           Your Honor to start with the threshold matter that we

9    actually haven't briefed because we learned of this in

10   response -- after the relator filed their opposition to our

11   opposition to their motion to amend.  And that has to do with

12   the specific language of 31 U.S.C. Section 3730, which is the

13   key provision for the False Claims Act here, (B)(4)(b).  And

14   that provision, your Honor, says that the relator, "Must have

15   voluntarily provided the information to the government before

16   filing an action under this section."

17          At the time -- and I think the relator doesn't contest

18   this -- at the time this statute was jurisdictional.  The

19   language was jurisdictional.  It has changed because of the

20   Obama care statute made it more flexible.  But at the time it

21   was jurisdictional.  Again, it said that the relator must have

22   voluntarily provided the information to the government before

23   filing an action under this section.

24          Now the relator admits in their briefing that the

25   disclosure here took place after their action was commenced.

F7M9USAA

 1    The relator's original complaint was filed on May 12, 2010 and

 2    the relator, by his own admission, first provided information

 3    about this case to the government in June of 2010, so about a

 4    month later.

 5          Again this is a jurisdictional issue at the time that

 6    the provision that applies in this case.  The relator basically

 7    tries to glide by this in the brief by asserting that he

 8    provided the information to the government before he originally

 9    asserted the specific claim at issue, which is the alleged

10    falsity of AIG's representations in the debt reduction

11    agreements; that it was the claim that was filed after they

12    provided the information to the government.  But, your Honor,

13    the clear, plain language of the statute is that it's an

14    action, when the action is filed.  Not when a claim is

15    presented in an action.

16          So, your Honor, there is doesn't seem to be any way

17    for the relator to get around that particular jurisdictional

18    bar.  They simply essentially defaulted in a sense because they

19    provided -- they filed their complaint, their original

20    complaint, before they actually provided information to the

21    government.  And there is no -- they provide no case law, no

22    statutory provision, nothing to refute that or suggest that

23    there's something we're missing.

24          So, your Honor, as a threshold matter we think this

25    case needs to be dismissed because at the very outset it was

F7M9USAA

1    faulty.  We didn't know that until literally a few weeks ago

2    because, of course, this was all under unseal.  They had no

3    obligation to provide that information to us until they

4    responded.  So that is, as a threshold matter, your Honor, this

5    case should be dismissed.

6            THE COURT:  You haven't addressed that in any of your

7    submissions.

8            MR. BURCK:  We have not, your Honor.  We have not had

9    an opportunity to do that because we learned it as a result of

10   the last set of briefing.  We are happy to do so and it may, in

11   fact, be worthwhile to do so, of course, your Honor, but that

12   seems to us to be a pretty strict hurdle they cannot overcome.

13           THE COURT:  Why don't you -- on that issue why don't

14   you submit me a letter on that issue and they can respond by

15   letter.

16           MR. BURCK:  Yes, your Honor.  We'll do that.

17           THE COURT:  You can submit a letter in ten days.

18           MR. BURCK:  Yes, your Honor.

19           THE COURT:  Before the end of the month, on the

20   31st.  And they can respond by the 10th of August.

21           MR. GOLDFARB:  Yes, your Honor.

22           MR. BURCK:  Thank you, your Honor.

23           I'll turn to the merits now of the third amended

24   complaint.  Before I do that I just want to talk a little bit

25   about the context.  The relator talks a bit about the context,

F7M9USAA

```
1    but I think there's a little bit more that should be explained

2    about the context of this whole case that has been going on for

3    a long time so you have an understanding of how this all plays

4    out when we get to the merits.

5         Now the heart of the relator's action is that AIG's

6    former subsidiaries, ALICO and AIA, conducted supposedly an

7    illegal insurance business in various states, including

8    New York, and that AIG's statements to the U.S. Government that

9    ALICO and AIA were in full compliance with state laws were

10   false statements.

11        The relator claims that the alleged false statements

12   are in these debt reduction agreements between AIG and the

13   Federal Reserve, which basically used ALICO and AIA as a kind

14   of ownership interest, the federal government got an ownership

15   interest in those entities, sort of collateral on the loan that

16   AIG got as part of the financial crisis.

17        So this is actually a very unusual False Claims Act

18   case because we have an alleged federal violation that is

19   premised on an alleged state law violation, which is itself

20   premised on business activities of former AIG subsidiaries

21   whose business activities had nothing to do with federal law

22   and the federal government.  These were state-regulated

23   insurance businesses.

24        So the alleged fraud in this case is purely derivative

25   of a supposed state law violation.  And reflecting this sort of
```

F7M9USAA

1    odd setup the relator has essentially pursued two tracks in his

2    efforts to bring this case to court.

3            The federal track began about five years ago, a little

4    over five years ago where the relator filed the original

5    complaint and provided the U.S. Government with information

6    about ALICO and AIA in around June 2010.  And then the civil

7    division of the U.S. Attorney's Office for the Southern

8    District of New York as well as the SIG TARP, which was the

9    Special Inspector General for the TARP program, which was

10   active at the time, investigated the relator's claims.

11           And as the court is aware, the Southern District of

12   New York declined to intervene in this case back in October of

13   2013, so a little under two years ago.

14           Now at the time that the Southern District declined,

15   relator's first amended complaint was pending.  And the first

16   amended complaint was prepared about two years before Southern

17   District declined, around June of 2011.  It was filed in July

18   of 2011.  All under seal.

19           That's significant for a couple reasons, your Honor,

20   in terms of when we get to the merits.  It's important to know

21   that before the relator went to the Southern District of

22   New York in his original complaint he made no mention at all --

23   and he concedes this -- of this supposed unlicensed insurance

24   business as being a basis for his claim, his federal False

25   Claims Act claim.  No mention of it at all.

F7M9USAA

1          The Southern District started investigating this case

2    right after -- and started looking into that issue, the issue

3    that we have here today, in 2010.  Again, the complaint didn't

4    mention it.  The Southern District started looking into it

5    nonetheless.

6          It was a year later that the relator then had the

7    first amended complaint which then offered up this theory which

8    has now evolved into the current third -- proposed third

9    amended complaint.

10          Your Honor, the reason why I mention this in

11    particular is because the relator wants the court to take a

12    look at the declarations to add substance to the third amended

13    complaint to understand more about the original source concept,

14    the public disclosure concept.

15          Well, we think that the court -- we invite the court

16    to take a very close look because what's interesting about what

17    they have put in the declarations is they never, ever say where

18    they got this theory from, this theory they have now.  They

19    never say that they gave it to the Southern District of

20    New York.

21          They say they gave the theory to the DFS, the DA's

22    Office -- the Department of Financial Services, the DA's

23    Office, the AG's Office.  Those are all, of course, state

24    institutions, state governed.

25          They never say that they gave it to the Southern

F7M9USAA

1   District of New York.  I think that's important, your Honor,

2   because the inference is very clear that they didn't give it to

3   the Southern District of New York.  They probably got it from

4   the Southern District of New York.

5          And again, your Honor, I think it's fair for us to

6   reference this because they want the court to take a close look

7   at those declarations, outside the four corners of the

8   complaint, to make a determination about the substance of their

9   complaint.  And I think it is very clear, your Honor, that they

10  must have gotten this theory from the Southern District of

11  New York.

12         Just a few other background issues and I'll get to the

13  substance, your Honor.

14         Now the Southern District of New York's declination

15  shouldn't have surprised anybody because the federal

16  government, led by the Federal Reserve and the Treasury

17  Department, as most people know, lived inside of AIG for years

18  following the financial crisis.

19         The debt reduction agreements, which were later

20  claims, contained the false statements, were negotiated,

21  diligenced and executed by the federal government with hordes

22  of lawyers, bankers, accountants, and everybody else,

23  diligencing these deals.

24         So, when the Southern District eventually declined

25  that really shouldn't have been much of a surprise.  But what

F7M9USAA

1    relator then did is they went to the state -- again, this is

2    all from the basis of their briefs and their declarations --

3    they went to the state and they asked the state, the DFS, the

4    DA's Office, the AG, to look into this issue.  And that did

5    lead to consequences for MetLife, which purchased ALICO and AIA

6    from AIG, and also for AIG.  It was state law consequences and

7    state settlements.

8          As the Court knows, MetLife settled with the DFS on

9    March 31 of 2014.  They signed a consent order.  And in that

10   consent order, which was only between MetLife and DFS, AIG is

11   alleged by DFS to have violated certain New York insurance laws

12   at the time it owned ALICO and this company called GMD which

13   was the marketing entity that worked with ALICO to market its

14   products.

15         So based on that allegation in the consent order that

16   MetLife signed with DFS, AIG sued DFS in federal court, in

17   front of Judge Nathan.  And we raised arguments about the

18   constitutionality of the statute, if it was read to -- if it

19   was interpreted to mean what DFS seemed to suggest it meant.

20   And we raised arguments about statutory provisions.  And we

21   fully briefed it in front of Judge Nathan on a motion to

22   dismiss basis.  And then we settled the case with DFS.

23         So there was never an adjudication of that issue.  But

24   that was the framework.  And, again, the reason why that's

25   important is because you're going to understand, your Honor,

F7M9USAA

1    where a lot of their theories come from in this third amended

2    complaint.

3          So we had at this point, before they filed their third

4    or they proposed their third amended complaint, we have a DFS

5    consent order with MetLife that says that MetLife committed

6    various violations after it owned ALICO and GMD.  We have AIG's

7    consent order.  We have also a DA's Office DPA, deferred

8    prosecution agreement, with MetLife; not with AIG.  And we have

9    AIG's briefing on all of these issues related to the New York

10   state law, constitutional issues, how it would implicate

11   federal law.  That's the context in which the relator then

12   created this proposed third amended complaint.

13         The relator has belatedly tried to fix what are

14   essentially conceded with the glaring deficiencies in the

15   second amended complaint by borrowing, cutting and pasting,

16   from all of the things I just mentioned; consent orders, even

17   from AIG's briefing and complaint against DFS in terms of how

18   we characterize the activities that happened.  And they do that

19   because, of course, the second amended complaint, they

20   essentially acknowledge, is deficient.  But this of can't work

21   to save the relator's claims for a bunch of reasons.

22         First, your Honor -- again, this is all, of course,

23   briefed and I will try to be as brief as I can be in addressing

24   some of these issues.  But on the public disclosure bar which

25   is of course part of 31 U.S.C. Section 3730.  Again, it was a

F7M9USAA

1    jurisdictional issue at the time.  It compels dismissal where

2    the relator cannot meet his burden to show beyond a

3    preponderance of the evidence that the information on which the

4    allegation of fraud rests was not a public disclosure and the

5    relator's allegations are not based on or substantially similar

6    to a public disclosure.

7              Now taking up this public disclosure issue first.  Of

8    course, there's also alternatively the original source issue.

9    I'm going to look at the public disclosure first and then I'll

10   address the original source.

11             Now, on the public disclosure issue, ALICO's New York

12   based marketing and sales activities, and it's Delaware based

13   underwriting activities, which are the core of the claims, were

14   disclosed in various AIG press releases and reports and

15   including occasionally even in regulatory reports long before

16   the federal -- the crisis occurred long before the DRAs came

17   into effect long before Mr. Grabcheski came up with his

18   complaint.

19             And we've cited to and quoted from in our brief a

20   number of these instances in which this is actually disclosed.

21   I'm just going to read from one, your Honor.  It's in 2008.  So

22   again this is before the financial crisis, long before all the

23   issues we have here today.

24             In that press release, on March 2008 AIG said:  AIG

25   group management division -- which is GMD, which is the heart

F7M9USAA

1     of the issue in this case -- is a division of the life

2     insurance subsidiaries of AIG.  Headquartered in New York, GMD

3     operates in more than a hundred countries.  GMD's employee

4     benefits, credit insurance, and global pension products and

5     services are offered through the various life insurance

6     subsidiaries of AIG including AIA and ALICO.

7              Your Honor, the relator wants to say well, that

8     doesn't tell us that GMD actually operated from New York.  Well

9     what it says is that GMD is headquartered in New York and what

10    it does is it markets insurance products for ALICO and AIA to

11    multinational corporations.  The gravamen of their claim is

12    that GMD, from New York, had people working here who were

13    marketing ALICO's products to multinational corporations.  It

14    actually doesn't matter for their theory whether or not the

15    multinational corporations are in the United States or

16    overseas.  What matters is that there was somebody here in

17    New York doing it.  That's theory.  Your Honor, that is the

18    case right there.  That's the underlying activity.  And it was

19    disclosed in March of 2008.

20             And then we cite a bunch of other press releases and

21    other reports that buttress this.  And in context, if you read

22    them all, it could not be clearer that the idea that GMD -- it

23    was not known to the public that GMD was doing this from

24    New York, it just doesn't withstand scrutiny.

25             Your Honor, again, I won't belabor the point because

F7M9USAA

1    we quote from a bunch of different sources in the brief.  But I

2    think it will be a hundred percent clear.

3         I'll just briefly touch on the underwriting, the

4    secret underwriting, as the relator mentions, in Delaware.

5         The secret underwriting was actually documented in the

6    Delaware Insurance Department's administrative reports.   In

7    fact, the Delaware insurance regulator was concerned about

8    layoffs at ALICO and GMD in Delaware because it would affect

9    underwriting business in Delaware.

10        So, again, the idea that the regulator didn't know

11   about it simply doesn't make any sense because they are worried

12   about people losing their jobs who are doing underwriting in

13   Delaware.

14        Now, the third amended complaint, the proposed third

15   amended complaint actually worsens the situation for the

16   relator than the second amended complaint, in our view, because

17   it literally cuts and pastes from the very definition of a

18   public disclosure, which are the consent orders, our briefs,

19   and the Manhattan D.A.'s Office's deferred prosecution

20   agreement.

21        And it does that because it needs particularity.  It's

22   trying to meet -- they're trying to meet Iqbal and Twombley.

23   They try and do that by literally taking language -- most often

24   not even similar language, not paraphrasing; literally taking

25   the language and sticking it in their complaint.

F7M9USAA

1              As I said, these are the very definition of public

2     disclosures.  And nothing in them that make specific claims

3     about specific activities that allegedly violated specific

4     New York laws, none of these specific issues that are put out

5     in the consent order, that are now in the third amended

6     complaint, ever made their way into any prior complaint by the

7     relator.  Ever.

8              The relator, finally, got a roadmap for their theory

9     from the DFS consent order.  That's why the third amended

10    complaint is here.  That's why they've abandoned the second

11    amended complaint.

12             The case law is clear.  The relator cannot evade the

13    public disclosure bar by filing -- by having filed three

14    defective complaints over the course of four years, and then

15    file a fourth that copies and pastes from further public

16    disclosures.  That's not the way the law works.  The entire

17    case is drawn now from public disclosures.

18             Now, the relator initially -- I'm turning to the

19    original source issue, your Honor.  The relator initially, in

20    his first brief, discounted the original source theory and said

21    we don't need that, we don't need to worry about that.  But

22    then after our opposition, they then try to put some meat on

23    the bones and they want the court to look at the declaration

24    and the exhibits to the declaration in order to say that

25    Mr. Grabcheski was the original source for all of these claims

F7M9USAA

1    for the unlicensed insurance.

2                Of course, your Honor, we already know that he wasn't

3    the original source in the original complaint.  We know that.

4    They concede that.

5                We also know that the Southern District of New York --

6    well, your Honor, I will stipulate that we don't know this but

7    I would invite counsel to address it -- we know that the

8    Southern District of New York investigated that issue before

9    Mr. Grabcheski put it in his first amended complaint.  So, we

10   know that he's not an original source in that sense.

11               What does he say he's an original source about?  He

12   says he has direct and independent knowledge of the underlying

13   claim in this case.  That's the statutory requirement.

14               I want to break that down for a minute because there's

15   really three necessary but distinct aspects of this claim.  One

16   is that he had to have direct and independent knowledge of the

17   underlying marketing activities of ALICO and GMD and AIA.

18   That's one concept.  Two, he had to have independent and direct

19   knowledge of the state insurance laws that were allegedly

20   violated by these activities.  And three, he had to know that

21   the debt reduction agreements that contained the allegedly

22   false statements, he had to know about those as well.  Those

23   are the way that you get to the federal False Claims Act case.

24   Any one of these alone is not sufficient, without the others,

25   to establish the relator as an original source of the

F7M9USAA

1    information that gave rise to this case.  This is so because

2    only together do they give rise to a potential violation of

3    federal law.

4              Consider this, your Honor.  The underlying activities

5    have no bearing -- the underlying activities themselves have no

6    bearing or relevance to any federal issue unless they give rise

7    to a state law violation, which in turn must breach some

8    federal obligation.  Here purportedly the allegedly false

9    statements in the DRAs that ALICO and AIA were compliant with

10   state laws.  That's the only way we're here.  The underlying

11   activities themselves mean nothing without everything else.  So

12   in isolation none of these give rise to even a hint of a

13   federal claim under the federal False Claims Act.

14             And there's nothing in the pleadings contained in the

15   original complaint, the first amended complaint, or the second

16   amended complaint that articulate with any particularity or

17   specificity at all the claim that now appears for the very

18   first time in the third amended complaint and is lifted,

19   shamelessly, one must say, from the most public disclosures,

20   the consent orders and the DFS, and the other public

21   disclosures that I referenced earlier.

22             Now seeking to amend the complaint for a third time to

23   us is a tacit admission of this fact by the relator himself.

24   Now he realizes that the prior complaints failed on Iqbal and

25   Twombly and now tries to resurrect this action by claiming, in

F7M9USAA

1   the most conclusionary fashion, and again without any

2   specificity at all in the third amended complaint, that he was

3   the original source of the claims embodied in DFS's consent

4   orders.

5           Now, to be sure, the relator has submitted

6   declarations attempting to establish that he's an original

7   source.  But none of these allegations about the relator's and

8   his counsel's disclosures is actually found in the third

9   amended complaint itself.  You have to look in the declarations

10  and the side -- and the other documents that are outside of the

11  complaint to start to understand the explanation as to where

12  this -- how this was originally sourced to Mr. Grabcheski.

13          Now it does make you wonder if there's going to be a

14  fourth amended complaint in order to try to bring some of that

15  in.  But right now it's not in the third amended complaint.

16          Even more of a problem is that, as seen in the

17  relator's own declaration, relator actually has no direct and

18  independent personal knowledge of either the alleged underlying

19  insurance activities.  He concedes he learned that from other

20  people.  He was a human resources official or executive.  He

21  was not doing the sales and marketing.  He learned about it

22  from others who worked with him.

23          And he also didn't know anyone at AIG who was

24  specifically involved in the negotiation and execution of the

25  debt reduction agreements which are the basis for this claim.

F7M9USAA

He didn't know anything about any alleged misrepresentations
because he wasn't even at AIG when the DRAs were drafted,
signed, executed.  He was gone.  He had been fired.

THE COURT:  Well I'm not sure I fully understood the
extent of your argument on original source.  Is your argument
that he can't be an original source if someone in the company
disclosed to him the illegal activity?

MR. BURCK:  Your Honor, our position is -- not quite
that far, your Honor.

THE COURT:  All right.

MR. BURCK:  Our position is -- and we base this off
of, for example, U.S. Rosner v. Stellar IP Owner LLC, which we
cite in the brief.  It's not that he can't -- that he can't
learn of activities that are illegal and then disclose them,
become a whistleblower in that sense.

The issue is that his knowledge of these activities
are purely derivative of what other people have told him.  He
wasn't participating in any way in any of these activities.

THE COURT:  I'm not sure there's a requirement that he
has to be a participant in the activities in order to qualify.

MR. BURCK:  Your Honor, fair point.  I think the issue
here is that it has to be more -- again, we rely here on the
cases that we cited in the brief, that it shouldn't be -- the
law is not that somebody who happens to be around the company
who happens to be -- who hears about something, especially --

F7M9USAA

1    especially, your Honor, in the context of the disclosures that

2    had already occurred by AIG, that that makes you an original

3    source under the law.

4            THE COURT:  But if someone in the company, a fellow

5    employee in the company, discloses illegal activity in the

6    company to him and that activity is not publicly disclosed.  He

7    is now, other than the person who disclosed the activity to

8    him, he's the only person that knows of this activity.  You're

9    saying he can't qualify as the original source if he discloses

10   that he was given this information by another employee in the

11   company to the U.S. Government.

12           MR. BURCK:  Your Honor, let me do this.  I'm going to

13   quote from the Rosner case which is interpreting Second Circuit

14   law on this issue.  And what the Second Circuit -- again this

15   is in the Rosner case, has interpreted the Second Circuit to

16   mean, and I'm quoting.  The Second Circuit has interpreted the,

17   quote, direct and independent knowledge requirement to bar

18   suits where a third party, not the relator, is the source of

19   the core information upon which the qui tam complaint was

20   based.

21           And in that case, in the Rosner case, the judge

22   decided the relator was not the original source where he

23   learned of the alleged misconduct by interviewing other people.

24           THE COURT:  No.  I understand that.  I understand that

25   rule.

F7M9USAA

1          I'm not sure if that's what you're arguing here.  Are

2     you arguing that as an employee of the company, that if another

3     employee discloses to him illegal activity, that he can't be

4     the original source of that information if he gives that

5     information to the government?

6          MR. BURCK:  Your Honor, I don't think it has to be as

7     broad.  It's not a categorical bar, your Honor.  Not at all.

8          I think in the circumstances here, given several

9     factors, your Honor, given the fact that AIG had already

10    disclosed GMD's activities and ALICO's activities.

11         THE COURT:  That's a different issue.  That's public

12    disclosure.  I'm not addressing that issue now.  You separated

13    the two issues, and I'm just addressing right now the issue of

14    whether or not he can be an original source.

15         You say regardless of the public disclosure,

16    independent of the public disclosure issue, he cannot qualify

17    as an original source because the information came from where?

18         MR. BURCK:  Well, your Honor, in this case the

19    information came from the fact that he happened to be working

20    at GMD and observed and learned from many other people,

21    including the public disclosures, your Honor -- that's how I

22    was bringing it in, as the original source -- about these

23    activities that were going on at GMD openly.

24         And on top of that, your Honor -- and, again, this is

25    why it's a circumstance.  I'm not making a broad argument

F7M9USAA

1      that --

2                THE COURT:  That's a public disclosure argument.

3      That's not an original source argument.

4                MR. BURCK:  I think the issue is that when it comes to

5      the original source -- this is why I mentioned the fact that in

6      the original complaint where Mr. Grabcheski came to the

7      government or filed under seal and then came to the government

8      with a bunch of claims about what was going on at AIG and at

9      ALICO and GMD, he didn't include this one.  He did not include

10     the one that he's pursuing now.

11               THE COURT:  As I review your original source argument,

12     you don't want me to conclude that he can't -- that a person

13     can't -- does not qualify as original source --

14               MR. BURCK:  No, your Honor.  We're not --

15               THE COURT:  -- if someone says to them -- if a

16     vice-president says to him, while he's working there, at the

17     watercooler, you know what, I just came out of a meeting and

18     they just decided they're going to go and defraud the

19     government and take money from the government.  You're not

20     saying that he can't take that information, give it to the

21     government, and qualify as the original source of that

22     information if that information is not otherwise publicly

23     disclosed.

24               MR. BURCK:  No, your Honor.  Absolutely.  We're not

25     taking that position.  We're not looking for a bright line rule

F7M9USAA

1      about whether or not a whistleblower -- what constitutes a

2      whistleblower in the context of an original source.

3              THE COURT:  You're saying he's not an original source

4      because it was publicly disclosed or he's not an original

5      source because of where the information came -- where the

6      private information came from?

7              MR. BURCK:  Your Honor, we're saying he's not an

8      original source because of where the information came from to

9      the government and in a sense that his -- the idea that

10     Mr. Grabcheski is the original source, again, for the three

11     aspects of this case, it's not him.

12             THE COURT:  But would you -- if the information did

13     not come to the government from a third party and if the

14     information wasn't already publicly disclosed, is there any

15     argument that he cannot qualify as an original source?

16             MR. BURCK:  Your Honor, I think that it's --

17             THE COURT:  Are those tied together?

18             MR. BURCK:  Your Honor, I don't believe -- we're

19     certainly not making that argument.  I think that the Second

20     Circuit and the rule -- it's obviously still somewhat open or

21     unclear.  We're not making that argument, your Honor.

22             We're being very specific about Mr. Grabcheski.  So we

23     don't need to say:  Well, everything else fails and therefore

24     what happened here was that he just got it from other people.

25             THE COURT:  So your primary argument is that the

F7M9USAA

 1    government -- the government did not get this information

 2    originally from him.

 3              MR. BURCK:  That's right, your Honor.  That's part of

 4    the argument.

 5              Then just to go back to what we're saying about

 6    Mr. Grabcheski.  And I think this goes to the heart of the

 7    court's question about the bright line about who -- who was the

 8    original source, who isn't, do you have to be, can you just

 9    overhear it at the watercooler?

10              Your Honor, I think that the hypotheticals that you're

11    posing are very different than what happened in this case, and

12    this is why we're talking the circumstance of this case.  If

13    Mr. Grabcheski learned of secret information, like we're going

14    to go defraud the federal government, from a third party at the

15    company, I think there's very little doubt that that person is

16    a whistleblower.

17              Here our argument is -- this is why I mentioned the

18    public disclosure -- he learned of publicly known information,

19    or information that was being provided to the government

20    through other people, including subpoenas to AIG and ALICO and

21    MetLife; that that's how the government learned -- the

22    government being the Southern District of New York.  DFS, and

23    with all respect to DFS and the D.A.'s Office, are not

24    obviously relevant in the sense of the federal False Claims Act

25    issues here; that he learned about it from public sources and

F7M9USAA

1    that's what we think is abundantly clear from even his own

2    declarations.

3           Just to be very specific, your Honor.  When I say that

4    he learned about this while he was working at human resources,

5    my point is that the information he learned at human resources,

6    amongst all the people at GMD, was public information.  It

7    wasn't:  We're going to go defraud the federal government.  It

8    was literally, Judge:  My job is to be a sales and marketer for

9    GMD for ALICO.  That's what I do.  That was my title.  And he

10   then goes and says:  Guess what, government, we have people who

11   are doing sales and marketing in New York.  And that's not

12   secret information, your Honor.  That was publicly known

13   information.  So on that, just on the underlying activities

14   alone he's not getting secret information.  He's recycling

15   public information.

16          Then when we go to the next two steps it becomes even

17   more clear that he's not the original source of the arguments.

18   The state law violation.  Your Honor, he wasn't even able to

19   articulate the state laws that were violated until DFS put it

20   on a consent order.  And then he put it into his third amended

21   complaint.

22          The second amended complaint, your Honor, actually

23   postdates the MetLife consent order by about a month, and also

24   our arguments in front of Judge Nathan.  And yet even in the

25   second amended complaint he didn't put in those arguments.  I

F7M9USAA

don't know why, but he didn't.  He did it now, a year later.

It's self-evident that it didn't come from him.  And, again,

this is a strange case where the legal issue is actually part

and parcel and a necessary piece of the federal claim.  Because

it has to be a state law violation in order to hit the third

element, which is the debt reduction agreement.  And that, your

Honor, that really he has no -- he doesn't even really make an

argument that I can discern as to how he's the original source

of that.

          The debt reduction agreement was a public document, of

course.  It was signed by the federal government and AIG and

ALICO and AIA.  And he has no basis, none -- he doesn't even

say he learned about it from somebody, that the representations

in it, which are the basis for the federal claim, were false.

So, he fails more dramatically at each level, but he fails at

each level.  And that's why we don't think he's an original

source.

          Your Honor, I'm going to turn to a couple of other

issues and this deals with the falsity of the statements and

the knowledge -- the knowledge requirement for the falsity.

          Now as I mentioned, of course, this is essentially a

derivative claim of the DFS consent orders.  It's essentially

just repeating what they've said.

          Now, the allegations became public as a result of the

consent orders.  The allegations in this case, which, again,

F7M9USAA

1    are the underlying activities violate state law and, therefore,

2    AIG violated federal law, became public as a result of the

3    consent orders.  And we cannot ignore that fact when we assess

4    the third amended complaint.

5          Now, none of the relator's authorities that he cites

6    for the third amended complaint's viability support the

7    assertion that allegations from a consent order can remain in a

8    complaint under the circumstances here where the allegations

9    became public because of the consent order.  In other words,

10   the law is clear that the consent order -- a consent order

11   shouldn't be cited for any purpose.  And in the consent order

12   itself for DFS, between DFS and AIG and DFS and MetLife, it's

13   abundantly clear that it's only about a settlement between the

14   parties.  There are explicit statements that it cannot be used

15   for other purposes.

16         Of course, for AIG's consent order there was no

17   adjudication at all.  This was simply a finding by DFS.  No

18   adjudication.  And the law is very clear that that's not

19   something that should be used in any kind of complaint.  And,

20   again, the allegation was made public by the consent order.

21         Under those circumstances, we have not found a case

22   that says that you can use the consent order in your complaint.

23   And therefore, the consent order, which is the basis for the

24   particularity in the third amended complaint, should be

25   stricken.  And if you strike all of that, the cut and paste

F7M9USAA

1    from the consent orders, then you're back to the second amended

2    complaint.  And the second amended complaint, which relator

3    appears to concede is at least -- is deficient under Iqbal and

4    Twombly.

5          THE COURT:  I'm not sure why it technically needs to

6    be stricken.  Because your argument, even if it's in there,

7    it's not sufficient for a factual allegation demonstrating the

8    original source of nonpublic information.

9          MR. BURCK:  That's right, your Honor.  In fact, I only

10   mention this because in the event that we are not successful on

11   the first argument that I think that this part -- and I think

12   also on -- and I'll explain this in a moment -- I think even

13   with respect to the falsity statement, the reason why I mention

14   the striking is because if you get to the point where you

15   actually look at the falsity, the falsity has to be premised --

16   is premised on the consent order, the consent order saying that

17   AIG -- a finding that AIG violated New York state law by the

18   DFS.  Once you take that out, which it seems under the case law

19   you'd have to, then there's nothing left under the second

20   amended complaint.  You don't have to get there.  But that's

21   why we're addressing that.

22          I'll skip ahead to the knowledge portion because this

23   is why we don't think it ultimately really should matter for

24   purposes of striking the consent order provisions that are in

25   the third amended complaint.

F7M9USAA

1          On the knowledge -- the False Claims Act, of course,

2     requires knowledge; some level of knowledge, reckless

3     disregard, willful blindness, or actual knowledge.

4          Here, the case law is very clear that the issue is:

5     Was AIG's understanding of the law unreasonable?  We cite the

6     case from Judge Chin, Colucci, and other cases, Taylor v.

7     Gabelli, that make it very clear that you've got to look at the

8     unreasonableness.  If you're basing it on a legal principle to

9     get to your False Claims Act case, you've got to look at the

10    unreasonableness of the interpretation.

11         Your Honor, in this case -- I'm not going to go into

12    it, your Honor, because I don't think this is necessarily ripe

13    for you to hear right now, unless you're interested.  We don't

14    think that AIG's view of the law was unreasonable at all.  In

15    fact, AIG sued DFS in federal court to assert that, in fact,

16    the law, as interpreted by DFS, was wrong.  We settled the

17    case.  But there was no -- there was never any adjudication as

18    to the issue of whether or not we were right or DFS was right.

19    That has been left unsaid.

20         Now the unreasonable issue here really turns on

21    whether or not the law, as DFS has interpreted it, is correctly

22    interpreted.  And our view is that it isn't.  And we go into

23    some detail in the brief.  Again, if the Court wants me to go

24    through that I can.  It's basically -- the argument is that the

25    statute itself does not apply to these types of activities on

F7M9USAA

1    its face.  And if they do, then they create constitutional

2    issues for the statute.  And that was --

3            THE COURT:  I'm not sure that's even an appropriate

4    inquiry on this motion.

5            MR. BURCK:  Exactly, your Honor.  That's why I'm not

6    going to go into it.  That's one of the reasons why the

7    unreasonableness -- the only way I think it comes into play,

8    your Honor, is the question of whether on its face the position

9    that AIG has taken for many years and argued in front of Judge

10   Nathan was unreasonable.

11           The broader or the bigger problem with the knowledge

12   element, as alleged by Mr. Grabcheski, really goes to this

13   collective knowledge point, which is that Mr. Grabcheski cannot

14   identify and has not identified a single person with any

15   specificity, not a single human being at AIG or ALICO who knew

16   both about the underlying activities that were going on at

17   ALICO and who also signed or was involved in the negotiation or

18   knew about the misrepresentations alleged by Mr. Grabcheski in

19   the debt reduction agreement.  He lists ten people whom he says

20   are people who knew.

21           Well, your Honor, five of them left AIG before the

22   debt reduction agreement was signed.  So I'm not sure what the

23   relevance of those people is.  Then the other five, most of

24   them are ALICO employees.  Four of them I believe are ALICO

25   employees, who had nothing -- he doesn't even allege they had

F7M9USAA

anything to do with the debt reduction agreement or had any
role in negotiating for AIG or signing anything for AIG with
the federal government.

Then he has one person who signed one of the debt
reduction agreement contracts.  But he doesn't allege, because
he can't, with any specificity, that that person knew anything
about ALICO -- about ALICO's underlying activities or knew
there was a violation of state law.  There's literally not a
single human being, which of course is required by law, to
allow the respondeat superior to go up to the corporation.
There's not a single person that Mr. Grabcheski has identified
who knew that:  A. what was going on at ALICO and GMD violated
state law; and B. nonetheless negotiated, participated in, knew
about, agreed to, signed the debt reduction agreement.  So
without that you cannot have a collective -- if he wants to
piece it all together and say various people had different
pieces of knowledge and that carries up to the corporation.
Your Honor, that's clearly not the law.  There is no basis and
any case law to suggest that he can do that.

Just briefly, your Honor.  He also claims, he tries to
bring in a bunch of other states beyond New York to say well,
we violated this law and that law and this law and that law
doing these things.  Well, your Honor, it's plain as day, and
in not only the complaint but also in the briefs, that there's
literally no specificity at all as to what we even did, what

F7M9USAA

1    he's saying we did in those states and what laws or provisions

2    of what laws we specifically violated.

3            The reason for that, your Honor, we believe is because

4    he didn't get a roadmap from those regulators.  New York did

5    investigate and did have settlements with MetLife and with AIG

6    and gave him a roadmap for how to put this together.  But those

7    other states didn't do that.  So he doesn't know.  So he just

8    puts in undifferentiated claims that we did things like we did

9    in New York and other states.  That's literally what he says,

10   more or less.  And then he has block quotes of statutory

11   provisions that it's completely unclear on their face how they

12   have anything to do with the activities that are at issue.  He

13   certainly doesn't try to explain it.

14           So, your Honor, with respect to the knowledge and the

15   of falsity there's just no -- there is no claim, there's

16   nothing he's alleged in even the third amended complaint that

17   gets you anywhere close to getting falsity.  Now we don't think

18   we need to get there because we think he fails public

19   disclosure, original source, etc.  But if we do, that is

20   clearly a barrier that he can't overcome and he hasn't overcome

21   after four attempts.

22           Last topic.  I'll be very brief on this topic.  This

23   is materiality.  This is only if they manage to get through all

24   of the other hurdles.  The materiality point, your Honor,

25   really comes down to Mr. Grabcheski claims that the loss amount

F7M9USAA

1    here to the government was about a hundred million dollars.

2    Now, how does he get there?  He gets there by counting up the

3    settlement numbers from the consent orders by DFS, the state

4    entity.  Now, he doesn't explain or doesn't claim to know how

5    those numbers came up or anything.  And also, your Honor,

6    there's something a little odd about it, because AIG owned

7    ALICO and GMD for 50 years.  MetLife owned them for about two

8    or three years.  MetLife paid $60 million.  AIG paid $35

9    million.  So there's obviously something wrong with the

10   calculation if you're going to base it on that kind of

11   calculation.  But he uses that to say it's a hundred million

12   dollar loss.

13          That is plainly insufficient.  That doesn't even come

14   close under any standard.  Forget Iqbal and Twombly, the prior

15   standard, to even meet a materiality threshold.

16          This was a humongous deal, $24.4 billion dollars was

17   the value of the two companies combined, when they were put

18   into these special purpose vehicles and given ownership

19   interest by the U.S. government.  The U.S. government forgave

20   $25 billion worth of debt on this basis.  The idea here is

21   something like well if it was a hundred million dollars less,

22   then the deal would have blown up.  Well, your Honor, I think

23   that we all know that that wasn't what this deal was about.

24   And also certainly that doesn't make any sense, .5 percent of

25   the deal.  But even that, your Honor, pales ultimately when you

F7M9USAA

```
 1    look at what actually happened with this deal on the

 2    materiality front.  The U.S. government got paid back

 3    everything they loaned to AIG.  Every last dollar.  And the

 4    federal government has been very clear about that.  The

 5    Treasury has been very clear about that.  There was a case in

 6    D.C. that was well known when Mr. Greenberg sued the federal

 7    government about this whole deal.

 8              There is no question that the materiality aspect here,

 9    if you have -- if you ever get there, is completely -- is

10    almost preposterous.  So your Honor with that -- those are the

11    basic principles.  Again, they sort of go, as the Court pointed

12    out, ratcheted down to materiality as the last hurdle for a

13    motion to dismiss purposes.  But that is -- that is essentially

14    our argument, your Honor.  If you have any questions, further

15    questions, I can answer those.

16              THE COURT:  No.

17              Let's take a break first for the court reporter.

18              (Recess)

19              MR. GOLDFARB:  I apologize, your Honor.

20              THE COURT:  That's okay.  I guess the heart of it

21    seems to me to be to define what information and in what way

22    that the plaintiff was the original source of what was at that

23    time nonpublic information, and was the original source and

24    provided that information to the government.

25              MR. GOLDFARB:  Your Honor, the original source issue
```

1    doesn't even arise unless the Court first finds that the public

2    disclosure bar is triggered.  We think that it was not

3    triggered here.  So unless the Court makes that finding that it

4    was triggered, doesn't even have to get to the original source

5    issue.

6                THE COURT:  My question is really more direct than

7    that.  What's really pivotal to clearly define for me and

8    articulate what was that information.  What was the public

9    information -- what was the nonpublic information that was

10   possessed by the plaintiff that he disclosed to the federal

11   government.

12               MR. GOLDFARB:  Your Honor, the nonpublic information

13   was the facts that demonstrated that the representations in the

14   debt reduction agreement were false.

15               THE COURT:  So what information was that?

16               MR. GOLDFARB:  The information was that ALICO and AIA

17   were involved in insurance activities in New York and also

18   other states, but I think since the disclosures that AIG relies

19   on relate to New York, let's focus on that, but his

20   information -- and this was in the first amended complaint when

21   this claim was first asserted.  The theory was that ALICO and

22   AIA were engaged in unlicensed insurance activity in New York.

23   That information had not been disclosed in the 2008 press

24   release at all, which Mr. Burck read, but he left out an

25   important piece of the language from that press release.  He

F7M9USAA

1    said -- the press release said GMD is headquartered in

2    New York.  An that of course doesn't mean they conduct

3    marketing activities.  But the press release also said, and

4    it's quoted on page 20 of AIG's original memorandum, if you'll

5    excuse me.  They quote -- the language of that 2008 press

6    release said:  AIG group management division, GMD, is a

7    division of the life insurance subsidiaries of AIG.

8    Headquartered in New York, GMD operates in more than one

9    hundred companies.  And then the part he left out was:  Through

10   a regional and local management structure.

11            So what that 2008 press release did is it said it was

12   headquartered in New York.  It did not say they're involved in

13   marketing or solicitation in New York.  And did say that it

14   operates through a local and global management structure, which

15   creates the impression that it's all distributed all over the

16   world since they're selling insurance in other countries.

17            So that, far from disclosing that they're doing

18   insurance activity in New York, suggests the opposite; that

19   they're doing the insurance activities overseas in their

20   various regional and local offices.

21            So that does not at all disclose that they were

22   involved in marketing of insurance in New York, that they

23   needed to be licensed, that they weren't licensed.  None of

24   those facts is disclosed.  Of course, why would AIG announce in

25   a press release we're involved in an illegal insurance

1  activity.  That makes --

2          THE COURT:  I'm trying to focus on the actual factual

3  information.

4          MR. GOLDFARB:  Yes.

5          THE COURT:  This is not a securities fraud case.  It's

6  not about whether or not the company had an obligation to

7  publicly disseminate information to investors so that they can

8  make investment decisions.

9          I'm trying to understand what is the -- it's unfair to

10  characterize it this way -- but what is the secret information

11  that your client had that the rest of the world -- no one else

12  in the world knew about except those people involved in that

13  illegal activity.

14          And I understand -- you're not saying that your client

15  was the source of information that these entities were involved

16  in insurance activity in New York.  That was publicly known,

17  that they were involved in insurance activity in New York.

18          You say that the fact that they were involved in

19  unlicensed insurance activity in New York is the nature of the

20  information that you say was withheld from the government that

21  defrauded the government.

22          MR. GOLDFARB:  Your Honor, the standard is not whether

23  this was secret information that was unknown out of AIG.  That

24  is not the standard for public disclosure.  For there to be a

25  public disclosure within the meaning of the False Claims Act it

F7M9USAA

1    has to be a disclosure through certain specified means; a

2    government report, the news media, etc.  They're relying on the

3    press release as a news media disclosure.  Those are all

4    they've come up with.

5         The fact that people -- the friends, the husbands and

6    wives of people who worked at AIG knew what those people did,

7    you know, in a colloquial sense, that's not secret certainly,

8    but that doesn't count for purposes of the False Claims Act.

9         THE COURT:  But public disclosure is really

10   technically not the issue.  The issue is whether or not the

11   information was disclosed to the federal government.  That's

12   the only issue.  We couldn't care less who else knew other than

13   the federal government.  Because the crux of the claim is that

14   the federal government was defrauded.  Because when they were

15   told they were in compliance with state laws, that they knew

16   that information was false, and they misled the federal

17   government into thinking that they were in compliance with

18   federal law when they really weren't.

19        So the question really is what is the specific

20   noncompliance information that was uniquely in the possession

21   of your client?  That's what I need you to focus on.

22        MR. GOLDFARB:  I'll tell the court what he disclosed

23   to the government and when he disclosed it.  I don't think it

24   has to be uniquely in his knowledge.  But in the first amended

25   complaint --

F7M9USAA

1    THE COURT:  Well he's got to be the original source

2    for it.

3    MR. GOLDFARB:  Right.  But original source within the

4    specific technical definition which requires him to have

5    independent and direct knowledge of the information.  And he

6    has to provide it to the government before filing an action

7    based on the information which, by the way, Mr. Burck made a

8    big deal of the fact that the information about the uninsured

9    insurance was not provided until after the lawsuit was

10   commenced.  And that's true.  But that doesn't matter.  Because

11   what the statute says when it's defining original source, it

12   says you have to disclose it to the government before filing --

13   commencing an action that's based on the information.  As

14   originally filed in this court, the first original complaint,

15   as Mr. Burck says accurately, did not include this complaint.

16   So at that time it was not an action that was based on the

17   information about the unlicensed insurance activity.  It only

18   became an action based on that information when the first

19   amended complaint was filed.

20   In that complaint, in paragraphs 81 to 90 spells out

21   the activities that took place in New York that constituted the

22   unlicensed insurance activity.

23   THE COURT:  Most of that information, your client

24   wasn't the original source of that information.

25   MR. GOLDFARB:  Your Honor, he was.

F7M9USAA

```
 1          THE COURT:  In what way?  Tell me what he found out
 2    and how he found out.
 3          MR. GOLDFARB:  Yes.  He was the director of human
 4    resources administration.  But to describe it as human
 5    resources actually kind of gives the impression that his duties
 6    were sort of more trivial than they were because we tend to
 7    think of human resources as just part of the bureaucracy.  But
 8    he was -- I realize I'm going a little bit beyond the
 9    complaint.  But he was one of the -- the people who was
10    involved in -- sort of the brain trust within GMD.
11          THE COURT:  So what information uniquely came to him
12    in that position.
13          MR. GOLDFARB:  What he was able to find out about it
14    was through his duties -- for instance, he was involved in the
15    approval of incentive compensation payments for the sales
16    people who were working at GMD in New York; because of that,
17    was aware that the sales and the business they were getting
18    credit for was on behalf of ALICO and AIA, and it was for
19    business that was supposed -- it was being done in New York,
20    because the people who did it were based in New York.  Through
21    that, through position descriptions, through that sort of thing
22    he was aware, as part of his duties, what these people were
23    doing.  This was not just a watercooler conversation.  He's
24    aware because of his duties what was going on.
25          He also was aware of the steps that were being taken
```

F7M9USAA

```
 1    to try to conceal the activity such as putting employees who

 2    were working for -- whose duties were for GMD and selling on

 3    behalf of ALICO and who worked in New York, but they had to be

 4    listed under the payroll of unrelated companies for whom they

 5    really were doing nothing such as American General.

 6             THE COURT:  I'm not sure how I understand how it's

 7    related to the unlicensed insurance in New York.

 8             MR. GOLDFARB:  Because that was to conceal -- by

 9    putting them on those other companies, that created the

10    pretense that these people were not engaged in unlicensed

11    insurance activity.

12             For instance, the people from GMD were put initially

13    under American General, which was a licensed insurance company,

14    even though they did nothing for American General.  And the

15    head of American General complained about it saying, What are

16    these people doing on my payroll?  And he was told, We have to

17    put them there because they can't be on the AIG or ALICO

18    payroll because ALICO is not licensed to do business in

19    New York.

20             THE COURT:  Who do you attribute that to?

21             MR. GOLDFARB:  I'm sorry?

22             THE COURT:  Who do you attribute that to?  Who told

23    him that?

24             MR. GOLDFARB:  Well --

25             THE COURT:  You can't just say that's what I was told.
```

F7M9USAA

```
1    If that's specific information that he was provided, you have
2    to be able to tell me who gave him that information.
3              MR. GOLDFARB:  Well, your Honor --
4              THE COURT:  Is that in the complaint?
5              MR. GOLDFARB:  The complaint does identify specific
6    high level AIG officers who were party to those discussions and
7    Mr. Grabcheski was involved with discussions and meetings where
8    this issue was discussed.
9              THE COURT:  I know, but the way you just characterized
10   it is not a sufficient factual allegation.  What I'm asking you
11   for is a specific factual allegation.
12             If you say -- I agree with you.  It is much more
13   compelling if you say that your client was told by John Jones
14   at the company that the reason these people were put on the
15   payroll is because they had to cover up the unlicensed
16   insurance activity in New York.  You've just represented to me
17   he had such a conversation with a person.
18             Who -- what are the circumstances of that conversation
19   and who provided him that information?
20             MR. GOLDFARB:  Your Honor, one of the people was Ken
21   Nottingham who was the CEO of ALICO.
22             THE COURT:  Said to him that the reason that they were
23   doing this was to cover up the illegal licensing activity?
24             MR. GOLDFARB:  I think in substance.  I don't think --
25   I'm not sure those were his words.
```

F7M9USAA

1          THE COURT:  I assume those weren't his words.  Those

2     are the words that you gave me.  You said somebody told him

3     that it was done to cover up the unlicensed insurance activity.

4          Are you saying that your client can make an

5     affirmative representation in a complaint that a particular

6     individual, a responsible individual at AIG that he can

7     identify, said that to him?

8          MR. GOLDFARB:  Well, your Honor, I can't -- I would

9     have to confer with Mr. Grabcheski.

10          I think the answer to that I can represent is yes.

11          THE COURT:  That's not in this complaint.  It's not in

12     any of the complaints.

13          MR. GOLDFARB:  I don't think we need to do it in that

14     level of detail.

15          THE COURT:  Well, you can't just say I was around and

16     I heard people say that this is what they wanted to do.

17          I mean I'm not even sure what -- why don't you give me

18     a couple of examples of specific factual allegations that you

19     say demonstrate his personal knowledge about illegal activity

20     at AIG.  Just give me a paragraph or two.

21          MR. GOLDFARB:  Your Honor, we discuss in the third

22     amended complaint, in fact, at paragraphs 104 to 126.

23          THE COURT:  I'm sorry.  I want to go to a paragraph

24     that you want me to rely upon so that I can say that this is a

25     factual allegation that your client came into possession of

F7M9USAA

1    information that illegal insurance activity was occurring and

2    tells me how he got that information and from whom he got that

3    information.  Because that's the only way I can assess whether

4    or not it is publicly or nonpublicly disclosed information that

5    he is in possession of that he's now going to provide to the

6    government.

7              MR. GOLDFARB:  Your Honor, I understand.

8              But, again, the question of public disclosure is not

9    whether in the abstract sense it's secret.  The question of

10   public disclosure is has there been a disclosure through a

11   specified source.  So you have to look at --

12             THE COURT:  No.  Whether or not -- I'm just

13   concentrating on the disclosure through your client.  I'm

14   trying to figure out what information that you say your client

15   disclosed to the government that is the basis of this complaint

16   and where factually will I look to see, other than

17   conclusionary language, what exactly he got; what information

18   he got, how he got that information, so I can determine that he

19   was the source of that information and where does it say he was

20   the source of that information to the government.  Give me an

21   example.

22             MR. GOLDFARB:  Your Honor, if the Court will turn to,

23   starting at paragraph 104 of the third amended complaint.

24             THE COURT:  104?

25             MR. GOLDFARB:  Yes.

F7M9USAA

1      THE COURT:  Where does it tell me that he's receiving

2  information that he's going to subsequently pass to the

3  government?

4      MR. GOLDFARB:  Your Honor, what these allegations

5  describe is the shuffling around of GMD personnel on the

6  payroll of various different AIG subsidiaries which

7  Mr. Grabcheski was involved in as the head of human relations

8  at GMD.

9      THE COURT:  But it doesn't say that.  It doesn't say

10  he has any relationship with this at all.  Or even knew about

11  this at all.  It just says it happened.

12      So I'm trying to figure out where do I look to say,

13  okay, this complaint gives me information that says that he

14  was -- provided this information and this information indicated

15  that they were making false statements to the government and

16  then he subsequently passed that information on to the

17  government.  Because you would agree that that's what's

18  required.

19      MR. GOLDFARB:  Well, your Honor, with respect, I don't

20  agree.  Because I think the court is combining the public

21  disclosure issue with the original source issue.

22      THE COURT:  Forget about public disclosure or original

23  source.  I'm just trying to understand.  You have a claim that

24  your client came into possession of certain information.  I'm

25  trying to get you to articulate for me directly what

F7M9USAA

1    information you say that he came in possession of and how he

2    got that information and that he disclosed that information to

3    the government.  Those are the three elements that you have to

4    meet.  We can agree on that.

5          So, this paragraph does not tell me that he came into

6    possession of any information.  This paragraph does not tell me

7    what information he came into possession of.  And this

8    paragraph doesn't tell me that he disclosed that information to

9    the government.

10          It just says in general that AIG engaged in a series

11    of actions.  But that's a conclusionary statement.

12          MR. GOLDFARB:  You're right, your Honor.

13          THE COURT:  What actions is he talking about and who

14    told -- how did he find that out and what did he do with that

15    information?

16          MR. GOLDFARB:  Your Honor that paragraph was an

17    introduction to the paragraphs that follow.  So that wasn't

18    intended to be the only statement.

19          THE COURT:  So give me a line that tells me what

20    information that he came in possession of or give me a line

21    that tells me how he got that information.

22          MR. GOLDFARB:  Your Honor, what he came into

23    possession of is all the information --

24          THE COURT:  Where does it say that?

25          MR. GOLDFARB:  It says that in his declaration.

F7M9USAA

1          THE COURT:  I can't read his declaration.  I'm reading

2     the complaint.

3          MR. GOLDFARB:  Except, your Honor, I think for

4     purposes -- there's different -- there's a variety of different

5     issues here that have to be sorted out.  For purposes of does

6     he adequately allege a fraud, I don't think he's required to

7     say in the complaint this is how I found it out.  What we have

8     to do is give enough --

9          THE COURT:  He's required to give me information,

10    enough factual information for me to determine that he had

11    information at the time before he filed this lawsuit and he

12    disclosed that information of this illegal activity to the

13    government.

14         MR. GOLDFARB:  And that's something that can come in

15    outside the complaint.  Because this goes to a jurisdictional

16    issue.  We're allowed to put in evidence outside the complaint.

17         THE COURT:  I'm sorry.  Not to articulate your claim.

18    Your claim has got to be a plausible allegation in the

19    complaint.  It can't be the complaint and I've got an affidavit

20    that's going to tell you how.  I've got to look at the

21    complaint -- the four corners of the complaint have got to

22    conclude that this complaint sufficiently meets the elements of

23    this claim.  And the elements of this claim are that he got

24    information that he gave -- and that information indicated to

25    him that there was illegal activity, and that illegal activity

F7M9USAA

1    was that the government was being defrauded, and he took that

2    information and he gave it to the government.  That's got to be

3    in this complaint.

4              MR. GOLDFARB:  Your Honor, with all respect, that's

5    not an element of the claim.  That's an issue that relates

6    to --

7              THE COURT:  Which is not an element?

8              MR. GOLDFARB:  How he got the information.  The fact

9    that he got the information.  That's not an element that goes

10   to the liability for the False Claims Act.

11             THE COURT:  But you have to be able to say that he got

12   the information because he doesn't have standing otherwise to

13   make this claim.  You've got to tell me that -- I've got to

14   read this complaint and when I'm finished reading this

15   complaint I have to conclude that he had information that

16   indicated that AIG was involved in fraudulent activity.  And he

17   gave that information to the government.

18             Right?

19             MR. GOLDFARB:  Your Honor, that only becomes relevant

20   once there is an identification of a public disclosure through

21   a specified source.  And there's -- we do allege in the

22   complaint there was no public disclosure.

23             THE COURT:  Of what?

24             MR. GOLDFARB:  Of the information in the complaint.

25             THE COURT:  Of what information?

F7M9USAA

1          MR. GOLDFARB:  Well we allege there was no public

2     disclosure.

3          THE COURT:  Of what information?

4          MR. GOLDFARB:  Well there was no public disclosure of

5     the information about the unlicensed insurance activity.

6          THE COURT:  So you're saying that they did not

7     disclose to the government that they were involved in

8     unlicensed insurance activity?

9          MR. GOLDFARB:  Correct.

10          THE COURT:  What is -- how do I determine that --

11     let's go beyond the complaint.  I'm going to stick with your

12     affidavit.  Tell me what it is -- what is the unique knowledge

13     that he had of this?

14          MR. GOLDFARB:  Your Honor, he had knowledge of the

15     unlicensed insurance activity.  It doesn't have to be unique to

16     him.  He does not have to be the only person who has that

17     knowledge.

18          THE COURT:  Well he's got to be one of the people.

19          MR. GOLDFARB:  Well, you're right.

20          THE COURT:  And he's got to be somebody who knows when

21     most people don't.

22          MR. GOLDFARB:  Well, your Honor, that's not --

23          THE COURT:  Well that is true.  That's a

24     whistleblower, you know it and most people don't, and you're

25     the one who discloses it.

F7M9USAA

1          MR. GOLDFARB:  Certainly dealing with most people, I

2     think that's true.

3          THE COURT:  That's in every case.

4          MR. GOLDFARB:  You're right.  That's true.

5          THE COURT:  It's not like everybody knows.  It's got

6     to be that he uniquely has some intimate knowledge of this that

7     he -- that he is now giving to the government; because the

8     government doesn't know about it, and it's not publicly known,

9     so the government wouldn't know about it.  That's premise of

10    your claim.

11         MR. GOLDFARB:  Although the question of whether the

12    federal government knows about it, that's not the test either.

13         THE COURT:  No.  It is the test on this factual

14    scenario you've given me because the nature of your fraud is

15    that they told the government that they were in compliance and

16    they knew they weren't in compliance.  If you can't demonstrate

17    that, you have no case.

18         Right?

19         MR. GOLDFARB:  Well if the government knew -- if

20    there's evidence that the government when they got the -- if

21    they -- when they got the debt reduction agreements.

22         THE COURT:  Right.  But the only false claim -- and I

23    can use "claim" in a generic sense -- the only false claim

24    you're alleging here is they claim they were in compliance with

25    state laws and you knew that they weren't in compliance with

F7M9USAA

1    state laws because they were doing unlicensed insurance

2    activity.  That's the crux of the claim.

3            MR. GOLDFARB:  Yes.

4            THE COURT:  So the requirement is, and the sole focus

5    is:  Was it true when they said that they were in compliance

6    with state laws, when they said that, did they know that it was

7    untrue or had reason to know that it was untrue, and that your

8    client had information that they disclosed to the government to

9    notify the government that they had been lied to.

10           MR. GOLDFARB:  Yes.

11           THE COURT:  I mean that's the essence.  I mean I'm

12   breaking it down in its simplest terms.

13           MR. GOLDFARB:  Your Honor, what was disclosed to the

14   government was -- initially was the first amended complaint.

15   And we've also submitted some other materials that were

16   disclosed to the government before the first amended complaint

17   was filed.

18           THE COURT:  What information is that?  Summarize that

19   information.  That's what I'm trying to extract.

20           MR. GOLDFARB:  One of the things we've identified is

21   the draft of the first amended complaint which we have not

22   submitted yet because -- frankly because the U.S. Attorney's

23   Office was concerned that by submitting a draft there would be

24   a waiver of privilege.  And while that would be true as to the

25   specific information in the draft, they are concerned about

F7M9USAA

1    waiver beyond what was in the draft.

2              THE COURT:  All you have to do is just allege whatever

3    information you gave them.  You don't necessarily need the

4    draft.

5              MR. GOLDFARB:  I'm sorry?

6              THE COURT:  All you have to do is allege what

7    information, in your amended complaint or by affidavit, what

8    information, relevant information you provided them.  I don't

9    need --

10             MR. GOLDFARB:  What we've alleged was, I believe in

11   Mr. MacCoby's affidavit, is that the draft amended complaint is

12   essentially the same -- the information that's in the amended

13   complaint, the first amended complaint.  So the court can look

14   at the first amended complaint, and I've cited you to the

15   paragraphs.

16             THE COURT:  Are you saying it's more information than

17   what's in the third amended complaint?

18             MR. GOLDFARB:  No.

19             THE COURT:  Well then why do I need to look at the

20   first one?

21             MR. GOLDFARB:  Your Honor, the question -- the issue

22   of what we disclosed to the government, other than the

23   complaint, is not the issue.

24             The reason that the first amended complaint is

25   relevant, at the time the first amended complaint was filed,

F7M9USAA

```
 1    the original question, before you get to anything else, is were
 2    the allegations or transactions in the first amended complaint,
 3    had those allegations or transactions been publicly disclosed
 4    by one of the specified sources listed in the False Claims Act.
 5    At that time --
 6              THE COURT:  I assume that that's in the third amended
 7    complaint.
 8              MR. GOLDFARB:  I'm sorry?
 9              THE COURT:  Is there something different about that in
10    the third amended complaint?
11              MR. GOLDFARB:  Well there's more detail in the third
12    amended complaint.
13              THE COURT:  So what's in the first amended complaint
14    that is not in the third amended complaint?  Is there something
15    in the --
16              MR. GOLDFARB:  No.  There's nothing in the first
17    amended --
18              THE COURT:  That's what I'm trying to understand.  I
19    mean I got the third amended complaint.  You tell me that's the
20    complete -- it has everything in it all the other complaints
21    had.
22              I'm not sure why you say that somehow disclosing the
23    first amended complaint is going to advance this argument one
24    way or the other, other than you just simply telling me what I
25    have in the third amended complaint, that's the same
```

F7M9USAA

1    information I gave to the government.  This part I gave to

2    them, this part --

3              MR. GOLDFARB:  The reason I'm telling you that, your

4    Honor, is that they're relying on, as the public disclosure,

5    they're relying on something that was disclosed in 2014.

6              THE COURT:  Right.

7              MR. GOLDFARB:  The first amended complaint was filed

8    in 2011 before those disclosures.  So jurisdiction over the

9    claim was established when the complaint was filed in 2011

10   unless the press release that they rely on was a public

11   disclosure, which it wasn't.

12             Once you rule out the press releases and those things

13   that they originally relied on in their original motion,

14   jurisdiction attached when we filed the first amended

15   complaint.  That's the point at which jurisdiction attached

16   over this claim.

17             The fact that there was a disclosure later on, three

18   years later, doesn't divest the court of jurisdiction.  And you

19   have to -- and the reason for that is the changes and additions

20   that were made since the first amended complaint.  They don't

21   add a new claim.  They just elaborate on the preexisting claim.

22   They don't add a new legal theory to the claim.  They do not

23   add new elements to the claim.  It provides more factual

24   detail; most of which, the overwhelming portion of which, did

25   not come from the DFS consent order or the Manhattan D.A.'s

F7M9USAA

1  deferred prosecution order.

2            THE COURT:  I know.  But that doesn't seem to be the

3  determinative issue for me.  I think we can all agree on this.

4  If we can't, then tell me.  That what they disclosed

5  subsequently doesn't help them, and what you found out

6  subsequently doesn't help you.  Because that's not the state of

7  affairs when the disclosures were made to the government.  So

8  they can't rely on:  We made a public disclosure sometime after

9  that.  And you can't rely on:  My client read three years later

10 in a report that somebody said X.

11           MR. GOLDFARB:  Well that's right.

12           THE COURT:  So, I don't --

13           MR. GOLDFARB:  We also allege in the complaint and say

14 in the affidavits that Mr. Grabcheski's allegations were the

15 source of what led DFS and Manhattan -- the Manhattan D.A. to

16 do that investigation.  And that's in the third amended

17 complaint.

18           THE COURT:  But that's not determinative either, is

19 it?

20           MR. GOLDFARB:  No.  That's not determinative.  But it

21 certainly rebuts the suggestion that Mr. Grabcheski is riding

22 piggyback and riding the coattails of DFS.  They are riding his

23 coattails.

24           THE COURT:  This is what I think, and take me into

25 another direction if you think I'm going in the wrong

F7M9USAA

1    direction.  But this is where I need guidance for me to sustain

2    this complaint.  All I need from you is to tell me where I'm

3    supposed to look so that I can articulate what information that

4    he had at the time, what he found out, and what information

5    that he disclosed to the government.  If I can identify that

6    and articulate that in some specificity, with some

7    particularity, then it's sufficient.  If I can't, if I just

8    have conclusionary language about I went to meetings and

9    sometimes peopled raised these issues, that's not going to make

10   it.  So, therefore, I concluded that they must have been hiding

11   something.  No.  It's got to be some evidence of a violation

12   here of a fraud, of a misstatement, of a material misstatement.

13   And in what way did he find out that or did he know and

14   disclose to the government that when they said that they were

15   in compliance with state law, that he knew that they knew that

16   that was false, that was a material misrepresentation being

17   made to the government because of these other facts that

18   existed that he knew at the time and that he disclosed to the

19   government.

20           MR. GOLDFARB:  Your Honor, in paragraph 150 to 155 of

21   the third amended complaint it deals with the issue of

22   knowledge.

23           THE COURT:  150 to 155.

24           MR. GOLDFARB:  Yes.  But also 104 to 126 which deal

25   with the concealment issue.  That's also very relevant to the

F7M9USAA

issue of knowledge.  And it names names of high level officers

who are officers of both ALICO and AIG, they were dual

officers, that they knew that ALICO, that GMD was involved in

activity that was --

          THE COURT:  Who knew that?

          MR. GOLDFARB:  Rod Martin is one.  Rod Martin was an

executive vice-president of AIG.

          THE COURT:  And he knew what?  What's the allegation

about him?

          MR. GOLDFARB:  Let me turn to that allegation.

          THE COURT:  Just point me to where that paragraph is.

          MR. GOLDFARB:  If you start -- let me walk you through

the scenario as described.  This is under the heading:  The

efforts to conceal the U.S. based insurance business conducted

by GMD.

          THE COURT:  What page are you on?

          MR. GOLDFARB:  I'm sorry?

          THE COURT:  What page and paragraph?

          MR. GOLDFARB:  It's on page 31 of the third amended

complaint starting at the top of the page.  Paragraph 104 is

really just the introduction paragraph that says they were

engaged in a series of actions to conceal.

          Then 105, up until 2001, the GMD sales force were on

the payroll of a variety of AIG domestic operating

subsidiaries.

F7M9USAA

1          And then in 2001, they were transferred, for payroll

2     purposes, to AIG, to the parent.  It says they were paid under

3     a specific payroll code.  And then, over the next few years,

4     AIG's CFO, initially Howard Smith and subsequently David

5     Herzog.

6          THE COURT:  Where are you?

7          MR. GOLDFARB:  Paragraph 107 now.  Questioned the

8     inclusion of the GMD sales staff and payroll code 032 because

9     they basically didn't want this expense under their fiefdom.

10    And it was complained to them, either directly or through a

11    subordinate who relayed information to them, that the employees

12    were GMD New York employees, based in New York, who serviced

13    the multinational segment of AIG's business on behalf of ALICO.

14    They had to be based in New York because that's where the

15    multinational clients were based.  And there had to be many of

16    them.  And they had to be there to deal with the clients in

17    New York.

18          As I said, they could not be put onto ALICO's payroll

19    because ALICO was not licensed as an insurer in New York and

20    putting them on ALICO's payroll would jeopardize the regulatory

21    exemptions and tax breaks that ALICO enjoyed under Delaware law

22    which were not available to insurers that transacted insurance

23    in the U.S.

24          If you'll indulge for a moment, I can get you the name

25    of the subordinate who relayed the information, who I believe

F7M9USAA

1     Mr. Grabcheski had direct contact with.

2          Michael Tebbs was the subordinate that is referred to

3     in paragraph 107 who Mr. Grabcheski had direct contact with.

4     And Mr. Grabcheski, I believe, also had direct contact with

5     Mr. Smith and Mr. Herzog, who were the CFO at different times.

6     And Mr. Grabcheski is also aware that the facts were explained

7     to Rod Martin who was simultaneously an officer of ALICO and

8     AIG.  And I believe it was Mr. Grabcheski, if I'm not mistaken,

9     had direct -- some of those were as a result of personal

10    conversations that Mr. Grabcheski had with Mr. Martin.

11         THE COURT:  Why is this, and you just have to explain

12    this to me because technically I don't know, why is this

13    activity -- why do you say this activity is against the law?

14         MR. GOLDFARB:  I'm sorry?

15         THE COURT:  Why do you say this activity here is

16    against the law?

17         It doesn't talk about being in violation of law.  It

18    talks about being able to get tax breaks.

19         MR. GOLDFARB:  Because it says they couldn't be put on

20    ALICO's payroll because ALICO was not licensed as an insurer in

21    New York, but GMD were acting on behalf of ALICO, selling

22    insurance on behalf of ALICO.  That's who they were -- for

23    whose benefit they were working.  And the insurance that was

24    being sold was ALICO insurance.  And the activity -- so the

25    activity that these people were doing in New York was the

F7M9USAA

 1    insurance activity that required ALICO to be licensed.  They

 2    were conducting these activities, selling insurance, marketing

 3    insurance, soliciting insurance sales and purchases on behalf

 4    of ALICO in New York.  And that's activity that's required to

 5    be licensed under New York law.

 6         The reason that they were put into all of these other

 7    companies rather than -- they couldn't be put into ALICO is

 8    because ALICO wasn't licensed.  But the fact is, even though

 9    despite these attempts to put them elsewhere, what we're saying

10    is that in substance they were working on behalf of ALICO.  And

11    their activity in New York was insurance activity that's

12    attributable to ALICO.

13         They can certainly -- I'm sorry?

14         THE COURT:  Is paragraph seven the manner in which the

15    client obtained this information?

16         MR. GOLDFARB:  He acquired the information through his

17    discussions with Mr. Herzog, with other -- as I said, Ken

18    Nottingham, who was an officer of ALICO.

19         THE COURT:  More than what's in this paragraph?

20         MR. GOLDFARB:  Your Honor, we didn't list every piece

21    of the evidence.  We didn't list every piece of evidence.  And

22    I don't think we have to list every piece of evidence.

23         He was asked to facilitate the process of where to put

24    the GMD employees, you know, other than ALICO.  And as a result

25    of being asked to do that he learned the reason that it was

F7M9USAA

1   being done.

2           I don't think we need to in the complaint allege --

3   identify every specific conversation that he had in the course

4   of however many -- however much time this process took.  This

5   is something that went on over a period of years.

6           THE COURT:  That sounds compelling but that doesn't

7   tell me anything.  So I'm just trying to figure out.  You say I

8   should look at his affidavits and I should look at the

9   complaint beyond the complaint.

10          I'm just asking you is there something else that I'm

11  going to see in his affidavit that is going to be other

12  instances where this kind of activity or discussion was going

13  on.

14          MR. GOLDFARB:  Well, your Honor, the affidavit

15  describes it.  It doesn't list specific instances.  I don't

16  think we're required to list specific instances.

17          THE COURT:  I'm just trying to figure out whether you

18  want me to rely on this as the sole instance or are you saying

19  that there's something else I should look at.

20          MR. GOLDFARB:  No, your Honor.  I'm going through it

21  one paragraph at a time.  Each paragraph only talks about one

22  thing.  You really have to read this whole section, which is

23  paragraphs 104 to 126.  You have to read the paragraphs about

24  the New York operations, which are paragraphs 67 to 83.

25  There's more discussion of AIG's knowledge in paragraph 150 to

F7M9USAA

```
1    155.   Those are the portions of the complaint that talk about

2    what ALICO did that constituted the illegality.  What evidence

3    there was that AIG knew about it.  And that's -- and disclosed

4    to the government -- what was disclosed to the government

5    before, previously, was what was in the first amended

6    complaint, which is basically the same underlying core

7    allegation that ALICO and AIG were involved in unlicensed

8    insurance activity, which was later disclosed in 2014.  But it

9    was there from the beginning of this claim.

10          THE COURT:  So then tell me why you say that was

11   material.

12          MR. GOLDFARB:  Why I say that what?

13          THE COURT:  Material.

14          MR. GOLDFARB:  It's material because it's -- all the

15   details about what was disclosed to the government when is not

16   material for the purpose of whether we've stated a sufficient

17   claim under the False Claims Act.  It's only material --

18          THE COURT:  Why is that a material misrepresentation?

19          MR. GOLDFARB:  It's a misrepresentation because they

20   alleged -- asserted and alleged, they represented and warranted

21   in the debt reduction agreements that they had all necessary

22   licenses.

23          THE COURT:  Right.  So that's why I asked you:  Why is

24   that a material misrepresentation?  Why would it have made a

25   difference?
```

F7M9USAA

1          MR. GOLDFARB:  Well it's material.  And materiality is

2     something they didn't raise until their reply.  So they didn't

3     tell us before we amended that was the problem.

4          THE COURT:  That's why I'm asking.

5          MR. GOLDFARB:  Materiality is really a dollar issue.

6     They refer to a hundred thousand dollars -- a hundred million,

7     I'm sorry -- a hundred million dollars was referred to in one

8     part of the complaint.  But that's not the only effect of the

9     misrepresentation.

10          THE COURT:  That's what I'm asking.

11          MR. GOLDFARB:  The other issues about the

12     misrepresentation, in addition to revenue, our argument is the

13     valuation of the company was based on revenue projections.  And

14     the revenue projections were based on revenue that was illegal

15     and therefore couldn't be continued.  So that loss -- that's

16     one way it was overvalued.

17          It was also --

18          THE COURT:  I don't understand what the consequences

19     of that overvaluing are.  That's what I'm trying to understand.

20          Two questions.  Why was that a material

21     misrepresentation?  Because are you saying that they would not

22     have bought this -- they would not have bailed them out if they

23     had known that they were doing this unlicensed activity?

24          MR. GOLDFARB:  No.

25          THE COURT:  And two, what are the damages that you say

F7M9USAA

1    that the U.S. Government suffered?

2            I'm not sure I clearly understand either why this

3    statement that they were in compliance would have materially

4    affected this agreement with the government; and two, what was

5    the damage that the government sustained as a result of this if

6    their position is well, look, they bailed us out, they bought

7    out the company, kept us afloat, then we bought it back from

8    them and that was what was intended.  And whether or not -- if

9    they had bought it for one million dollars, then we would have

10   bought it back for a million dollars.  If they had bought it

11   back for a hundred million dollars, we would have bought it

12   back for a hundred million dollars.

13           So where do you say is the damage?  And where do you

14   say that this would have materially changed the agreement if

15   they had said well, you know what, we can't really say to you

16   that we're totally in compliance because we might be doing --

17   there are some allegations, or we might be doing some insurance

18   stuff here in New York but we're really not licensed to do

19   insurance stuff in New York.  If they told them that, you say

20   the deal would have fallen through?

21           MR. GOLDFARB:  It would have been a different deal.

22           Your Honor, our theory -- what we allege in the

23   complaint is that the amount of the debt reduction that was

24   given in the debt reduction agreement, that amount of reduction

25   was based on the valuation of ALICO and AIG -- I'm sorry, AIA.

F7M9USAA

1   And we allege that those valuations were based on the

2   assumption that -- for instance, the revenue projections that

3   they based it on were based on the assumption that ALICO and

4   AIA continue to do the business that they've been doing which

5   we say was illegal and, therefore, that projection was invalid.

6   And they also --

7               THE COURT:  Invalid in what way?

8               MR. GOLDFARB:  Because --

9               THE COURT:  They did make that kind of money.

10              MR. GOLDFARB:  Because if the assumption is we're

11   going to continue -- that our projection or determination of

12   the value is based on this revenue stream, if the revenue

13   stream is based on illegal activity, that's not a basis you can

14   use to value the company.

15              THE COURT:  But it didn't play itself out that way

16   though.  It didn't make a difference.

17              MR. GOLDFARB:  The question is not how did it play

18   out.

19              THE COURT:  The question is how it played out, because

20   you've got to tell me there were damages to the government, and

21   you've got to tell me that it materially would have affected

22   their judgment because they would have anticipated the

23   consequences of this agreement was going to be something

24   different than what they agreed to.

25              MR. GOLDFARB:  Your Honor, damages is determined as of

F7M9USAA

1    the time the debt reduction agreement is entered into.

2              THE COURT:  So how did the government lose money?

3              MR. GOLDFARB:  Because they got -- the value of what

4    they got was worth less than what they paid in debt reduction

5    and what they contracted.

6              THE COURT:  What did they pay that they didn't get

7    back?

8              MR. GOLDFARB:  Your Honor, that's not -- the issue is

9    not that.  The issue is what -- did they get, in that

10   transaction at that time, did they get something that was worth

11   what it was supposed to be worth.  That's the damages.  At this

12   point we're going beyond the --

13             THE COURT:  I don't know what the alternative scenario

14   is that you're trying to give me though.  I'm not sure what I

15   see anything different about the world of the financial

16   collapse that would have been different had they been told we

17   can't exactly say that we're in total compliance.

18             MR. GOLDFARB:  Your Honor, the alternative scenario is

19   what the deal would have been if the true facts had been

20   disclosed.

21             THE COURT:  What do you say that it would have been.

22             MR. GOLDFARB:  I'm saying it would be the lesser --

23   the amount of debt reduction would be less.  So, therefore,

24   they would have had --

25             THE COURT:  What do you mean by debt reduction?

F7M9USAA

1          MR. GOLDFARB:  This was an agreement.  The government

2     had previously loaned zillions of dollars to AIG.  And these

3     two agreements were to reduce the amount of those zillions by

4     25 billion in return for giving the government these equity

5     interests in AIG and ALICO.  And they would -- the allegation

6     is that they would have gotten less of a debt -- there would

7     have been less of a debt reduction so that the debt -- the debt

8     that would have had to have been paid back would be more than

9     it would have been if the truth had been disclosed.

10          THE COURT:  I just don't know how you came up with the

11     hundred million dollars in relationship to that.

12          MR. GOLDFARB:  The hundred million dollars has to do

13     with one figure in terms of amount of profit that was received,

14     generated by GMD with regard to certain business.  That's

15     quantifying to some extent -- it's actually not a complete

16     quantification, but quantifying, putting a dollar value on some

17     of the illegal business.

18          But in addition to the revenue, there's also they

19     failed to disclose the liabilities, the potential liabilities

20     that ALICO and AIG faced because they were engaged in this

21     illegal activity.

22          THE COURT:  But the government never suffered those

23     liabilities.

24          MR. GOLDFARB:  But the government -- it's not the

25     question whether the government suffered those liabilities.

F7M9USAA

| 1 | THE COURT:  Well, it.  It's a question of damages.

| 2 | That's not part of your damages.

| 3 | MR. GOLDFARB:  The damage is -- the measure of damages

| 4 | is determined at the time of the deal.  It's not determined

| 5 | based on facts --

| 6 | THE COURT:  But it's determined as a loss.

| 7 | MR. GOLDFARB:  Right.  And the loss that we're saying

| 8 | happened is that what the government got for its reduction was

| 9 | overvalued.  If you buy property and it's overvalued, you've

| 10 | been damaged because instead of getting something that's

| 11 | supposed to be worth a million dollars you're getting something

| 12 | that's worth half a million dollars.  In that case you're

| 13 | damaged by half a million dollars.  And we're talking different

| 14 | numbers, but that's essentially what's happening here.

| 15 | They contracted to pay -- to buy -- it's sort of buy

| 16 | in quotes because they paid for it by debt reduction, but they

| 17 | contracted to buy something worth X and what they got was

| 18 | something that was worth less than X.  And that's the classic

| 19 | form of fraud damages.

| 20 | There's Second Circuit case law that says that's

| 21 | the -- the measure of damages in a False Claims Act case.  And

| 22 | you don't look at down the line what happened later on.  You

| 23 | look at damages as of the time that the transaction is

| 24 | undertaken.

| 25 | THE COURT:  But those damages clearly can't be

F7M9USAA

1    measured by the purchase price.

2              MR. GOLDFARB:  Well that's one piece of it.

3              THE COURT:  Because they got that paid back.  That's

4    not the question.

5              The question would be what was the loss amount -- if

6    you say that they owed the government a hundred million dollars

7    and they forgave $50 million of that.  And otherwise if they

8    had known that this company was doing illegal activity, they

9    would not have forgiven $50 million of that, they would have

10   only forgiven $25 million of that.  I mean I have some doubt

11   that that's really the kind of thing you're going to be able to

12   establish on the basis of what really occurred here ultimately.

13   I can understand that.

14             Obviously, it doesn't have anything to do with them

15   just giving them loans or purchasing an interest in the company

16   because they didn't suffer a loss as a result of that.  And

17   they would not have -- it is no reason to conclude that they

18   would have not done this deal had they known that they were

19   involved in illegal insurance business.  That's not what you're

20   arguing.

21             MR. GOLDFARB:  No.  We're not saying the deal would

22   not have been done.  It would have been a different deal.

23             THE COURT:  The purpose of this deal was not for the

24   U.S. Government to make money.

25             MR. GOLDFARB:  No.  But they're entitled to get what

F7M9USAA

1    they contract for.  The government is entitled to get what it

2    contracts for.

3            THE COURT:  Right.

4            MR. GOLDFARB:  It's entitled not to be defrauded when

5    it does the deal, no matter what the purpose of the deal, you

6    know, it's entitled to that.  The statute, in addition to just

7    the common law of fraud, the False Claims Act entitles them to

8    that.  So it makes it illegal to defraud the government.

9            This is an issue that hasn't been briefed because it

10   wasn't raised until AIG's reply, and it really goes beyond

11   what's in the complaint.  I would suggest -- maybe we could

12   submit a letter that would lay out the argument because I

13   haven't had a chance to give those cases, and I don't have them

14   with me right now.

15           THE COURT:  Well can you can submit -- on the same

16   schedule that they are going to submit their letter on the

17   other issue, you can submit a letter.

18           MR. GOLDFARB:  So that deals with the damages theory.

19           To get back to the issue of materiality.  That really

20   is a question, as they framed, of whether the dollar amounts

21   are, you know, of the overvaluation are enough that it would

22   have made a difference.  And we have alleged -- in addition to

23   that hundred million dollar figure there is tax liability that

24   we have alleged; that they weren't paying taxes on U.S. income

25   that would have been taxable by the feds and by states.  And

F7M9USAA

1     that there was potential liability to state governments such as

2     occurred with the consent orders and deferred prosecution

3     agreements, which we realize were settled, but that

4     certainly --

5             THE COURT:  But those were not settlements with the

6     federal government.

7             MR. GOLDFARB:  No.  But that shows, that's the kind of

8     liability that would have contributed -- the likelihood of that

9     liability affects the valuation of the company.  Because one of

10    the things that was --

11            THE COURT:  But the U.S. Government didn't pay that

12    liability.

13            MR. GOLDFARB:  No.  But it entered the debt reduction

14    agreement based on a warranty that the liabilities had been

15    disclosed in the financial statements, which we don't think

16    happened because they didn't disclose we're facing zillions of

17    dollars of liability to the federal government in taxes, to the

18    New York government in fines.

19            Also, one of the representations and warranties was

20    that they had adequate reserves.

21            THE COURT:  Well, you don't allege that that's part of

22    the false claims.

23            MR. GOLDFARB:  Well, it's part of what makes it false

24    because we say, because they were -- because of the fact they

25    weren't licensed they weren't following the reserve

F7M9USAA

1     requirements.

2             For instance, give an example.  In Delaware they were

3     exempt from the ordinary reserve requirements for insurance

4     companies because the position they took with the Delaware

5     government was we're only doing insurance business overseas so

6     there's a statutory exemption in Delaware that as long as

7     you're not doing insurance business in the U.S. you only have

8     to comply with the reserve requirements in all those different

9     countries where you're doing business.

10            THE COURT:  But that wasn't part of your client's

11    disclosure.

12            MR. GOLDFARB:  It was not in the first amended --

13            THE COURT:  Well, it wasn't part of your client's

14    disclosure at all.  He was not the original source for that

15    information.  And he didn't disclose that information to the

16    government.  He wasn't the source, original or otherwise, of

17    that information.

18            MR. GOLDFARB:  He doesn't have to be.  If the original

19    source issue comes up, he doesn't have to be the original

20    source of everything.  He has to be the original source of the

21    core allegations, as the Second Circuit said.

22            THE COURT:  He said that they were not in compliance

23    in New York and he had information.

24            MR. GOLDFARB:  And also said they weren't in

25    compliance in Delaware.

F7M9USAA

```
 1              THE COURT:  He did also tell the government that --

 2              MR. GOLDFARB:  Yes.

 3              THE COURT:  Based on what?

 4              MR. GOLDFARB:  Based on that they were doing

 5   underwriting activities in Delaware.

 6              THE COURT:  I didn't see that.  Where is that?

 7              MR. GOLDFARB:  That's in the first amended.

 8              THE COURT:  Well is it in the third amended?

 9              MR. GOLDFARB:  It's in both, your Honor.

10              THE COURT:  Where is it in the complaint that it says

11   that he -- that they weren't in compliance in Delaware?

12              I don't think it says that he disclosed that.  And I

13   don't even think -- does his affidavit even say that?

14              MR. GOLDFARB:  Well, no.  The affidavit talks about

15   how it was that he knew the information.

16              THE COURT:  Yeah, but it doesn't talk about the

17   Delaware information.  He doesn't say he knew the Delaware

18   information.

19              MR. GOLDFARB:  Right.  Because the Delaware -- it's

20   not relevant whether -- in order for the question to come up

21   whether he's the original source of the Delaware information,

22   first there has to be a public disclosure of the allegation or

23   transaction.  And the only thing they've pointed to as that, as

24   a public disclosure, is a statement in the examination report

25   by Delaware which doesn't say that they were doing underwriting
```

F7M9USAA

1    activity --

2            THE COURT:  I know, but that's not -- I don't even

3    know why we even have to debate about Delaware because it's not

4    your contention that your client found out about Delaware and

5    disclosed Delaware to the government; is it?

6            MR. GOLDFARB:  It's in the first amended complaint.

7            THE COURT:  That he knew about activity going on in

8    Delaware?

9            MR. GOLDFARB:  Yes.  That was -- it's in the first --

10           THE COURT:  Where is that?

11           MR. GOLDFARB:  Your Honor, if you'll indulge me --

12   maybe if I could submit the paragraph rather than take the time

13   to look now.

14           THE COURT:  Are you saying that's in the complaint or

15   in his affidavit?

16           MR. GOLDFARB:  I believe it's in the first amended

17   complaint and the second and third amended complaint.

18           THE COURT:  That he knew about Delaware activity and

19   he disclosed that to the government?

20           MR. GOLDFARB:  Well, yes, because the disclosure to

21   the government is the, among other things, a disclosure of the

22   draft first amended complaint which was disclosed before the

23   draft --

24           THE COURT:  What do you mean the disclosure of the

25   draft?

F7M9USAA

1          MR. GOLDFARB:  Well we provided a copy of it to the

2     government before we filed it.  That's a disclosure to the

3     government.

4          THE COURT:  But, again, you're confusing me because

5     you keep saying there's nothing in that complaint that's not in

6     this complaint.

7          MR. GOLDFARB:  That's right.  But there's also --

8          THE COURT:  So why am I --

9          MR. GOLDFARB:  There's a lot in the third amended

10    complaint.  There is stuff in the third that's not in the

11    first.

12         THE COURT:  I understand that.  But I didn't see a

13    reference to Delaware.  Maybe I didn't look at it as closely.

14         MR. GOLDFARB:  Would the court indulge -- if the Court

15    will indulge me I'll find the paragraph number.

16         THE COURT:  I think I did find it.  I'm sorry.  I

17    apologize.  I think it's on page 13.

18         MR. GOLDFARB:  Which document are you looking at?

19         THE COURT:  I'm looking at the third amended

20    complaint.

21         MR. GOLDFARB:  What paragraph?

22         THE COURT:  Paragraph 46.

23         MR. GOLDFARB:  That lays out what Delaware law is.

24         THE COURT:  That's reference to Delaware.  That's all

25    right.  I can look at that.

F7M9USAA

1      MR. GOLDFARB:  I'll be glad to submit if the Court

2   would like a letter.

3      THE COURT:  That's not determinative either way.

4   You're arguing now about Delaware.  I mean he didn't make

5   disclosures about other states.  The one paragraph you pointed

6   to me was that he was told why they were trying to cover up

7   New York business because -- for the reasons that you gave.

8   But you don't say that there are similar conversations about

9   activities in other states that he was aware of.

10      MR. GOLDFARB:  Your Honor, you're right.

11      Let me explain the reason why Mr. Grabcheski's

12   declaration talks about what it does and why it doesn't talk

13   about other things.  And that's because if there's -- unless

14   there's a prima facie showing of a public disclosure, original

15   source is irrelevant.  We don't have to do anything.

16      What they produced about Delaware, the only thing they

17   pointed to is that excerpt from the examination report which is

18   not a prima facie disclosure.  So we determined we don't need

19   to disclose -- say anything about Delaware.  If the Court finds

20   that that was a public disclosure by Delaware, then we're in a

21   different situation.  But we think it's clear that it was not.

22      THE COURT:  They have to give me a relevant public

23   disclosure before he makes his disclosure to the federal

24   government.

25      MR. GOLDFARB:  Before it triggers the original source.

F7M9USAA

```
 1    And that's the point at which it makes a difference about what
 2    was told to the federal government.
 3            Unless the court has any more questions about that
 4    aspect, let me talk about some additional issues.
 5            One of the points they've made is -- before I get to
 6    that.  Just to lay out, just so the Court understands our
 7    position about --
 8            THE COURT:  Let me just find out.  How much more time
 9    are you going to want to need, because either we're going to
10    adjourn for lunch and come back or we can wind up in the next.
11            MR. GOLDFARB:  Fifteen minutes.
12            Maybe it would be better if we did it after lunch so I
13    don't have to keep leaning over to hear my client.
14            THE COURT:  Why don't we do this.  Let's adjourn for
15    an hour.  2:15.  So I will give you a full opportunity to be
16    heard.
17            (Luncheon recess)
18
19
20
21
22
23
24
25
```

F7M9USAA

                              AFTERNOON SESSION

                                  2:25 p.m.

          THE COURT:  Yes, sir.

          MR. GOLDFARB:  Thank you, your Honor.  Your Honor
Mr. MacCoby has some kind of emergency.  I'm not sure if he'll
be back or what the story is.

          Just to pick up where we left off, on the issue of the
Delaware allegations.  That's paragraphs 81 through -- I'm
sorry 88 through 91 of the third amended complaint.

          Now, your Honor, I think -- as we said, I think that
the detail the court has been asking for is not required in the
complaint.  And frankly, if the Court's asking did we allege,
you know, Mr. Grabcheski found XYZ facts from one person and he
found ABC facts from another person, that level of specificity,
that's not in the complaint, and it's not in the declaration.
We don't think it has to be.  But we absolutely can provide
that if the Court allows another amendment.  And I think that
makes sense because I think that the Court would clearly -- I
can see now what the court has focused on -- I don't know if
they were the only issues, but certainly some very major
issues.  And I think I can represent I think we can provide
that information.  Certainly Mr. Grabcheski can -- you know,
has the information about who told him what.  And if the Court
would like, I can proffer some of it now to give an example.

          But I think it would be best to, if we have that

F7M9USAA

1    opportunity, that we could give a complaint that really does

2    lay out what we think -- what he found out, how he found it

3    out, and what was disclosed to the government at what point.

4              THE COURT:  I'm just trying to figure out in what

5    manner you have alleged fraud with particularity.

6              MR. GOLDFARB:  That's right.  I understand that.

7              THE COURT:  It can't simply be I think they violated

8    the law or I accuse them of violating the law or I accuse them

9    of saying that -- I accuse them of falsely saying that they

10   have complied with the law and they didn't comply with the law.

11   It's got to be -- a pleading with particularity is who did

12   what, who said what, what were the misrepresentations, who

13   relied upon them.

14             MR. GOLDFARB:  Your Honor, in terms of the

15   particularity, I mean the who, what, where, that relates

16   primarily to the fraudulent statements.  And that we've alleged

17   very particularly.  We've identified two specific documents,

18   the debt reduction agreements.  We have the date they were

19   executed.  We've made allegations about the place they were

20   executed.  We've alleged who signed it.  It's visible on the

21   complaint.

22             Most frauds -- a lot of frauds, certainly, the

23   statements are made orally.  There is general -- you know,

24   there's an issue of particularity.  But we've got the specific

25   documents.  There is no doubt about -- no possible dispute or

F7M9USAA

1  uncertainty about where and when and how the fraudulent

2  statements were made and what they said.

3          THE COURT:  Well I think one of the issues that I have

4  is it's unclear to me who is supposed to have some scienter

5  here.

6          MR. GOLDFARB:  I can address that.

7          THE COURT:  You can't just simply say AIG defrauded

8  the government.  You've got to give me with some particularity

9  the scienter over whose part that you say connects the dots in

10  terms of knowing the truth, making the false statements,

11  knowing the false statements were intended to mislead.

12          It can't be that person A made a statement and that

13  wasn't true, person B knew it was false, and person C was the

14  person who was hiding it.  You've got to connect it all.

15          MR. GOLDFARB:  Yes, your Honor.

16          THE COURT:  I'm not quite sure who you're accusing of

17  knowingly making the false statement to the government.

18          MR. GOLDFARB:  Let me address that, your Honor.

19          First of all, just on a broad level of the law, to

20  what extent are we allowed to aggregate different people's

21  knowledge.  That's the collective knowledge issue.  The case

22  that AIG relies on, what the rule is you cannot aggregate --

23  you can't take everybody in the company and say whatever

24  anybody knows, we can put that together, even if it's totally

25  innocent knowledge.  That's clearly not allowed.  That's not

1    what we've done.

2              We've identified very specific, high level officers,

3    such as Rod Martin, who is an executive vice-president of AIG

4    and was also a high level officer of ALICO; David Herzog, who

5    is the chief financial officer of AIG; Chris Swift who was a

6    vice-president of AIG.  All of those people we allege had

7    knowledge of the illegality.  And we describe some of the

8    circumstances in the discussion of concealment, which -- how

9    they got that knowledge.

10             THE COURT:  But you have to connect those people not

11   just with the illegality.  But you have to connect them to the

12   false statements.

13             MR. GOLDFARB:  That's right.

14             We do that, your Honor.  We allege that they were

15   aware of the debt reduction agreement and of the written -- the

16   representations that were made.  And that's enough.  In the

17   Harrison, U.S. ex rel. Harrison, which is cited in the case

18   that AIG has cited, the Science Applications case, said you

19   don't have to show that the person who actually signed the

20   claim had the knowledge.

21             So the fact that the chief financial officer, for

22   instance, who had knowledge of the underlying facts also was

23   aware of the debt reduction agreement.  That's what chief

24   financial officers --

25             THE COURT:  But that's not sufficient.  They have to

F7M9USAA

| | |
|---|---|
| 1 | be more than aware of the debt reduction agreement.  They have |
| 2 | to be aware of the representation that's made in the debt |
| 3 | reduction agreement.  You can't just simply say they know |
| 4 | there's an agreement.  They have to be aware that a statement |
| 5 | was made in the agreement that they knew was false. |
| 6 | MR. GOLDFARB:  Well the complaint alleges that. |
| 7 | But there's also the fact that knowledge is defined in |
| 8 | the False Claims Act not only as actual knowledge but also |
| 9 | reckless disregard of the truth and willful blindness as to the |
| 10 | truth. |
| 11 | THE COURT:  I'm not sure I can read from your |
| 12 | complaint that you're alleging any factual circumstance other |
| 13 | than actual knowledge. |
| 14 | MR. GOLDFARB:  Well, I mean we specifically say -- |
| 15 | THE COURT:  You weren't willfully blind.  There is no |
| 16 | fact that you put in here that would make them willfully blind |
| 17 | as opposed to knowingly making a falsehood.  Either they knew |
| 18 | that they were complying with the law or they didn't know they |
| 19 | were complying with the law the way you've alleged it.  They |
| 20 | didn't stick their head in the sand and not care.  You |
| 21 | specifically allege that they deliberately made this falsehood |
| 22 | knowing the facts were different. |
| 23 | MR. GOLDFARB:  Your Honor, the complaint -- we |
| 24 | actually say that, as used in the complaint, we're using |
| 25 | knowledge to include either actual knowledge or reckless |

F7M9USAA

1    disregard or willful blindness.

2              THE COURT:  Give me a plausible scenario that this

3    would be willful blindness under the facts that you've given

4    me.

5              MR. GOLDFARB:  Let me give you -- one plausible

6    scenario has to do with the person who signed the debt

7    reduction agreements on behalf of AIG was, I think it's Paula

8    Reynolds, who was the chief restructuring officer.  And she

9    certainly had, before signing that agreement, had a duty to do

10   due diligence.

11             THE COURT:  But that's not willful blindness.

12             MR. GOLDFARB:  Let me finish out the scenario.

13             So that would require finding out, asking people what

14   the answer -- are these representations correct.  And

15   certainly -- and it's also, the chief financial officer, it's

16   within the scope of his duties to sign off on a major deal like

17   this.  He needs to know what it contains.

18             These kind of representations are not unusual

19   representations.  The representation that insurance companies

20   got licenses, they're operating lawfully, they are absolutely

21   standard representations in major deals like that.  So they've

22   got to know that these representations are being made.

23             THE COURT:  What's the factual scenario that you

24   allege -- wait.

25             What's the factual scenario that you allege is willful

F7M9USAA

1   blindness?

2          If I know that they're making a representation in the

3   agreement that they're in compliance with state law, based on

4   the way you've alleged this complaint, in what way can I not --

5   can I be liable and not know that the statement is not true?

6          MR. GOLDFARB:  I'll tell you -- first of all, your

7   Honor, knowledge does not have to be alleged with

8   particularity.  It can be alleged generally.

9          One scenario -- you've asked for a scenario.  I'll

10  admit this is not spelled out in the complaint.

11         THE COURT:  That's what I meant, a scenario that

12  you've laid out on the facts that you've alleged -- I cannot

13  read this complaint and come away from it with:  Oh, this is

14  willful blindness.  I read this complaint and come away from it

15  that they knew and they deliberately made a false statement

16  that they knew is not true because they were intentionally

17  covering it up.  That's the only scenario.

18         MR. GOLDFARB:  An inference that you can draw from

19  the -- one inference, I'm not saying it's the only inference --

20  is that Paula Reynolds, either she didn't ask are we in

21  compliance, and that's either recklessness or willful -- you

22  know, deliberate blindness.

23         THE COURT:  Why would I read that from your complaint.

24  Your complaint doesn't say that.  It doesn't even imply that.

25  It doesn't imply that she didn't ask.

F7M9USAA

1          MR. GOLDFARB:  Your Honor, I'm saying the possible

2     scenarios; that you can infer that either she did ask or she

3     didn't ask.  If she did not ask, that's either willful

4     blindness or reckless disregard.

5          THE COURT:  I can't infer that because you don't

6     allege it.

7          MR. GOLDFARB:  If she did ask and she was told the

8     truth, then she knew about it and --

9          THE COURT:  That seems to be the only --

10         MR. GOLDFARB:  If she did ask and was not told the

11    truth, then AIG is tagged with that dishonesty of the person

12    who didn't tell her the truth.

13         THE COURT:  But that's not what you allege.  Right.  I

14    mean that's not what you accused them of doing.

15         MR. GOLDFARB:  Your Honor, it's not spelled out.

16         THE COURT:  That's not what you intended -- that's not

17    even what you intended to imply.

18         You specifically said they knew that they were in

19    violation of the law.  And they made a deliberate decision to

20    say that they weren't, they were in compliance with the law.

21    That's what you've alleged.  That's the only thing you've

22    alleged.

23         MR. GOLDFARB:  Perhaps -- I thought -- we tried to

24    make it clear and perhaps it was not as clear as it should have

25    been.

F7M9USAA

1          We did specifically say that knowingly -- we said this

2     in the complaint.

3          THE COURT:  Did you say that somebody at AIG was

4     willfully blind to this?

5          MR. GOLDFARB:  We said that, as used in the complaint,

6     knowingly or knowledge includes reckless disregard and willful

7     blindness.

8          THE COURT:  I'm not talking about a definition.  I'm

9     talking about a factual allegation.

10          MR. GOLDFARB:  I didn't spell out those scenarios

11     explicitly but we've got -- again, I think given that knowledge

12     can be alleged with generality, I think that what we've said is

13     sufficient.  I don't think we need to spell it out at that

14     level of detail.

15          And we do specifically allege that Mr. Herzog,

16     Mr. Martin, and Mr. Swift, who were very high officers at AIG,

17     were aware not only of the illegality but aware of the debt

18     reduction agreement and aware of the representations.

19          THE COURT:  I don't know what the basis of that

20     allegation is.

21          That's an assumption.  But I don't know where that

22     factual allegation comes from.  You're assuming that.  You

23     don't have any proof of that.

24          MR. GOLDFARB:  Your Honor, perhaps we should have put

25     information and belief.

F7M9USAA

1        THE COURT:  But even with information and belief,

2   you've got to tell me on what kind of information that you.

3        MR. GOLDFARB:  Certainly with regard to -- there's

4   several things.

5        First of all, Mr. Herzog as chief financial officer

6   making this kind of a decision whether to sell a subsidiary --

7   because this is all in the context of selling -- planning to

8   sell ALICO and AIA.

9        THE COURT:  But you have to acknowledge that that

10   would be an insufficient basis to make a sufficient allegation.

11   If that was true -- and quite frankly I hear that argument

12   plenty of times.  If that were true, every single person who

13   was a high level officer, there would be some inference that

14   they would be involved in fraud because they are a high level

15   official and should have known.

16        That's not the test here.  You can't do it that way.

17   There's got to be some reasonable inference based on some facts

18   that would give that particular person personal knowledge or

19   some willful disregard of the truth or something.

20        I can't say that somebody stealing money out of

21   Microsoft, that the natural inference is that Bill Gates knows.

22   That's not the way it works.  You know that that's not the way

23   it works.

24        I have to go behind the reference to AIG and analyze

25   the individuals that you say are the actors on behalf of AIG to

F7M9USAA

1   look at the conduct and their knowledge and their scienter.

2   Because companies are fictions.  They are not people.  They

3   don't act.  They don't talk.  They don't speak.  They don't

4   take actions.  They do it through individuals.

5        I'm trying to give myself a mental chart of who are

6   the links, individuals in this chain that you say makes AIG

7   responsible for knowingly or recklessly making false

8   representations in the document that's only signed by a limited

9   number of people.

10        Who are the conspirators here?

11        MR. GOLDFARB:  Your Honor, I think certainly the chief

12   financial officer is -- straight in the core scope of his

13   duties to be involved in a major, enormous transaction,

14   billions and billions of dollars, the chief financial officer

15   is going to be involved in that.  And that's not just

16   speculation.  That's what CFOs do.

17        THE COURT:  That's not an inference of scienter.  You

18   can't make that an inference of scienter.  Of course they are

19   going to be involved with it.  Every time something goes wrong,

20   just because the person is the chief financial officer you

21   can't say:  Well, they're the chief financial officer, they

22   should have known.  "Should have known" is not the test.

23        MR. GOLDFARB:  Mr. Grabcheski told Mr. Herzog himself

24   about the illegality of the conduct.  So in that case we --

25        THE COURT:  Again that's why I ask these questions.

F7M9USAA

1    Is that either in the complaint or in his affidavit, or is that

2    something you're informing me of now?

3            MR. GOLDFARB:  Your Honor, that level of detail I

4    don't think is in the complaint.

5            THE COURT:  Well any level of detail.  There is no

6    place that he says that I read that he was told by this person.

7    You're informing me of that now.

8            I mean I accept your representation of that.  I just

9    didn't -- that's news to me.

10           It could be there.  If it is, I'd like to look at it

11   specifically.

12           That's fine.  I agree with you.  Obviously, knowledge

13   by a high level AIG official that the operations were not in

14   compliance with the law and a statement saying -- in the

15   agreement saying that they were in compliance with the law may

16   be enough.  I'm not going to say it's necessarily enough

17   because it depends on how you link the two and whether or not

18   you have the combination of people that will make AIG as an

19   entity liable for the misstatement.  But I'm not going to say

20   that necessarily the person who makes the misstatement has to

21   be the same person he spoke to for that to sustain, at least

22   initially, the complaint.  But I've got to have, as I say, link

23   in this chain of having someone demonstrating that they had the

24   knowledge, and that person having such a capacity that it would

25   be unlikely that someone else on behalf of the company would

F7M9USAA

1    make this representation without knowing the information that

2    that person knows and should be attributed to that person.

3         MR. GOLDFARB:  Your Honor, as far as what's in the

4    complaint -- the third amended complaint that goes -- there's

5    two places where we talk about the knowledge.  One is

6    paragraphs 104 through -- that section about the concealment,

7    104 through 122, I think.  And then the other one is paragraphs

8    150 through 155.

9         155 talks generally in terms of this was a topic of

10   discussion, there were meetings.  It doesn't get more specific

11   than that.

12        The earlier set of paragraphs, 104, in that section,

13   that does talk about more specifically about circumstances in

14   which David Herzog for instance and Chris Swift and Rod Martin

15   found out.  It doesn't say, I don't think, that Mr. Grabcheski

16   told them anything.  It says they knew.

17        We can provide -- we think what we've given is enough

18   but we could certainly I think provide the level of detail that

19   your Honor is asking about.

20        THE COURT:  What paragraphs?

21        MR. GOLDFARB:  104, that section, section D that

22   starts at 104.

23        THE COURT:  Right.  We looked at that.

24        MR. GOLDFARB:  So 104 to 112.  Two pages.  I'd

25   particularly call your attention to those two pages.

F7M9USAA

```
 1              THE COURT:  The real question for me, part of the
 2     important question is I have to be confident that this is
 3     something that your client knew rather than surmised.
 4              MR. GOLDFARB:  Yes.  I understand.
 5              THE COURT:  That's the thing.  I need that level of
 6     detail.  It can't be just I figured it out.  It's got to be
 7     that I had specific knowledge and specific facts that if I gave
 8     those facts to the government the government would have a basis
 9     to bring this complaint.
10              MR. GOLDFARB:  Yes.
11              THE COURT:  That's the way I'm trying to handle it.
12              MR. GOLDFARB:  To the extent that we have not done
13     that, if the complaint doesn't do that, I can proffer that I
14     think we can do that if the court gives us another opportunity
15     to amend.
16              Mr. Grabcheski was certainly present there, and
17     operating at a high level, and interacting with high level
18     management people and did, in fact, have the kind of
19     conversations that the court is talking about.
20              And I think a better way to present that than me
21     making proffers in court would be to allow us another chance to
22     amend.  And it will be in the complaint in black and white and
23     it's not -- at that point we certainly understand the court's
24     concerns and have a very specific target to be aiming for.  So,
25     as I said, I do think that would be the best thing to do.  And
```

F7M9USAA

1    then certainly the court -- I think that -- if we can't do it

2    then, we're not going to be able to do it.  There will be no

3    doubt at that point.  If the court thinks that's not enough,

4    then I think at that point there's not going to be anything

5    more we can do.

6              THE COURT:  I agree with you that everything that

7    establishes his status to bring this lawsuit doesn't have to be

8    in the complaint.  I agree with you with that.  I didn't mean

9    to give you that impression.

10             Even if I analyze this complaint as if it was the

11   government bringing this complaint, I still would demand of

12   them some specific factual allegations that would lead to the

13   probable conclusion that these people knew, made the false

14   statement, this is how they knew, this is the particular false

15   statement they made.

16             Because this is -- this is the more general rather

17   than the more specific false statement kind of allegation.

18   This isn't like:  Well our company has ten trucks in their

19   warehouse and we only have one truck in the warehouse, we have

20   no trucks in the warehouse.  This is:  Oh, we complied with

21   state law.

22             That's sort of general statement about being in

23   compliance with state law demands a little more specific -- not

24   a little more than what you have, at least more specific than

25   the example I gave you of, okay, what is the nature of the

F7M9USAA

1    information and the noncompliance that really puts the lie to

2    that statement.  If it said -- if the agreement said we're in

3    compliance with all state laws and I know that our truck driver

4    ran a red light yesterday, no you don't have a material false

5    statement or a fraud.  So the question really also is whether

6    or not the nature of what you say is the unlicensed -- you

7    allege is the unlicensed insurance business is such that it is

8    the kind of thing that is specifically deemed represented to be

9    in compliance rather than -- that saying that we are in

10   compliance with the law is a representation that we are doing a

11   licensed insurance business rather than we are doing an

12   unlicensed insurance business.

13            MR. GOLDFARB:  That's right.  But there was -- we did

14   allege, and there is a representation and a warranty in the

15   agreements that they had all necessary licenses.  So it wasn't

16   just we complied with the law.  The agreements did focus in on

17   the licenses.

18            As I said, I think we can provide the kind of detail

19   that you're asking about.  So we'd ask for that opportunity to

20   do that.

21            If I could, I'd like to move on to one of the -- a

22   couple of the additional other issues that Mr. Burck raised.

23   One has to do with his argument that the New York statute

24   wasn't clear and they had a reasonable interpretation that if

25   they were doing this activity they didn't have to be licensed.

F7M9USAA

1    And his argument, as I understand it, is that the statute

2    doesn't clearly say that if the insureds and the risks are

3    located outside of New York that you still have to be licensed

4    if you're doing the sales and marketing in New York.  That's

5    simply wrong.

6           The statute -- first of all, in defining what's an

7    insurance business in New York, and this is New York Insurance

8    Law Section 1101(b)(1), it says doing any of the following

9    acts, and it includes making or proposing to make as insurer

10   any insurance contract, including issuance or delivery of a

11   policy or contract to a resident of the state, and that's what

12   Mr. Burck relies on.  But then it goes on to say, "or to any

13   firm, association, or corporation authorized to do business

14   herein."

15          So that, by definition, includes foreign companies.

16   It doesn't say any companies incorporated in New York.  It says

17   authorized to do business in New York.  So a Delaware

18   corporation, dozens, hundreds of them are authorized to do

19   business in New York.

20          THE COURT:  I'm not sure that that's a determinative

21   factor for me because I'm not sure -- I'm not convinced that I

22   can resolve their good faith or reasonableness on the face of

23   this complaint on this motion.  If that's their defense, that's

24   their defense.

25          Your complaint doesn't allege that they're acting

F7M9USAA

reasonably.  Your complaint alleges that they're acting

deliberately in violation of the law and making false

representations.

MR. GOLDFARB:  There is also -- there were

department -- the regulators gave publicly available advisory

opinions that were very clear that said this did cover activity

even where the insured is located out of the country.

THE COURT:  How do I resolve that?

MR. GOLDFARB:  There is also this -- this I think

makes it unmistakably clear.  If I could hand up -- this is

just an excerpt from the statute.  I've given a copy to

Mr. Burck.  The first paragraph is just the section I read

before.  Section 1101(b)(2) is two of the exceptions to the

definition.  And you'll see that those exceptions talk about

situations under certain circumstances where the risk or the

insured is located out of the state, that in those cases under

certain conditions you don't need a license.

Well, obviously if out-of-state risks aren't within

the definition to begin with, you don't need an exception for

them.  The fact that they put in an exception covering those

kind of risks in certain conditions, which don't apply here,

but the fact that they put those exceptions in, that

conclusively shows that the statute covers a situation where

there's activity in New York that is insurance business and the

risks and the insureds are located out of New York.

F7M9USAA

1              So given that, together with the first section,

2        together with the advisory opinions, there is no reasonable,

3        possible reasonable argument that they could have believed that

4        it wasn't necessary to get a license.  So I just think that

5        point needs to be made.

6              Even if they did -- that still gets to the question

7        even if there might have been a reasonable argument, what did

8        they think the law was.  And that is a factual question.  And

9        we do allege that they -- that their understanding of the law

10       was that a license was required.

11             In terms of the falsity of the representations,

12       assuming the court -- the question then is, is the activity

13       that we've alleged, does that constitute activity that would

14       require licensing.

15             We alleged it was marketing activity, it was

16       solicitation.  We said it was on behalf of multinational

17       corporations.  We named about a half a dozen corporations that

18       were clients.  We said they made phonecalls, they made sales

19       calls, they went out and visited the clients in New York,

20       negotiated the terms of an agreement.  So we've given more than

21       just a general description of the kind of activities that went

22       on.  We've been very specific.

23             So when you compare that, especially to the advisory

24       opinions and the kind of activities that are described there, I

25       think it's very clear that what they were doing did require a

F7M9USAA

1    license.

2           Now with regard to the issue of materiality.  Based on

3    a conversation I had with Mr. Burck I don't know if I misspoke

4    or it wasn't totally clear but I want to make sure to clarify

5    something I said about the fact of when they raised the

6    argument about materiality.  They raised it in the most recent

7    filing which was their opposition to our motion for leave to

8    amend and combined with their reply in support of their motion

9    to dismiss.

10          I don't mean to contend that they hadn't raised the

11   issue before today.  They did raise it then.  But that was

12   after -- that was not included in their initial motion to

13   dismiss.  So when we drafted the third amended complaint we

14   didn't -- you know, we had no notice that they were contending

15   our materiality allegations were deficient.

16          THE COURT:  I thought you replied to that.

17          MR. GOLDFARB:  Well, we replied -- we replied -- yes,

18   we did reply, make a legal argument.  What we did not do was to

19   file yet another request to amend at that point.  We had

20   already submitted our third amended complaint which did not

21   make any changes regarding materiality because at that time

22   they hadn't raised the issue.  So, my point was just we hadn't

23   really had a fair opportunity to meet the objection.  If the

24   court found the objection was well taken, we didn't have an

25   opportunity to make another amendment.  So that would be

F7M9USAA

1    another, I guess, point in support of a request for leave to

2    amend that, if we're granted it, we would be able to address

3    that issue and those are the kind of questions that the Court

4    raised before lunch.

5            If I can have the Court's indulgence for a minute.

6            (Pause)

7            That's all I have, your Honor.

8            THE COURT:  Thank you.  Mr. Burck do you want to

9    reply.

10           MR. BURCK:  I will try to be very brief, your Honor.

11           Just a few points.  I'll take it backwards because it

12   was a long argument.

13           The last point about materiality.  We didn't raise

14   materiality in our motion to dismiss because they didn't

15   specify any statute that we violated.  So when we did our

16   motion to dismiss, they then responded and said okay well

17   forget the second amended complaint, we'll do the third amended

18   complaint.  That's when they added the provisions from the

19   consent orders.  So then we raised materiality.  They did, as

20   the court said, have an opportunity to respond in the brief.

21   That's just a small point, your Honor.  I'll do another small

22   point before I get to the broader point.

23           On the New York insurance law argument -- this is one

24   of the reasons why I believe the Court is absolutely correct,

25   that this is not the place to be assessing the legal arguments

1    on New York state law.

2              Mr. Goldfarb said that -- he pointed to this provision

3    in 1101 where he said that the reason why we should have known

4    that we couldn't market to companies located in New York was

5    because -- he read from this part of the statute.  We were

6    making or proposing to make as insurer any insurance contract,

7    including either issuance or delivery of a policy or contract

8    of insurance, to a resident of this state or -- this is the

9    provision he thinks is important -- or to any firm,

10   association, or corporation authorized to do business herein.

11             The problem, your Honor -- the reason we're raising

12   this is to highlight the point that you made, this is not the

13   place to do this.  ALICO is a life insurance company, your

14   Honor.  The companies and the firms and associations do not

15   receive life insurance.  The contracts are to people, human

16   beings.  So that provision is not relevant.  In fact, I'll just

17   offer this, proffer to the court.  DFS never alleged that

18   provision was relevant.  The only reason I raise it, again,

19   your Honor, was just to say that this is not the place to be

20   arguing these provisions.

21             The broader point we'd like to make, your Honor, is

22   really on the, apparently, the fourth amended complaint.  We

23   actually heard the complaint being amended for the last couple

24   of hours as the court asked questions.  And now it is

25   essentially a request to skip -- to ignore the third amended

F7M9USAA

1     complaint, ignore the second amended complaint, and now go to a

2     fourth amended complaint to try to address the issues that the

3     court has raised today.  And Mr. Grabcheski, apparently, was

4     giving information to Mr. Goldfarb right in front of the court

5     to give some more specific facts, alleged facts about

6     conversations, meeting, things that occurred.

7             Your Honor, just to put this in context again.

8     Mr. Grabcheski filed an original complaint in May of 2010 in

9     which he raised a bunch of complaints, issues that the Southern

10    District of New York investigated.  He raised a bunch of

11    alleged illegal behavior that AIG, ALICO, AIA engaged in.

12    You've heard today, you've seen in the multiple complaints, all

13    of these terrible things that AIG is alleged to have done --

14    AIG officials, executives, ALICO people -- fraudulent criminal

15    acts.  Your Honor, he never said anything about those the first

16    time he went to the federal government.  Not one thing.

17            Now, your Honor, the only reason I raise that, because

18    I think it's relevant to assessing the credibility of a

19    complaint and a relator who comes back to this court four times

20    and just today figures out well, I had a direct conversation

21    with this person, I'll put it on the record, that this person

22    told me that we were committing a fraudulent act to hide

23    activities from regulators.

24            Didn't remember that in May of 2010.  No idea.  And

25    that was four years ago.  He had just been fired.  The DRA had

F7M9USAA

just been signed.  The world was collapsing around us.  AIG was

going under.  I didn't remember it then.  But I remember it

today in court in 2015.

          Your Honor, again, the only reason I raise that is

because the reason we have all of these rules about amending

complaints is partially so that we can understand the

credibility and assess the credibility of changes and

amendments to the complaint.  And the fact that he never

mentioned them one time, one single time before today.  And had

never mentioned the first time -- none of these issues, the

first time that he filed the complaint has to cast doubt on the

credibility of those claims.

          I think that goes to the broader point that the fourth

amended complaint that is being proposed today is at least two

complaints too far and this case should stop at the second

amended complaint and should be dismissed with prejudice.

          Just a few specific points on the -- Mr. Goldfarb's

claims about the specificity of knowledge and Mr. Grabcheski's

claims that people said things or he knew things.  I want to

look at 104, paragraph 104.  This was the paragraph that

Mr. Goldfarb says is all about the intent and him knowing that

people believed this and that people were telling him this and

were doing these things in order to evade the law and break the

law.  Well what does it actually say, your Honor?

          It says, "AIG engaged in a series of actions that were

F7M9USAA

1  designed to conceal the fact that GMD was soliciting and

2  selling insurance in New York on behalf of ALICO and AIA.  As

3  described below, those activities included treating GMD's

4  New York sales force for payroll purposes at various times as

5  if they were employees of one or another of AIG subsidiaries,

6  other than ALICO or AIA.  Even those employees regarding

7  themselves as employees of AIG were de facto employees of AIG."

8       Your Honor, there's nothing in that paragraph which

9  Mr. Goldfarb relied on that says anything about anybody's

10  intent, any conversations anyone had, anything anyone said to

11  anybody.  These are conclusionary statements that

12  Mr. Grabcheski put into a complaint.  Nothing at all about

13  anybody saying anything to him or to anyone about any of those

14  things.

15       Then the famous paragraph 107.  And I'll read it more

16  slowly.  Excuse me.

17       "On one or more occasions over the next few years,

18  AIG's chief financial officer, initially Howard Smith and

19  subsequently David Herzog, questioned the inclusion of the GMD

20  sales staff and payroll code 032 which increased expenses that

21  were charged to AIG as opposed to being charged to one of the

22  subsidiaries.  In response, it was explained to them, either

23  directly or through a subordinate who reported the information

24  to them (a) that these employees were GMD New York employees

25  based in New York who serviced the multinational segment of

F7M9USAA

1    AIG's business primarily on behalf of ALICO; and (b) the

2    employees had been based in New York because of how many the

3    multinational clients and potential clients had offices in

4    New York; and (c) that the employees could not be put into

5    ALICO's payroll because ALICO was not licensed as an insurer in

6    New York because putting them on ALICO's payroll would

7    jeopardize the regulatory exemptions and tax breaks that ALICO

8    enjoyed under Delaware law which were not available to insurers

9    that transacted insurance in the United States."

10           Now, your Honor, once again, that paragraph contains

11   nothing about conversations that Mr. Grabcheski had, nothing

12   about where these came from, who said what to whom.  There's a

13   lot of passive voice about it was told to people.

14           And most fundamentally about 107, and your Honor

15   touched on this, there's literally nothing in this paragraph

16   that remotely hints of illegal behavior.  Everything that is

17   described in this paragraph is linked up to a payroll code,

18   your Honor, a payroll code at AIG, and where an employee should

19   be put on a payroll code.  And apparently the motivation was

20   because ALICO's payroll, they were not licensed as an insurer

21   in New York, which was true.  It was not illegal.  They didn't

22   want to put these people on that because it would jeopardize

23   ALICO's lack of -- tax exemptions for not being licensed in

24   New York.

25           Your Honor there's nothing else in this paragraph --

F7M9USAA

1    there's nothing in this paragraph that says anything about what

2    is illegal about that.  And there's certainly nothing on the

3    face of it that's illegal.  And every single paragraph -- I

4    won't bore the court and waste more time -- but every single

5    paragraph in this complaint that Mr. Goldfarb pointed to as

6    evidence of intent, evidence of people having conversations

7    about criminal behavior, every one of them is like this.

8          And, again, Mr. Grabcheski never once, ever once said

9    in 2010, 2011, 2014 when he amended these complaints that any

10   of these conversations ever happened.  He said it the first

11   time today to Mr. Goldfarb right in front of the court.  That's

12   the first time.  It's not even in his declarations that he

13   submitted in support of the third amended complaint.

14         Your Honor just a couple more points.  Two more points

15   to make.

16         The Southern District of New York.  And I sort of

17   think of this as a bit of a shuffle on the Southern District of

18   New York.  And this goes to the original source issue which, of

19   course, follows from the public disclosure issues.

20         Mr. Goldfarb still refused to address the question of

21   what was the information that Mr. Grabcheski sourced to the

22   Southern District of New York in this investigation.  He did

23   not answer it.  It's not in the declarations.  When he was up

24   here, he didn't address the point.  All he would focus on was

25   the state authorities.

F7M9USAA

1          The Southern District of New York of course is the

2     operative federal government authority in this matter and

3     Mr. Goldfarb refused or did not address that point.

4          Again, it goes to the original fact, undisputed fact

5     in this case that the original complaint had nothing to do with

6     anything that's before the court now.  The inference that

7     should be drawn from that is that Mr. Grabcheski told the U.S.

8     Attorney's Office nothing about what is in the case today.

9     Just not there.  And the -- and again, we have to go beyond the

10    complaint for this but since we were doing that quite a bit

11    with Mr. Goldfarb I'll just offer up this point.  The Southern

12    District issued subpoenas and the SIG TARP, the Special

13    Inspector General for the TARP program, issued subpoenas to AIG

14    in the summer of 2010 and investigated these issues.  And those

15    subpoenas asked for information about ALICO's activities in the

16    United States, its marketing activity, which Mr. Grabcheski had

17    never mentioned in his original complaint.  At the same time

18    that that complaint was filed, the U.S. Attorney's Office was

19    asking about something he never asked about.  And then a year

20    later he puts it in a complaint which Mr. Goldfarb was very

21    careful to say he provided and disclosed to the U.S. Attorney's

22    Office but does not claim that he was the original source of

23    that information.  And to the extent the original source issue

24    comes into play, I think it is abundantly clear on the record

25    that there is no basis to believe that Mr. Grabcheski was the

F7M9USAA

```
1    original source for the U.S. Attorney's Office for the Southern
2    District of New York.  He may have been for DFS.  He may have
3    been for the D.A.'s Office.  He may have been for the New York
4    A.G.'S Office, but he wasn't for the Southern District of
5    New York.
6           Your Honor just one last point on materiality.  The
7    issue with materiality here is something the court really
8    focused on and I think it is an important point.
9           AIG not only paid back all of the loan that was given
10   to it as part of the ALICO and AIA transactions.  In fact, as
11   part of the overall structure, AIG paid the government $20
12   billion or so more than the U.S. Government gave AIG.  So the
13   U.S. government actually made a substantial amount of money off
14   of the entire loan profile.
15          So, the idea that materiality is not relevant -- and
16   it's not just about damages, your Honor.  It's about the very
17   fundamental question of materiality.  There is no allegation in
18   this case at all, and Mr. Goldfarb couldn't come up with one
19   today, about why this alleged a hundred million dollars which I
20   think was pretty clear is based on nothing at all remotely
21   relevant to this case, to the federal government case.  How
22   that has any bearing on materiality, how that -- how you
23   establish it, how he would establish it, where that comes from,
24   other than these state law consent orders, is not described,
25   not explained, not addressed.  It's simply there.  And we're
```

F7M9USAA

1    supposed to then assume materiality, even though the facts, as

2    the court can take notice of, are that AIG paid everything back

3    and actually overall paid the government $20 billion more than

4    they were loaned.

5           So at the end of the day, materiality -- it's not even

6    about the legal issues of materiality.  It's about a

7    fundamental, again, Iqbal Twombly issue on materiality.  There

8    is no allegation.  There is no particularity.  There is no

9    specificity.  A number is made up out of thin air.  A hundred

10   million dollars is a basis to claim that that's how much this

11   alleged violation of state law cost the federal government even

12   though the reality is, as we all know, the federal government

13   made money off of AIG.

14          Your Honor, unless you have any further questions, I'm

15   going to stop there.

16          THE COURT:  No.  Thank you very much.

17          MR. GOLDFARB:  Your Honor, if I could just address a

18   few things.

19          First of all, I want to thank Mr. Burck for bringing

20   up the issue of communications with the U.S. Attorney's Office

21   because that was something I meant to bring up but was

22   distracted with the other issues and forgot to.  And that is

23   that he is not correct that -- he said that the idea of these

24   claims was, of the U.S. Attorney's Office, there was something

25   that Mr. Grabcheski did disclose to the U.S. Attorney, and the

F7M9USAA

1   idea of the claim that we brought was an idea from

2   Mr. Grabcheski's counsel.  So it was not a suggestion by the

3   U.S. Attorney's Office.  And that's something that we can go

4   into if we have an opportunity to file another amended

5   complaint.

6           With regard to the issue of credibility.

7   Mr. Grabcheski isn't the one who drafted the complaints.

8   Counsel did that.  We did it based on what we thought would be

9   a sufficient amount of information.  Obviously, you can debate

10  whether what we did was sufficient.  We think it was.  They've

11  argued it wasn't.  But that's certainly got nothing to do with

12  Mr. Grabcheski's credibility, even if credibility were

13  something that could be considered at this point.

14          Additionally, just with regard to the statute and the

15  language.  And they said life insurance policies are given to

16  individuals.  Well, the policies include also health insurance

17  policies.  And the contracting people.  It doesn't say

18  necessarily -- it says issuance or delivery of a policy or

19  contract of insurance.

20          A group health insurance policy, that's issued and

21  delivered to the employer.  The individual employees are

22  covered insureds.  But that language certainly is broad enough

23  to cover that.  So that doesn't really prove anything.

24          Other than that I think I've said what I've had to

25  say.  I think the Court should allow one more opportunity to

F7M9USAA

1    amend and give us that shot.  Thank you.

2              THE COURT:  Let me look and see if I think that that

3    is appropriate or necessary or futile.

4              Let me go back to the papers.  I want to get this

5    transcript because this is helpful to me, given the volume of

6    paper there, but I'm going to try to see if I can try to

7    resolve fairly quickly in the next 30 or 60 days.  Thank you

8    very much.

9              (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25